ACCEPTED
03-15-00447-CV
8312763
THIRD COURT OF APPEALS
AUSTIN, TEXAS
12/18/2015 5:34:50 PM
JEFFREY D. KYLE
CLERK

**NO. 03-15-00447-CV**

In the Court of Appeals
For the Third Judicial District of Texas
at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
12/18/2015 5:34:50 PM
JEFFREY D. KYLE
Clerk

**AUSTIN CAPITAL COLLISION, LLC,**
Appellant

**v.**

**BARBARA PAMPALONE,**
Appellee and Cross-Appellant

On Appeal from the 419th Judicial District Court, Travis County, Texas
Trial Court Cause No. D-1-GN-14-003207

**PAMPALONE'S BRIEF OF APPELLEE**

**ORAL ARGUMENT REQUESTED**

McGINNIS, LOCHRIDGE & KILGORE, L.L.P.
Nelia J. Robbi, State Bar No. 24052296
Joe Lea, State Bar No. 24013257
April E. Lucas, State Bar No. 24046323
Stephanie N. Duff-O'Bryan, State Bar No. 24087448
600 Congress Avenue, Suite 2100
Austin, Texas  78701
(512) 495-6000
(512) 495-6093 FAX
nrobbi@mcginnislaw.com

ATTORNEYS FOR BARBARA PAMPALONE

# IDENTITY OF PARTIES AND COUNSEL

Plaintiff/Appellee/Cross-Appellant: Barbara Pampalone

Defendant/Appellant: Austin Capital Collision, LLC

Defendant/Cross-Appellee Eric Hinojosa

Names and Addresses of Trial and Appellate Counsel

| | |
|---|---|
| Trial and Appellate Counsel for Plaintiff: | Nelia J. Robbi<br>nrobbi@mcginnislaw.com<br>Joe Lea<br>jlea@mcginnislaw.com<br>April E. Lucas<br>alucas@mcginnislaw.com<br>Stephanie N. Duff-O'Bryan<br>sduffobryan@mcginnislaw.com<br>600 Congress Avenue, Suite 2100<br>Austin, Texas 78701<br>(512) 495-6000<br>(512) 495-6093 FAX |
| Appellate Counsel for Defendants: | Michael Truesdale<br>mike@truesdalelaw.com<br>801 West Avenue, Suite 201<br>Austin, Texas 78701<br>(512) 482-8671<br>(866)-847-8719 FAX |

Trial Counsel for Defendants:　　　　　Adam Pugh
apugh@slaterpugh.com
8400 N. Mopac Expressway, Suite 100
Austin, Texas  78759
(512) 472-2431
(512) 472-0432 FAX

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................ ii

TABLE OF CONTENTS........................................................................... iv

INDEX OF AUTHORITIES...................................................................... vi

STATEMENT OF THE CASE.................................................................... vi

STATEMENT REGARDING ORAL ARGUMENT ........................................... viii

ISSUE PRESENTED............................................................................. ix

CITATION KEY.................................................................................. ix

STATEMENT OF FACTS .......................................................................1

    A.    The loan to Capital Collision. ........................................................2

    B.    Dr. Pampalone's complete performance. ..........................................2

    C.    Appellant's Partial Performance:  94 monthly payments over 8 years.........3

    D.    The litigation. ..........................................................................7

SUMMARY OF THE ARGUMENT .............................................................8

ARGUMENT .....................................................................................9

    A.    Standard of Review: Legal Sufficiency .............................................9

    B.    The trial court did not err in enforcing the loan agreement pursuant to the partial performance exception to the statute of frauds. .......................................12

        1.    The parties' stipulation and the trial court's finding established payments constituting partial performance. ...................................................12

        2.    Oral agreements are enforceable where partial performance is unequivocally referable to the agreement........................................13

        3.    The partial performance exception applies equally to Appellant Austin Capital Collision, LLC and to Capital Collision GP. ......................................17

4.  The evidence shows that the partial performance was unequivocally referable to the loan from Dr. Pampalone.............................................19

5.  There is no other credible reason for the payments. ................................22

6.  *Breezevale* does not save Appellant Austin Capital Collision's argument. 24

CONCLUSION ............................................................................................27

PRAYER ...................................................................................................27

CERTIFICATE OF SERVICE ............................................................................29

CERTIFICATE OF COMPLIANCE .......................................................................30

APPENDIX ..................................................................................................31

# INDEX OF AUTHORITIES

**Cases**

*626 Joint Venture v. Spinks*, 873 S.W.2d 73 (Tex.App.—Austin 1993, no writ) ........................................................................................................... 18, 19

*ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426 (Tex. 1997) .........................11

*Adams v. H & H Meat Products, Inc.*, 41 S.W.3d 762 (Tex. App.—Corpus Christi 2001, no pet.)................................................................. 10, 11

*Chevalier v. Lane's, Inc.*, 213 S.W.2d 530 (1948))................................................16

*Estate of Kaiser v. Gifford*, 692 S.W.2d 525 (Tex. App.—Houston [1st Dist.] 1985 writ ref'd n.r.e.).......................................................... 9, 14, 15, 23

*National Property Holdings, LP v. Westergren,* 453 S.W.3d 419 (Tex. 2015) ................................................................................................ 16, 17, 25, 26

*Quick v. City of Austin,* 7 S.W.3d 109 (Tex. 1998) ..........................................11

*Rodriguez v. Klein*, 960 S.W.2d 179 (Tex. App.—Corpus Christi 1997, no pet.).................................................................................................. 25, 26

*Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790 (Tex. App.—Dallas 2013, no pet.) ....................................................................... 10, 14, 16, 21

*Vehle v. Brenner*, 590 S.W.2d 147 (Tex. App.—San Antonio 1979, no writ).....12

*Waggoner v. Morrow,* 932 S.W.2d 627 (Tex.App.—Houston [14th Dist.] 1996, no writ) ......................................................................................... 11, 12

*Weirich v. Weirich*, 833 S.W.2d 942 (Tex. 1992) ...........................................11

**Rules**

TEX. R. APP. P. 38.1 .......................................................................................... ix

TEX. R. APP. P. 39.1............................................................................................ ix

TEX. R. APP. P. 39.2 .......................................................................................... ix

## STATEMENT OF THE CASE

Nature of the Case:       Appellee and Cross-Appellant, Barbara Pampalone ("Dr. Pampalone"), sued Appellant, Austin Capital Collision, LLC ("Appellant"), and Cross-Appellee, Eric Hinojosa ("Hinojosa") (collectively, "Defendants"), for breach of contract.

Parties:       Austin Capital Collision, LLC is Appellant/Defendant

      Dr. Barbara Pampalone is Cross-Appellant/Appellee/ Plaintiff

      Eric Hinojosa is Cross-Appellee/Defendant

Trial Court:       The Honorable Todd Wong, 419th Judicial District Court, Travis County, Texas.

Trial Court's Disposition:       After a bench trial on June 8, 2015, the trial court granted judgment in favor of Dr. Barbara Pampalone and against Appellant Austin Capital Collision, LLC, awarding her the amount the parties stipulated as due and owing on the loan as of the date of trial, $56,758.68, plus her reasonable and necessary attorneys' fees. Appellant Austin Capital Collision, LLC and Cross-Appellant Barbara Pampalone filed timely notices of appeal on July 29, 2015, and on July 7, 2015, the trial court issued its findings of fact and conclusions of law.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Texas Rules of Appellate Procedure 38.1, 39.1and 39.2, Dr. Pampalone requests oral argument before this Court of Appeals. Dr. Pampalone believes oral argument will assist the Court in determining whether the trial court erred by recognizing the applicable exception to the statute of frauds for partial performance in this matter.

## ISSUE PRESENTED

Whether, despite there being an acknowledged loan agreement, full performance by Dr. Pampalone, and more than 94 monthly payments made in accordance with the terms of the loan agreement over a period of eight years, the trial court erred in entering judgment in favor of Dr. Pampalone for the stipulated amount due pursuant to the partial performance exception to the statute of frauds.

## CITATION KEY

CR = Clerk's Record, Volume 1 of 1

2RR = Reporter's Record, Volume 2 of 3

Appx = Appendix attached hereto

Appx:2 = Findings of Fact and Conclusions of Law (attached hereto as second document in the Appendix, and also located at pp. 53-63 of the Clerk's Record)

PX = Plaintiff's Exhibit

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellant Austin Capital Collision, LLC premises its entire appeal on one argument: that the years of payments it made to Dr. Pampalone pursuant to the loan agreement at issue in this appeal do not satisfy the partial-performance exception to the statute of frauds because they are not "solely referable" to the loan agreement. This argument is baseless because the payments are unequivocally referable to the loan agreement, as the trial court found, and is supported by ample evidence, including the fact that Appellant identified the payments as "Barbara Pampalone Bill Payment." Additionally, the primary case upon which Appellant relies is distinguishable from the instant facts and does not support its argument. Accordingly, this Court should affirm the judgment below, awarding Dr. Pampalone $56,758.68 in damages and $43,241.00 in reasonable and necessary attorneys' fees. *See* CR 49-50.

## STATEMENT OF FACTS

Appellant's statement of facts is inadequate and misleading. Among other reasons, Appellant disregards or contradicts the facts found by the trial court, although Appellant has not challenged those fact findings on appeal. Dr. Pampalone incorporates by reference the statement of facts set forth in her Cross-Appellant's Brief and adds the following.

1

## A. The loan to Capital Collision.

In 2005, Dr. Pampalone, a widow and semi-retired dentist, mortgaged her home in order to loan the sum of $80,000 to the auto body repair business being operated by her son, Erik Pampalone, and his childhood friend, Eric Hinojosa. 2RR:52-53; Appx:2, ¶¶6, 7, 9. That business was known as and did business as Capital Collision. Appx:2, ¶7. At the time of the loan, Capital Collision was an assumed name being used by Capital Collision, GP, a general partnership comprised of two corporate partners; Hinojosa was the president and a 50% shareholder of both corporate partners, and Erik Pampalone was the vice-president and other 50% shareholder. 2RR:97-102, 171-72.

Pursuant to the terms of the agreement, Dr. Pampalone was to advance the sum of $80,000 to Capital Collision, and Capital Collision was to repay the loan over 20 years at 7% interest. Appx:2, ¶9; 2RR:59, 60, 106-07; Appx:2, ¶11.

## B. Dr. Pampalone's complete performance.

Dr. Pampalone fully performed under the terms of the agreement by paying the funds to Capital Collision in two installments: $50,000 on or about March 24, 2005, and the remaining $30,000 on or about April 13, 2005. 2RR:58-9, 107-10, 158-59; PX-1; PX-2; PX-3A; Appx:2, ¶14. The loaned funds were deposited into a Bank of America Account held in the names of "Capital Collision" and "Eric Hinojosa." 2RR:107-10; PX-1; PX-2; PX-3A; Appx:2, ¶15. Although there was

no signed promissory note for the loan, the terms of the loan were evidenced in yearly amortization schedules generated by Erik Pampalone on Dr. Pampalone's behalf and sent to Hinojosa and the business.  2RR:59-60, 62; Appx:2, ¶16.

**C.     Appellant's Partial Performance:   94 monthly payments over 8 years.**

In accordance with the terms of the agreement between Dr. Pampalone and Capital Collision, the company immediately began repaying the loan.  Appx:2, ¶18.  Beginning in May 2005, Capital Collision began performing under the agreement by making monthly payments to Dr. Pampalone in accordance with the agreed-upon terms.  2RR:64-65, 112; Appx:2, ¶18.  Erik Pampalone in his capacity as vice-president set up the loan payments and testified that the intent of the payments was to perform under the loan agreement.  2RR:112-13.

Two years later, in 2007, Erik Pampalone exited Capital Collision completely, and the company, now run exclusively by Eric Hinojosa, continued to repay the loan as agreed for another 6 years.  2RR:113; Appx:2, ¶¶22, 23, 27, 31.  Dr. Pampalone had no reason to ever suspect anything was amiss until, in April 2013, the monthly payments ceased.  Appx:2, ¶¶30, 37; Appx:8.

The parties stipulated that between May 2005 and April 2013, Dr. Pampalone received 94 monthly payments from two different Bank of America accounts as summarized in Plaintiff's Exhibit 3.  CR:41-47; Appx:2, ¶19; Appx:8; PX-3, PX-3A.   From May 2005 through approximately March 2010, these

payments were made from the Bank of America Account held in the names of "Eric Hinojosa" and "Capital Collision" (hereinafter, the "Capital Collision Account"). PX-3; PX-3A; Appx:2, ¶32; Appx:8. Thereafter—and without missing a payment during the transition—payments were made from a Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision GP" (hereinafter, the "Capital Collision GP Account"). PX-3; PX-3A; Appx:2, ¶32. However, because the payments were being electronically deposited into Dr. Pampalone's account, she never noticed any change in the bank account making the payments to her. 2RR:66, 79; Appx:2, ¶32.

Unbeknownst to Dr. Pampalone, one of the Capital Collision entities, Capital Collision, GP, was terminated by Eric Hinojosa in 2010 in an effort to "close old debt." PX-20; PX-24; Appx:2, ¶¶30, 24, 26, 29; 2RR:175-76. Despite this, Eric Hinojosa kept the old company's bank accounts open to continue to repay the loan to Dr. Pampalone until the statutory wind up period expired. 2RR:194-203, 248-49, 17; Appx:2, ¶¶29, 31, 33.

In June 2009, one year before termination Capital Collision, GP, Hinojosa formed a new company, one of the named defendants in the trial court: Appellant Austin Capital Collision, LLC. 2RR:173-74; PX-20; Appx:2, ¶24. The new company, like the old company, was also "basically just [Eric Hinojosa]." 2RR:174; Appx:2, ¶27. Appellant Austin Capital Collision, LLC, became the

4

owner of the Capital Collision business and, like the first business had done, filed an assumed name certificate for "Capital Collision." Appx:2, ¶24, PX-21, PX-22. The trial court found that "[f]ollowing its formation, Defendant Austin Capital Collision, LLC, assumed the loan to Plaintiff," and Appellant Austin Capital Collision has not appealed the finding. Appx:2, ¶25.

There was no asset purchase agreement between Hinojosa's old company and his new company. 2RR:176. But his new company engaged in the same business as his old company and continued to use the same exact assumed name (2RR:174-75; PX-14), business email address (cptlcollision@aol.com) (2RR:217-18, 222-23; PX-5; PX-14), and email signature block (with the same name and physical address) (2RR:224; PX-14) as the old business. Appx:2, ¶29. Additionally, Appellant Austin Capital Collision, LLC, retained some of the same employees (2RR:219, 124-25, 223-24; Appx:2, ¶29), and took control of both the Capital Collision Account and the Capital Collision GP Account (Appx:2, ¶29). After Appellant Austin Capital Collision, LLC, was formed, the old company was left with nothing. 2RR:176:7-13. Thereafter, in July 2010, Hinojosa terminated the old company. 2RR:173; Appx:2, ¶26; PX-24.

Hinojosa did not tell Dr. Pampalone any of this, nor provide her with any notice that "Capital Collision" was now being operated as a brand new entity. 2RR:79, 127, 247. Instead, Hinojosa simply continued to do business and repay

5

Dr. Pampalone as Capital Collision, the only name by which Dr. Pampalone ever knew the business. 2RR:55; Appx:2,¶31.

Hinojosa, in his capacity as the managing member of Appellant Austin Capital Collision, LLC, continued to direct that payments be made to Dr. Pampalone on the loan. 2RR:240-41; Appx:2, ¶31. Employees and representatives of Appellant Austin Capital Collision, LLC, communicated with Dr. Pampalone and Erik Pampalone on Appellant Austin Capital Collision, LLC's behalf, acknowledging the existence of the loan and Appellant Austin Capital Collision, LLC's indebtedness thereunder. Appx:2, ¶¶34-36. Erik Pampalone, acting on his mother's behalf, sent correspondence concerning the loan to the cptlcollision@aol.com email address and, in response, Appellant Austin Capital Collision, LLC continued to make payments on the loan. 2RR:127; Appx:2, ¶34; PX-12a, PX-13, PX-14. Indeed, in September 2012 (years after the old company had been terminated), when Mr. Pampalone sent an email to the cptlcollision@aol.com address requesting that Hinojosa change where he was sending the monthly loan payments, Mirium Matta—Hinojosa's sister-in-law and an employee of Appellant Austin Capital Collision, LLC—responded from the cptlcollision@aol.com email address with "received and updated." 2RR:123-24; PX-14; Appx:2, ¶35. Thereafter, three additional years of regular monthly payments in accordance with the loan agreement occurred. PX-3; PX-3A.

In March 2010, just a few months before terminating Capital Collision, GP, Hinojosa switched the monthly payments on the loan from the Capital Collision account to the Capital Collision GP Account. 2RR:196-98; PX-3; PX-3A; Appx:9. Around this same time, he began transferring funds from the Capital Collision Account (of the new entity, Appellant) into the Capital Collision GP Account (the account of the old entity) to cover the payments coming out of that account. 2RR:193-98; PX-3A; Appx:2, ¶32; Appx:9. Of significant note, the monthly payments made from both accounts were almost exclusively described on the company's own bank statements as "Barbara Pampalone Bill Payment." PX-3A; Appx:8.

## D.    The litigation.

When the payments ceased, Dr. Pampalone made demand for payment, but Hinojosa failed and refused to cure the default. Appx:2, ¶39. The lawsuit in the trial court ensued in which Dr. Pampalone sued both Appellant Austin Capital Collision, LLC, and Hinojosa for breach of contract. CR:28-40. The case was tried to the bench on June 8, 2015. The parties stipulated at the trial that the amount due and owing on the loan as of the date of trial was $56,758.68. CR:41-47; 2RR: 128-29; Appx:2, ¶41.

7

The trial court found in favor of Dr. Pampalone, rendered judgment against Appellant Austin Capital Collision, LLC, for breach of the loan agreement, and awarded Dr. Pampalone her attorneys' fees. 2RR:252-53; Appx:1.

## SUMMARY OF THE ARGUMENT

Appellant's only argument raised and briefed on appeal is that the 94 monthly payments made did not constitute partial performance because they were not "solely referable" to the loan, and that therefore the judgment and attorneys' fees should be reversed. Defendant relies on one case, *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied), to support this argument. *Breezevale*, however, does not stand for the propositions Appellant advances and is distinguishable from the instant case.

Dr. Pampalone is entitled to be repaid on the loan. The oral agreement is enforceable despite the statute of frauds. Dr. Pampalone fully performed by funding the loan; Capital Collision GP, d/b/a Capital Collision, and later Austin Capital Collision, LLC, d/b/a Capital Collision, accepted and used her money and partially performed by making eight years of monthly payments that were unequivocally referable to the loan, as shown by ample evidence below, including notations on the payments themselves explicitly reading, "Barbara Pampalone Bill Payment." PX-3A. Such full performance by the lender removes the oral agreement from the statute of frauds. *See, e.g., Estate of Kaiser v. Gifford*, 692

8

S.W.2d 525, 525-26 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding that oral agreement "was not barred by the Statute of Frauds, because the deceased lender had made full performance under the agreement, thereby taking the oral agreement out of the prohibition of the statute," and "where one party fully performs a contract, the Statute of Frauds is unavailable to the other who knowingly accepts benefits and partly performs").  Thus, the trial court did not err in awarding the stipulated amount of damages to Dr. Pampalone, plus her reasonable and necessary attorneys' fees.

## ARGUMENT

### A.    Standard of Review: Legal Sufficiency

Appellant Austin Capital Collision's assertion that *de novo* review is appropriate is mistaken.

The one point Appellant Austin Capital Collision, LLC raised on appeal is whether the partial performance exception to the statute of frauds applies.  Whether the circumstances of a particular case fall within an exception to the statute of frauds is generally a question of fact, *not* a legal issue that would be reviewed *de novo*.  *See, e.g.*, *Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 798

(Tex. App.—Dallas 2013, no pet.); *Adams v. H & H Meat Products, Inc.*, 41 S.W.3d 762, 775 (Tex. App.—Corpus Christi 2001, no pet.).[1]

As Appellant Austin Capital Collision acknowledges on page 13 of its brief discussing the standard of review, it is challenging the ***legal sufficiency*** of the court's factual finding that the partial performance exception applies.

Where, as here, a party claims an exception to the statute of frauds exists, she must secure findings to that effect; Dr. Pampalone did so. *Adams*, 41 S.W.3d at 775; *see* Appx:2, ¶¶17-20, 25, 31-32, 34-36. In response to Appellant Austin Capital Collision's challenge to those findings, the court will "review the court's findings of fact by the same standards used to review the sufficiency of the evidence to support a jury's findings." *Adams*, 41 S.W.3d at 769. "The judgment of the trial court will not be set aside if there is any evidence of a probative nature to support it, and this Court may not substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. *Id.* at 769.

When courts "review a 'no evidence' or legal sufficiency of the evidence issue, [they] must consider all of the record evidence in the light most favorable to

---

[1] *BACM 2001-San Felipe Road ltd. Partnership v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 143-45 (Tex. App.—Houston [14th Dist.] 2007, pet. denied), is inapposite, because it concerns whether the statute of frauds applies at all—which is concededly a legal issue—not whether the circumstances of this case fall within an exception to the statute of frauds, which is generally a fact issue. *See, e.g., Adams*, 41 S.W.3d at 775.

the party in whose favor the verdict has been rendered, and indulge in that party's favor every reasonable inference deducible from the evidence." *Adams*, 41 S.W.3d at 769. They "consider only the evidence and inferences tending to support the jury's finding, disregarding all evidence to the contrary." *Breezevale Ltd*., 82 S.W.3d at 439 (citing *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992)).

"The findings of fact must be upheld if there is more than a scintilla of evidence in support thereof." *Adams*, 41 S.W.3d at 770. "There is more than a scintilla when the evidence creates more than a mere surmise or suspicion of its existence." *Id*. That is, "[i]f the record contains any evidence of probative force to support the jury's finding, the finding will be upheld." *Breezevale*, 82 S.W.3d at 438 (citing *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).

Moreover, Appellant Austin Capital Collision, LLC's discussion of the *de novo* standard of review, even if it were applicable, is incomplete. When performing a *de novo* review, the Court exercises its own judgment and redetermines the legal issue. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998). The Court will uphold conclusions of law on appeal if the judgment can be sustained on any legal theory the evidence supports. *Waggoner v. Morrow*, 932 S.W.2d 627, 631 (Tex. App.—Houston [14th Dist.] 1996, no writ). Even incorrect

11

conclusions of law do not require reversal where, as here, the controlling findings of fact support the judgment under a correct legal theory.[2] *Id.*

Finally, in the unlikely event that Capital Collision should convince the court that Dr. Pampalone failed to carry her burden to prove the applicability of the exception, because there is ample evidence to raise a fact issue in her favor, the appropriate remedy would be to reverse and remand, not, as Capital Collision requests, to reverse and render judgment. *See Vehle v. Brenner*, 590 S.W.2d 147, 152 (Tex. App.—San Antonio 1979, no writ).

**B.    The trial court did not err in enforcing the loan agreement pursuant to the partial performance exception to the statute of frauds.**

**1.    The parties' stipulation and the trial court's finding established payments constituting partial performance.**

As discussed above, the parties stipulated that 94 monthly payments were received on the loan.  Appx:2, ¶19.  The trial court therefore held that the statute of frauds does not bar Dr. Pampalone's recovery, because Dr. Pampalone fully performed under the agreement, and Appellant Austin Capital Collision, LLC, d/b/a Capital Collision partially performed.  It held:  "Capital Collision performed on the agreement prior to the termination of the HAPB Entities by making monthly

---

[2] Appellant Austin Capital Collision, LLC also cites *Troxel v. Bishop*, 201 S.W.3d 290, 300 (Tex. App.—Dallas 2006, no pet.) for the unremarkable proposition that if the statute of frauds applies, and no exception is available, then the loan is unenforceable.  The language in question is inapposite and arguably dicta.

payments on the loan as agreed. . . . Austin Capital Collision, LLC, d/b/a Capital Collision assumed the loan from the HABP Entities through its conduct and course of performance, including by continuing to make payments on the loan in accordance with the terms of the agreement.[3] . . . Austin Capital Collision, LLC, d/b/a Capital Collision partially performed on the agreement by continuing to make payments on the loan to Plaintiff in accordance with the terms of the agreement." Appx:2, ¶ 53-55.

Appellant's only argument on appeal is that the 94 monthly payments by Capital Collision GP, d/b/a Capital Collision and later by Appellant Austin Capital Collision, LLC d/b/a Capital Collision were not "solely referable" to the loan and thus did not qualify as partial performance that would permit Dr. Pampalone to obtain repayment despite the statute of frauds.

### 2. Oral agreements are enforceable where partial performance is unequivocally referable to the agreement.

It is well established that an oral agreement is enforceable despite the statute of frauds if the agreement has been fully or partially performed, because in such a

---

[3] Although Appellant Austin Capital Collision implies in its brief that Dr. Pampalone must make a separate and distinct showing of partial performance of Appellant Capital Collision, LLC, d/b/a Capital Collision, apparently on the theory that Appellant Austin Capital Collision, LLC, d/b/a Capital Collision did not assume the loan, it does not raise an appellate point nor provide briefing attacking the trial court's finding that it did indeed assume the loan. Accordingly, that factual finding is not challenged.. Moreover, there is ample evidence to support the finding, and in any event the second entity, Appellant Capital Collision LLC d/b/a/ Capital Collision did indeed partially perform the agreement, by continuing to make years worth of payments unequivocally referable to the loan in question.

13

case, "denying enforcement would itself amount to a fraud." *See, e.g., Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 800 (Tex. App.—Dallas 2013, no pet.); *Breezevale*, 82 S.W.3d at 439 ("[C]ontracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would result in a virtual fraud."); *Estate of Kaiser v. Gifford*, 692 S.W.2d 525, 525 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

For example, in a loan context, the statute of frauds does not prevent enforcement of an oral loan agreement where the party loaning the money makes full performance under the agreement. *Estate of Kaiser v. Gifford*, 692 S.W.2d 525, 525 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). In *Kaiser*, as here, there was an oral agreement creating a loan, with no executed written agreement providing for repayment. *Id*. at 526. After the death of the lender, the borrower quit making monthly payments, claiming that the money advance was a gift, not a loan; he defended against the ensuing lawsuit by arguing the statute of frauds. *Id*. The court held "that the oral installment agreement, although payable in 300 monthly installments, was not barred by the Statute of Frauds, because the deceased lender had made full performance under the agreement, thereby taking the oral agreement out of the prohibition of the statute." *Id*. at 525. *Kaiser* followed other authorities holding that "where one party fully performs a contract,

14

the Statute of Frauds is unavailable to the other who knowingly accepts benefits and partly performs" and "where one party to an oral contract has, in reliance thereon, so far performed his part of the agreement that it would be permitting a fraud on him to allow the other party to repudiate the contract and set up the statute of frauds in justification thereof, equity will regard the case as being removed from the operation of the statute, and will enforce the contract." *Id.* at 526 (internal quotation omitted). It noted that "a great majority of jurisdictions agree with the rule that full performance by one party to an oral contract removes the contract from the prohibitions of the Statute."[4] *Id.* at 527.

As in this case, where the creditor has provided full performance in funding a loan in reliance on an oral agreement, with monthly payments of fixed amounts as partial performance by the debtor, "allowing [the debtor] to invoke the Statute, under these facts, would tend more to encourage fraud rather than discourage it as is contemplated by the Statute." *Id.* at 527. This is even more a concern in this case, in which the debtor and its principal engaged in *actual fraud* to attempt to escape its obligations. *See Brief of Cross-Appellant Barbara Pampalone*.

---

[4] The language of *Kaiser* strongly suggests that in the context of a loan, Dr. Pampalone's full performance, alone, is enough to exempt her from the statute of frauds. However, in *Kaiser*, as here, there was also partial performance by the debtor in the form of monthly payments in accordance with the oral agreement. *Kaiser*, 692 S.W.2d at 527. Because this case involves ample partial performance by Appellant Austin Capital Collision, LLP, with clear notations as well as other acts directly referencing the loan by Dr. Barbara Pampalone, this Court need not decide whether Dr. Pampalone's performance, alone, would have been sufficient to allow performance despite the statute of frauds.

15

Partial performance sufficient to remove a contract from the statute of frauds bar must be "unequivocally referable" to the oral agreement and corroborate the existence of that agreement. *Stovall*, 409 S.W.3d. at 800 (citing *Breezevale*, 82 S.W.3d at 439). "In other words, the purpose of the alleged acts of performance must be to fulfill a specific agreement." *National Property Holdings, LP v. Westergren,* 453 S.W.3d 419, 426 (Tex. 2015). They must be acts that could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff. *Breezevale*, 82 S.W.3d at 439-40.

"The kind of performance that justifies the exception to the statute of frauds is 'performance which alone and *without the aid of words of promise* is unintelligible or at least extraordinary unless as an incident of ownership, assured, if not existing.'" *Westergren,* 453 S.W.3d at 427 (citing *Chevalier v. Lane's, Inc.*, 213 S.W.2d 530, 533 (1948)) (emphasis added). *Westergren* concerned the sale of real estate, not a loan; however, its explanation of the rule is instructive here, where monthly payments made over years beginning immediately after the loan funded to the person who made the loan would, in the absence of a loan agreement, be unintelligible, or at least extraordinary. *Westergren* also instructs that, "[i]f the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill

16

obligations under the oral contract, the exception is unavailable." *Id*. at 426-27. It gives an enlightening example of evidence establishing that the party performing the act alleged to be partial performance did so for some other reason: a contradictory written contract for which the alleged partial performance was consideration. *Id*. at 427. In *Westergren*, the alleged partial performance was payment of $500,000; however, the payment accompanied a written document, signed by the recipient, that stated that the $500,000 was in consideration for the full and final release of the very claim based on an oral agreement being asserted despite the statute of frauds. *Id.* Accordingly, the payment was not partial performance and was not unequivocally referable to the oral agreement, because it was made to fulfill obligations under a different agreement. There is no such other agreement obligating Capital Collision to make payments of $657.09 to Dr. Barbara Pampalone here. The payments made were unequivocally referable to the $80,000 loan.

> **3. The partial performance exception applies equally to Appellant Austin Capital Collision, LLC and to Capital Collision GP.**

Appellant Austin Capital Collision, LLC's hair-splitting about the identity or name of the business or the contacts Dr. Pampalone had with one agent as opposed to another are irrelevant to the application of the doctrine of partial performance. Regardless of the name under which they operated or the date of their inception,

both Capital Collision GP and Appellant Austin Capital Collision, LLC accepted benefits by using the account into which Dr. Pampalone's money was deposited, and both partially performed by making payments unequivocally referable to the loan. *See 626 Joint Venture v. Spinks*, 873 S.W.2d 73, 76 (Tex.App.—Austin 1993, no writ) ("Where one party to a contract has fully performed his obligations under it, the statute of frauds is unavailable to the other who knowingly accepts benefits and partly performs."). In *Spinks*, an owner transferred real property to a person in his name as trustee, though there was no written indication for whom he was acting. *Id*. at 76. He partially paid and executed a note and deed of trust. *Id*. at 74. After the transaction, a new entity, which did not exist at the time of closing, was formed, creating the "626 Joint Venture." *Id*. at 75. Because the joint venture actively managed the property, made improvements, and made payments, it accepted the benefits and partially performed under the agreements, even though it didn't even exist at the time of closing. Nor did the fact that the negotiations and agreement occurred through an agent excuse the principal from liability under the statute of frauds. Instead, this Court affirmed a judgment based on a jury finding that the joint venture was liable notwithstanding the statute of frauds, holding: "In the present case, the Spinkses [the Plaintiffs] fully performed their part of the transaction by deeding the land to Bizzell as trustee [the Defendants' agent]. Bizzell paid the Spinkses $300,000 cash, and signed a note for $445,000. Over the

18

next three years, the joint venture managed the property, made improvements to the property, and made payments to the Spinkses. Therefore, the defense of the statute of frauds is unavailable to defendants." *Id*. at 76.

### 4. The evidence shows that the partial performance was unequivocally referable to the loan from Dr. Pampalone.

The evidence, moreover, overwhelmingly establishes that the payments were indeed unequivocally referable to the loan Dr. Pampalone generously made and which Appellant seeks to cheat her out of. Each of the following facts shows that the performance was unequivocally referable to the loan from Dr. Pampalone:

The loaned funds were deposited into Capital Collision's bank account, a Bank of America Account held in the names of "Capital Collision" and "Eric Hinojosa." 2RR:107-10; PX-1; PX-2; PX-3A; Appx:2, ¶15. Erik Pampalone, the person who began the payments on the company's behalf, testified that their purpose was to perform under the agreement. 2RR:113-14. The terms of the loan were evidenced in yearly amortization schedules generated by Erik Pampalone on Dr. Pampalone's behalf and sent to Hinojosa and the business, and the payments reflected those amortization schedules. 2RR:59-60, 62; Appx:2, ¶16; 2RR:65 (payments made in amount of $657.09); PX-5, PX-7, PX-9, PX-12, PX-12A, PX-13, PX-15, PX-16, and PX-17 (amortization schedules reflecting payments owed in the amount of $657.09). The payments began immediately in May 2005. 2RR:64-65, 112; Appx:2, ¶18. From May 2005 through approximately March 2010, these

payments were made from the Bank of America Account held in the names of "Eric Hinojosa" and "Capital Collision" into which the funds had been deposited. PX-3; PX-3A; Appx:2, ¶32; Appx:8. The payments were made in accordance with telephone and electronic communications referencing the obligation, both with Hinojosa, and other Capital Collision employees, concerning the loan. 2RR:115; PX-3; PX-3A; PX-5; PX-6; PX-8; PX-9; PX-10; PX-14; PX-15; Appx:2, ¶22. There was never any other explanation for or reason behind this long course of performance other than the loan in question.

When Erik Pampalone resigned from Capital Collision and the entities became essentially just Hinojosa, 2RR:173, they continued to repay the loan to Dr. Pampalone as agreed and exactly as they had been doing. 2RR:67, 113; PX-3; PX-3A; Appx:2, ¶23.

After June, 2009, when Appellant Austin Capital Collision was formed, it was also "basically just [Hinojosa]," and it continued to make payments with no feasible explanation other than the loan at issue. Erik Pampalone, acting on his mother's behalf, sent correspondence concerning the loan to the cptlcollision@aol.com email address and, in response, Appellant Austin Capital Collision, LLC, made payments on the loan. 2RR:127; Appx:2, ¶34; PX-12a, PX-13, PX-14.

Indeed, in September 2012 (years after the old company had been terminated), when Erik Pampalone sent an email to the cptlcollision@aol.com address requesting that Hinojosa change where he was sending the monthly payments on the loan, Mirium Matta—Hinojosa's sister-in-law and an employee of Appellant Austin Capital Collision, LLC—responded from the cptlcollision@aol.com email address with "received and updated." 2RR:123-24; PX-14; Appx:2, ¶35. And the payments continued. PX-3; PX-3A. Such behavior has been found by courts to constitute "acts . . . sufficient to corroborate the existence of an agreement . . . [and that] could not have been performed with any purpose except to perform an agreement." *See, e.g., Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790, 801 (Tex. App.—Dallas 2013, no pet.) (looking to acts of performance, in a statute of frauds dispute concerning a lease, such as dates of possession, payments, knowing acceptance of services and performance, etc. to determine whether performance was "unequivocally referable" to alleged agreement).

Payments were made by Capital Collision and Appellant Austin Capital Collision, LLC out of two accounts, although Dr. Pampalone, a direct deposit recipient, did not realize it at the time. ***Notably, these payments, from either account, were almost exclusively described on the bank statements as "Barbara Pampalone Bill Payment."*** PX-3A. It would be difficult to imagine a more

21

explicit indication that a payment was unequivocally referable to a loan made by Dr. Barbara Pampalone, which required monthly payments of loan bills, than these repeated bank account notations saying so in plain English.

## 5. There is no other credible reason for the payments.

Appellant's suggestions that there could be other reasons for its 94 equal, monthly payments over the course of eight years that referenced the loan and complied with its terms are incredible. They consist of: (1) Hinojosa's testimony that monthly payments were made to Dr. Pampalone for basically no reason, but merely "to help his childhood friend," and (2) the fact that Erik Pampalone, Dr. Pampalone's son, who is not a party to this suit, brought and then nonsuited a claim in another state seeking payment on his mother's behalf.

As an initial matter, the trial court specifically found (and, again, Appellant did not challenge the finding) that Hinojosa lacked credibility, especially in light of the fact that he was wholly unprepared for his corporate representative deposition, having not reviewed a single document or talked to any employees or representatives regarding designated topics, and that he demonstrated a repeated inability to provide substantive responses on his own behalf or on behalf of Austin Capital Collision, LLC. 2RR:252; Appx:2, ¶48. Further, the trial court found that, at trial, Hinojosa tried to change many of the answers he had provided at his depositions just one month prior. Appx:2, ¶48. Indeed, Hinojosa was squarely

22

impeached at trial when he tried to testify that he knew why the monthly payments were being made to Dr. Pampalone despite the fact that at his deposition he testified he had "no idea." 2RR: 184-86. The fact that Appellant now offers this same testimony—which the trial court found to lack credibility—to this Court as a so-called credible other reason for the payments to Dr. Pampalone is incredible in and of itself. Quite simply, given his lack of credibility, Hinojosa can offer no credible other reason.

Of Hinojosa's two other explanations for the monthly payments, the first is an argument that Hinojosa directed Capital Collision to make 94 payments over eight years simply because *he felt like it*. Such an assertion is meaningless—in every case the alleged partial performer could argue he took certain acts for no reason at all. This is not sufficient to defeat the exception; an interested party's say-so does not defeat a showing that certain acts were made because of and in partial performance of an oral contract. *See, e.g.*, *Kaiser*, 692 S.W.2d at 526 (holding statute of frauds did not bar enforcement of oral loan agreement despite debtor's bald claim that money advanced pursuant to oral loan agreement was instead a gift). Moreover, it flies in the face of all the evidence to the contrary discussed above, including but not limited to the dates and schedules of the payments, the testimony of the person who set up the payments for the company as to why he did it, the many communications about the reasons for the payments,

where and how they should be directed, and the notations on the payments themselves.

The second is a classic—but factually unsupportable—"gotcha" argument, an attempt to use Dr. Pampalone's son's very efforts to recover for her, merely because they were legally imperfect because not brought by the proper party in the proper forum, to instead extinguish all Dr. Pampalone's rights and entitle Capital Collision to a windfall by keeping her money. Of course, it makes no logical sense that an after-the-fact lawsuit could establish that years of payments contemporaneously marked "Barbara Pampalone Bill Payment," were instead made for some other purpose.[5] Naturally, Appellant Austin Capital Collision can cite to no authority supporting this position; it is not the law.

### 6. *Breezevale* does not save Appellant Austin Capital Collision's argument.

Appellant Austin Capital Collision relies on one case, *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 439 (Tex. App.—Dallas 2002, pet. denied), to support its argument. *Breezevale* does not stand for the propositions Defendant advances and is distinguishable, among other reasons because it was based on the existence of an independent obligation under a separate contract that equally obligated the party to undertake the same purported partial performance. But, as

---

[5] Nor has Capital Collision ever taken the position that it owed the money to Dr. Pampalone's son, Erik.

24

the court pointed out, a party taking acts it is otherwise obligated to do does not evidence an oral agreement.

In *Breezevale*, the court found no evidence that the alleged partial performance, a trip to Nigeria by a liaison, was unequivocally referable to a working interest agreement that was being negotiated. *Id*. at 440. The trip was not unequivocally referable to the working interest agreement because it did not show strong evidence establishing the existence of that agreement and its terms. *Id*. On the contrary, the trip was taken consistent with other liaison services being performed in the same time period for the same client under a separate services agreement. *Id.* The services were not more likely to have been taken under the purported oral working interest agreement than under the separate services agreement. *Id*. This is why the court noted that the mere possibility that such acts could have been taken in furtherance of the contract sought to be enforced was not enough; the performance must be solely referable to that contract. *Id*.

The *Breezevale* situation was thus similar to that in *Westergren*, where there was a separate contract under which the party was already obligated to take the acts alleged to be partial performance, and thus those acts were not "strong evidence establishing the existence of the [oral] agreement and its terms." *Id.* at 440 (also citing *Rodriguez v. Klein*, 960 S.W.2d 179, 186 (Tex. App.—Corpus Christi 1997, no pet.) (holding that because party's performance was required

25

under one or more of three agreements, including bill of sale, it could not be unequivocally referable to the bill of sale)).

In this case, in sharp contrast to *Breezevale, Westergren,* and *Rodriguez*, there simply is no other contract obligating Capital Collision to make monthly payments to Dr. Pampalone. The regular payments, including those labeled "Barbara Pampalone Bill Payment" are strong evidence establishing the existence of the loan and its terms. They are unequivocally referable to the loan agreement, and they remove it from the statute of frauds.

Additionally, the language in *Breezevale* requiring evidence that the performance be solely referable to the contract is dicta, because the court also based its holding on the fact that the claimant suffered no substantial detriment for which there is no adequate remedy. It said, "even assuming there was evidence that Breezevale's actions were unequivocally referable to the working interest agreement, the doctrine of partial performance also requires that the party acting in reliance on the agreement suffer a substantial detriment for which there is no adequate remedy. . . . Because there is no evidence that Breezevale's partial performance was unequivocally referable to the working interest agreement, ***and because Breezevale did not suffer a substantial detriment for which it had no adequate remedy***, there is no evidence to support the jury's finding on partial performance." *Id*. at 441.

## CONCLUSION

Appellant Austin Capital Collision, LLC hopes—by obfuscating details of the loan itself, bickering over to whom payments were due, or attempting to evade payment by sharp business practices aimed to confuse its own identity—to evade its debt completely, a debt both it and its predecessor acknowledged and paid for nearly a decade. It urges this position because Dr. Pampalone failed to demand a clearer, detailed, signed and written loan agreement before providing her own personal funds as a creditor to the fledgling business. Appellant Austin Capital Collision, LLC appeals to this Court to keep Dr. Pampalone's money as a windfall, despite the obvious writings and performance evidencing its obligation to repay.

Its argument about partial performance is factually wrong. It is contrary to the law of the State of Texas on the statute of frauds and the longstanding partial-performance exception thereto. And it is no way to treat a so-called friend since childhood's mother.

## PRAYER

For the above reasons, Appellee Dr. Barbara Pampalone respectfully requests that this Court affirm the judgment awarding her actual damages in the amount of $56,758.68 plus reasonable and necessary attorneys' fees and such other and further relief to which she may be entitled in law or in equity.

Respectfully submitted,

MCGINNIS, LOCHRIDGE & KILGORE, L.L.P.
Nelia J. Robbi
State Bar No. 24052296
Joe Lea
State Bar No. 24013257
Stephanie N. Duff-O'Bryan
State Bar No. 24087448
600 Congress Avenue, Suite 2100
Austin, Texas  78701
(512) 495-6000
(512) 495-6093 FAX
nrobbi@mcginnislaw.com


 /s/ Nelia J. Robbi
Nelia J. Robbi
State Bar No. 24052296

ATTORNEYS FOR BARBARA PAMPALONE

# CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of December, 2015, I electronically filed the foregoing Pampalone's Brief of Appellee with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michael Truesdale
mike@truesdalelaw.com
801 West Avenue, Suite 201
Austin, Texas 78701
(512) 482-8671
(866)-847-8719 FAX

Adam Pugh
apugh@slaterpugh.com
8400 N. Mopac Expressway, Suite 100
Austin, Texas 78759
(512) 472-2431
(512) 472-0432 FAX

*Attorneys for Eric Hinojosa*

/s/ Nelia J. Robbi
Nelia J. Robbi
Joe Lea
Stephanie N. Duff-O'Bryan

*Attorneys for Barbara Pampalone*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing Amended Cross-Appellant's Brief was prepared with Microsoft Word 2007, and that, according to that program's word-count function, the sections covered by TEX. R. APP. P. 9.4(i)(1) contains 6,391 words. I further certify that this brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e).

/s/ Nelia J. Robbi
Nelia J. Robbi
Joe Lea
Stephanie N. Duff O-Bryan

***Attorneys for Barbara Pampalone***

# APPENDIX

1. Final Judgment

2. Findings of Fact and Conclusions of Law

3. TEX. BUS ORG. CODE § 11.052

4. TEX. BUS. ORG. CODE § 11.356

5. TEX. BUS. ORG. CODE § 21.223

6. TEX. BUS. & COMM. CODE § 24.006

7. TEX. R. APP. P. 43.3

8. Plaintiff's Exhibit 3 (summary of payments)

9. Excerpts of Plaintiff's Exhibit 3A (transfers)

10. Excerpts of Plaintiff's Exhibit 3A (end of payments)

11. Stipulation of the Parties

12. *626 Joint Venture v. Spinks*, 873 S.W.2d 73 (Tex.App.—Austin 1993, no writ)

13. *Estate of Kaiser v. Gifford*, 692 S.W.2d 525 (Tex. App.—Houston [1st Dist.] 1985 writ ref'd n.r.e.)

14. *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429 (Tex. App.—Dallas 2002, pet. denied)

15. *National Property Holdings, LP v. Westergren,* 453 S.W.3d 419 (Tex. 2015)

16. *Stovall & Assocs. v. Hibbs Fin. Ctr., Ltd.*, 409 S.W.3d 790 (Tex. App.—Dallas 2013, no pet.)

# APPENDIX

1

Filed in The District Court
of Travis County, Texas

**JUN 1 8 2015**

At_____ 2:46 ___PM.

Velva L. Price, District Clerk

NO. D-1-GN-14-003207

| | | |
|---|---|---|
| BARBARA PAMPALONE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ERIC HINOJOSA AND AUSTIN | § | |
| CAPITAL COLLISION, LLC, | § | |
| | § | |
| *Defendants.* | § | 419TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On June 8, 2015, this case was called for trial. Plaintiff Barbara Pampalone appeared in person and announced ready for trial. Defendant Eric Hinojosa appeared in person and announced ready for trial. Defendant Austin Capital Collision, LLC, appeared through its representative, Eric Hinojosa, and announced ready for trial.

All matters in controversy, legal and factual, were submitted to the Court for its determination. The Court heard the evidence and arguments of counsel and announced its decision for Plaintiff Barbara Pampalone.

The Court orally RENDERED judgment for Plaintiff Barbara Pampalone and against Defendant Austin Capital Collision, LLC, on June 8, 2015, and this written judgment memorializes that rendition.

IT IS THEREFORE ORDERED that Plaintiff recover the following from Defendant Austin Capital Collision, LLC:

1.    Actual damages in the amount of $56,758.68;

2.    Plus reasonable and necessary attorneys' fees in the amount of $43,241.32; plus

3.    Post-judgment interest at the rate of 5.0%, compounded annually from the date this judgment is entered until all amounts are paid in full.



004080302



50

It is further ORDERED that Defendants take nothing.

It is further ORDERED that if Defendant Austin Capital Collision, LLC, unsuccessfully appeals this judgment to an intermediate court of appeals, Plaintiff Barbara Pampalone will additionally recover from Defendant Austin Capital Collision, LLC, the amount of $20,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiff in defending the appeal.

It is further ORDERED that if Defendant Austin Capital Collision, LLC, unsuccessfully appeals this judgment to the Texas Supreme Court, Plaintiff Barbara Pampalone will additionally recover from Defendant Austin Capital Collision, LLC, the amount of $20,000.00, representing the anticipated reasonable and necessary fees and expenses that would be incurred by Plaintiff in defending the appeal.

It is further ORDERED that Plaintiff may have all writs, orders and executions necessary for collection of this judgment, which may issue immediately.

It is further ORDERED that except as specifically provided herein, all relief not expressly granted is hereby DENIED.

This judgment finally disposes of all parties and all claims and is appealable.

SIGNED this __18__ day of June, 2015.

_____

THE HONORABLE TODD WONG

2

APPROVED AS TO FORM AND SUBSTANCE:

McGINNIS LOCHRIDGE
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6065
(512) 495-6093 (Fax)

By:_____
     Joe Lea
     State Bar No. 12082000
     jlea@mcginnislaw.com
     Nelia J. Robbi
     State Bar No. 24052296
     nrobbi@mcginnislaw.com
     Jordan K. Mullins
     State Bar No. 24070308
     jmullins@mcginnislaw.com

ATTORNEYS FOR BARBARA PAMPALONE

APPROVED AS TO FORM ONLY:

SLATER PUGH, Ltd. LLP
8400 N. Mopac Expressway
Suite 100
Austin, Texas 78759
Telephone: (512) 472-2431
Telecopier: (512) 472-0432

By:_____
     Adam Pugh
     State Bar No. 24044341
     apugh@slaterpugh.com

3

2

NO. D-1-GN-14-003207

Filed in The District Court
of Travis County, Texas

JUL - 7 2015

At ___3:45___ p.M.
Velva L. Price, District Clerk

| | | |
|---|---|---|
| BARBARA PAMPALONE, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ERIC HINOJOSA AND AUSTIN | § | |
| CAPITAL COLLISION, LLC, | § | |
| | § | |
| Defendants. | § | 419TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Introduction

On June 8, 2015, this case was called for trial, and all matters in controversy, legal and factual, were submitted to the Court for its determination. In addition to all other findings necessary to support the Judgment rendered in favor of Plaintiff and against Defendant Austin Capital Collision, LLC, in this cause, the Court hereby makes and files the following specific findings of fact and conclusions of law. Any finding of fact that should be construed as conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

### II. Findings of Fact

**A. Procedural History.**

1. Plaintiff Barbara Pampalone ("Plaintiff") filed her original petition on August 26, 2014, alleging causes of action for breach of contract against Defendant Eric Hinojosa and Defendant Austin Capital Collision, LLC.

2. This is an expedited action under Texas Rule of Civil Procedure 169.

3. This case was called for bench trial on June 8, 2015, and the parties appeared and announced ready for trial. At the close of trial, judgment was rendered in favor of Plaintiff and


004108045



against Defendant Austin Capital Collision, LLC. Judgment was signed on June 18, 2015.

4. Defendants requested findings of fact and conclusions of law on June 18, 2015.

## B. The Parties and Associated Persons/Entities.

5. Defendant Eric Hinojosa is a resident of Texas. Eric Hinojosa previously lived in California where he and Plaintiff's son, Erik Pampalone, became friends.

6. Plaintiff is a semi-retired dentist who resides in Chatsworth, California.

7. In 2005, when the loan at issue in this lawsuit was made, Eric Hinojosa was the president and a 50% shareholder of Hinojosa Auto Body & Paint, Inc. (Texas), and Hinojosa Auto Body & Paint, Inc. (Nevada), (collectively, the "HABP Entities"). Plaintiff's son, Erik Pampalone, was the vice president and other 50% shareholder of the HABP Entities. The HABP Entities were the general partners of Capital Collision, G.P., and the business—auto body repair shop—operated under the assumed name filed by Eric Hinojosa of Capital Collision [Exh. P-19]. The HABP Entities were terminated in July of 2010 and, accordingly, the general partnership of Capital Collision, G.P. was also terminated.

8. Prior to the termination of the HABP Entities in 2010, Eric Hinojosa formed Defendant Austin Capital Collision, LLC, in June of 2009. Eric Hinojosa is the sole managing member and 99% owner of Austin Capital Collision, LLC, which is also engaged in auto body repair. On the same day that Austin Capital Collision, LLC, was formed, Defendant Eric Hinojosa filed an assumed name certificate on behalf of Austin Capital Collision, LLC, for the name "Capital Collision." Austin Capital Collision, LLC, continues to conduct business today as Capital Collision.

## C. The Loan Agreement.

9. Around March of 2005, Plaintiff loaned the principal sum of $80,000.00 to the owners of

2

the Capital Collision business which, at the time, were the HABP Entities as general partners of Capital Collision, G.P. The owners of the Capital Collision business are referred to herein as "Capital Collision."

10. At the time, Capital Collision had an option to purchase the land it was renting but lacked the necessary funds. Erik Pampalone and Eric Hinojosa, as corporate officers/directors, discussed the issue, and Erik Pampalone suggested to Eric Hinojosa that he could ask his mother, Plaintiff, to loan the funds to Capital Collision. Eric Hinojosa agreed that Erik Pampalone should ask Plaintiff to loan funds to Capital Collision.

11. Erik Pampalone, in his capacity as Vice-President of Capital Collision, approached Plaintiff and proposed that Plaintiff loan Capital Collision the sum of $80,000.00 and, in exchange, Capital Collision would repay the $80,000.00 over a twenty year period, plus annual interest at the rate of 7%.

12. Plaintiff understood, and Capital Collision agreed, that the loaned funds would be used for business purposes, including the possible purchase of land.

13. Plaintiff had previously loaned funds to Capital Collision for business purposes in 2003 and, at the time of the loan at issue in this lawsuit, was being repaid by Capital Collision as agreed.

14. Plaintiff agreed to loan $80,000.00 to Capital Collision. Plaintiff performed under the terms of the agreement and paid the funds to Capital Collision in two installments: $50,000.00 on or about March 24, 2005, and the remaining $30,000.00 on or about April 13, 2005. [Exhs. P-1, P-2].

15. The loaned funds were deposited into Capital Collision's bank account, a Bank of America account held in the names of "Capital Collision" and "Eric Hinojosa."

3

16. The parties have stipulated that there is no signed promissory note for the loan. However, the terms of the loan were evidenced in yearly loan amortization schedules generated by Erik Pampalone and sent to Defendants and their representatives. [Exhs. P-5, P-7, P-9, P-12, P-12A, P-13, P-15, P-16, P-17].

17. The statute of frauds does not bar the agreement, even though it is not in writing, because Plaintiff fully performed under the agreement, and Defendant Austin Capital Collision, LLC, partially performed.

### D. Payments on the Loan.

18. Thereafter, beginning on or about May 20, 2005, Capital Collision began performing under the agreement by making monthly payments on the loan pursuant to the agreed upon terms. Payments were made by electronic bill payment from Capital Collision's Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision" into Plaintiff's bank account.

19. The parties stipulated that from May 2005 through April 2013, Plaintiff received 94 monthly payments on the loan. [Exhs. P-3, P-3A].

20. The 94 monthly payments were made by Capital Collision to Plaintiff as repayment on the loan.

21. During this time period, there was email correspondence among the parties and persons acting on their behalf acknowledging the existence of the loan and Defendants' indebtedness to Plaintiff thereunder. [Exhs. P-5, P-7, P-8, P-9, P-10, P-11, P-12, P-12A, P-13, P-15, P-16, P-17].

### E. Defendant Austin Capital Collision's Assumption of the Loan.

22. Erik Pampalone began the process of leaving Capital Collision in 2006, and he formally resigned in approximately April of 2007. After resigning, Erik Pampalone assisted Plaintiff in

4

oversight of repayment of the loan, corresponding by telephone and email with Defendant Eric Hinojosa and other Capital Collision employees concerning the loan.

23. Following Erik Pampalone's resignation, Defendant Eric Hinojosa became and remained the sole officer/director of Capital Collision. Capital Collision continued to repay the Loan to Plaintiff pursuant to the agreed upon terms.

24. In June of 2009, Defendant Eric Hinojosa formed a new company, Defendant Austin Capital Collision, LLC, [Exh. P-20] which became the owner of the Capital Collision business and filed an assumed name of "Capital Collision." [Exhs. P-21, 22].

25. Following its formation, Defendant Austin Capital Collision, LLC, assumed the loan to Plaintiff.

26. Approximately one year later, in July of 2010, Defendant Eric Hinojosa terminated the HABP Entities (and, accordingly, the general partnership). [Exh. P-24].

27. At the time of termination of the HABP Entities and formation of Austin Capital Collision, LLC, all entities were operated solely by Defendant Eric Hinojosa.

28. Defendant Eric Hinojosa did not provide notice—statutory or otherwise—to Plaintiff or Erik Pampalone that he was terminating the HABP Entities or that Capital Collision was owned or being operated by a new entity, Austin Capital Collision, LLC.

29. Although there was no formal purchase or transfer of assets between Austin Capital Collision, LLC, and the HABP Entities, Austin Capital Collision, LLC, continued to use the same assumed name, business email address (cptlcollision@aol.com) and email signature block (with the same name and physical address) as the as the HABP Entities [Exh. P-14]. Austin Capital Collision, LLC, also retained some of the same employees, took over control of the bank accounts of the HABP Entities, and operated the same general business as the HABP Entities.

5

57

30. Prior to institution of this lawsuit, neither Plaintiff nor Erik Pampalone was aware or had any reason to be aware that the HABP Entities had been terminated or that a new entity, Austin Capital Collision, LLC, was operating the business and using the assumed name of Capital Collision.

31. Following formation of Austin Capital Collision, LLC, and termination of the HABP Entities, Austin Capital Collision, LLC, d/b/a Capital Collision continued to make payments to Plaintiff pursuant to the agreed upon terms of the loan.

32. Austin Capital Collision, LLC, d/b/a Capital Collision made its payments from the Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision" until approximately March of 2010 when the payments began being made from a Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision GP." Because the payments were electronically deposited into Plaintiff's bank account, Plaintiff was not aware of any change in the bank account making the payments to her.

33. Defendant Austin Capital Collision, LLC, d/b/a Capital Collision was operating the Bank of America accounts making the payments to Plaintiff. Its sole managing member and majority owner, Defendant Eric Hinojosa, intentionally put money into the Bank of America account held in the names of "Eric Hinojosa" and "Capital Collision, GP" to cover the monthly bill payments to Plaintiff on the loan.

34. After Austin Capital Collision, LLC, was formed, Erik Pampalone, acting on behalf of Plaintiff, continued to send correspondence concerning Plaintiff's loan to the cptlcollision@aol.com email address. [Exhs. P-12a, P-13, P-14]. In response, Austin Capital Collision, LLC, d/b/a Capital Collision continued to make payments on the loan as agreed. [Exhs. P-3, P-3A].

6

35. In September of 2012, Erik Pampalone, acting on behalf of Plaintiff, sent an email to cptlcollision@aol.com requesting that Eric Hinojosa change where he was sending the monthly deposits to Plaintiff on her loan to Capital Collision. [Exh. P-14]. In response, Mirium Matta, Eric Hinojosa's sister-in-law and an employee of Austin Capital Collision, LLC, responded from the cptlcollision@aol.com email with "received and updated." [Exh. P-14].

36. Austin Capital Collision, LLC, acknowledged the loan to Plaintiff and its indebtedness thereunder through its conduct and course of performance.

### F. *Austin Capital Collision, LLC's, Default on the Loan.*

37. Defendant Austin Capital Collision, LLC, d/b/a Capital Collision made its last regular monthly payment on the loan in April of 2013. [Exhs. P-3, P-3A].

38. In October of 2013, Austin Capital Collision, LLC, d/b/a Capital Collision made a payment of $6,000.00 to Plaintiff. [Exhs. P-3, P-3A]. No further payments have been made to Plaintiff. Austin Capital Collision, LLC, d/b/a Capital Collision has breached and defaulted on the loan to Plaintiff.

39. Plaintiff made demand for payment upon Defendants, but Defendants failed and refused to cure the default on the loan. [Exhs. P-16, P-25].

### G. *Plaintiff's Damages.*

40. As a result of Defendant Austin Capital Collision, LLC's, default on the loan to Plaintiff, Plaintiff has suffered damages.

41. The parties stipulated that the amount due and owing on the loan as of the date of trial is $56,758.68.

### H. *Attorneys' Fees.*

42. As a result of Defendants' default, Plaintiff was compelled to file the instant lawsuit and

7

incur attorneys' fees and costs associated with same.

43. Through April 2015, Plaintiff incurred attorneys' fees in the amount of $44,950.30. [Exh. P-18]. Plaintiff's fees incurred through trial are in excess of $90,000.00. These fees are reasonable and necessary in Travis County, Texas.

44. The parties stipulated to Ms. Robbi's qualifications to present attorneys' fees testimony and the reasonableness of the hourly rates being charged.

45. Plaintiff's attorneys were required to expend significant time engaging in discovery, drafting and filing a motion to dismiss claims asserted by Defendants, compelling discovery from Defendants, attempting to subpoena documents from Defendants' accountant, preparing for and attending depositions and mediation, attending hearings on Defendants' special exceptions and motion for continuance, preparing for and attending trial, and drafting pre-trial motions, including a motion to exclude the testimony of Defendant's corporate representative, Eric Hinojosa, who was wholly unprepared for his deposition in which it was agreed he would provide answers in his individual capacity and as the corporate representative for Defendant Austin Capital Collision, LLC.

46. Plaintiff's reasonable and necessary fees for Travis County in the event of an unsuccessful appeal by either Defendant to the Court of Appeals are $20,000.00.

47. Plaintiff's reasonable and necessary fees for Travis County in the event of an unsuccessful appeal by either Defendant to the Texas Supreme Court are $20,000.00.

*I. Other Findings by the Court.*

48. Defendant Eric Hinojosa lacks credibility, especially in light of the fact that Eric Hinojosa was wholly unprepared for his corporate representative deposition, had not reviewed a single document produced in the lawsuit or otherwise talked to any Austin Capital Collision, LLC,

8

employees or representatives regarding the designated deposition topics, and demonstrated a repeated inability to provide substantive responses on his own behalf or on behalf of Austin Capital Collision, LLC. Further, at trial of this cause, Eric Hinojosa tried to change many of the answers he provided at his deposition which occurred approximately one month before trial.

### III. Conclusions of Law

#### A. Breach of Contract.

49. Plaintiff and Capital Collision ("Capital Collision," as indicated, *supra*, referring to the owners of the Capital Collision business which, at the time, were the HABP Entities as the general partners of Capital Collision, G.P.) intended to and did enter into an agreement whereby Plaintiff would loan the sum of $80,000.00 to Capital Collision and, in exchange, Capital Collision would repay the loan over 20 years at 7% interest.

50. This agreement constitutes a valid, enforceable contract.

51. The statute of frauds does not bar the agreement, even though it is not in writing, because Plaintiff fully performed under the agreement, and Defendant Austin Capital Collision, LLC, d/b/a Capital Collision partially performed.

52. Plaintiff fully performed under the terms of the agreement, paying the sum of $80,000.00 to Capital Collision.

53. Capital Collision performed on the agreement prior to the termination of the HABP Entities by making monthly payments on the loan as agreed.

54. Austin Capital Collision, LLC, d/b/a Capital Collision assumed the loan from the HABP Entities though its conduct and course of performance, including by continuing to make payments on the loan in accordance with the terms of the agreement.

55. Austin Capital Collision, LLC, d/b/a Capital Collision partially performed on the agreement

9

by continuing to make payments on the loan to Plaintiff in accordance with the terms of the agreement.

56. Austin Capital Collision, LLC, defaulted on the loan.

57. As a result of Austin Capital Collision, LLC's, default, Plaintiff suffered damages in the amount of $56,758.68. Accordingly, Plaintiff is entitled to recover the sum of $56,758.68 from Defendant Austin Capital Collision, LLC.

58. Plaintiff is entitled to post-judgment interest at the rate of 5%.

### B. Attorneys' Fees.

59. Because this is an expedited action under Texas Rule of Civil Procedure 169 and Plaintiff cannot recover more than $100,000.00 inclusive of attorneys' fees, Plaintiff is entitled to attorneys' fees in the amount of $43,241.32 which fees are reasonable and necessary in Travis County, Texas.

60. Plaintiff is entitled to a conditional award of $20,000.00 in the case of an unsuccessful appeal by either Defendant to the Court of Appeals. This sum is reasonable and necessary in Travis County, Texas.

61. Plaintiff is entitled to an additional conditional award of $20,000.00 in the case of an unsuccessful appeal by either Defendant to the Texas Supreme Court. This sum is reasonable and necessary in Travis County, Texas.

### C. Defendants' Affirmative and Other Defenses.

62. All of Defendants' affirmative or other defenses as alleged in its Fourth Amended Original Answer, Verified Denial and Special Exceptions lack merit and any relief associated with same is expressly denied.

63. Any conclusion of law deemed a finding of fact is hereby adopted as such.

10

SIGNED this 7th day of July, 2015.

_____
THE HONORABLE TODD WONG

11

3

Vernon's Texas Statutes and Codes Annotated
  Business Organizations Code (Refs & Annos)
    Title 1. General Provisions (Refs & Annos)
      Chapter 11. Winding up and Termination of Domestic Entity
        Subchapter B. Winding up of Domestic Entity

V.T.C.A., Business Organizations Code § 11.052

§ 11.052. Winding Up Procedures

Effective: September 1, 2013
Currentness

(a) Except as provided by the title of this code governing the domestic entity, on the occurrence of an event requiring winding up of a domestic entity, unless the event requiring winding up is revoked under Section 11.151 or canceled under Section 11.152, the owners, members, managerial officials, or other persons specified in the title of this code governing the domestic entity shall, as soon as reasonably practicable, wind up the business and affairs of the domestic entity. The domestic entity shall:

(1) cease to carry on its business, except to the extent necessary to wind up its business;

(2) if the domestic entity is not a general partnership, send a written notice of the winding up to each known claimant against the domestic entity;

(3) collect and sell its property to the extent the property is not to be distributed in kind to the domestic entity's owners or members; and

(4) perform any other act required to wind up its business and affairs.

(b) During the winding up process, the domestic entity may prosecute or defend a civil, criminal, or administrative action.

**Credits**
Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006. Amended by Acts 2013, 83rd Leg., ch. 9 (S.B. 847), § 3, eff. Sept. 1, 2013.

Notes of Decisions (5)

V. T. C. A., Business Organizations Code § 11.052, TX BUS ORG § 11.052
Current through the end of the 2015 Regular Session of the 84th Legislature

© 2015 Thomson Reuters. No claim to original U.S. Government Works

4

Vernon's Texas Statutes and Codes Annotated
    Business Organizations Code (Refs & Annos)
        Title 1. General Provisions (Refs & Annos)
            Chapter 11. Winding up and Termination of Domestic Entity
                Subchapter H. Claims Resolution on Termination

V.T.C.A., Business Organizations Code § 11.356

§ 11.356. Limited Survival After Termination

Effective: January 1, 2006
Currentness

(a) Notwithstanding the termination of a domestic filing entity under this chapter, the terminated filing entity continues in existence until the third anniversary of the effective date of the entity's termination only for purposes of:

(1) prosecuting or defending in the terminated filing entity's name an action or proceeding brought by or against the terminated entity;

(2) permitting the survival of an existing claim by or against the terminated filing entity;

(3) holding title to and liquidating property that remained with the terminated filing entity at the time of termination or property that is collected by the terminated filing entity after termination;

(4) applying or distributing property, or its proceeds, as provided by Section 11.053; and

(5) settling affairs not completed before termination.

(b) A terminated filing entity may not continue its existence for the purpose of continuing the business or affairs for which the terminated filing entity was formed unless the terminated filing entity is reinstated under Subchapter E. [1]

(c) If an action on an existing claim by or against a terminated filing entity has been brought before the expiration of the three-year period after the date of the entity's termination and the claim was not extinguished under Section 11.359, the terminated filing entity continues to survive for purposes of:

(1) the action until all judgments, orders, and decrees have been fully executed; and

(2) the application or distribution of any property of the terminated filing entity as provided by Section 11.053 until the property has been applied or distributed.

**Credits**

Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006.

Footnotes

1        V.T.C.A., Business Organizations Code § 11.201 et seq.

V. T. C. A., Business Organizations Code § 11.356, TX BUS ORG § 11.356

Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

5

Vernon's Texas Statutes and Codes Annotated
  Business Organizations Code (Refs & Annos)
    Title 2. Corporations (Refs & Annos)
      Chapter 21. For-Profit Corporations (Refs & Annos)
        Subchapter E. Shareholder Rights and Restrictions

V.T.C.A., Business Organizations Code § 21.223

§ 21.223. Limitation of Liability for Obligations

Effective: September 1, 2007
Currentness

(a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:

(1) the shares, other than the obligation to pay to the corporation the full amount of consideration, fixed in compliance with Sections 21.157-21.162, for which the shares were or are to be issued;

(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or

(3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including the failure to:

(A) comply with this code or the certificate of formation or bylaws of the corporation; or

(B) observe any requirement prescribed by this code or the certificate of formation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.

(b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

**Credits**
Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006. Amended by Acts 2007, 80th Leg., ch. 688, § 74, eff. Sept. 1, 2007.

Notes of Decisions (213)

V. T. C. A., Business Organizations Code § 21.223, TX BUS ORG § 21.223
Current through the end of the 2015 Regular Session of the 84th Legislature

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

6

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or Preempted    **Negative Treatment Vacated by**    Gulley v. Sunbelt Sav., F.S.B.,    5th Cir.(Tex.),    June 01, 1990

Vernon's Texas Statutes and Codes Annotated
  Business and Commerce Code (Refs & Annos)
    Title 3. Insolvency, Fraudulent Transfers, and Fraud
      Chapter 24. Uniform Fraudulent Transfer Act (Refs & Annos)

V.T.C.A., Bus. & C. § 24.006
Formerly cited as V.T.C.A., Bus. & C. Code § 24.03

§ 24.006. Transfers Fraudulent as to Present Creditors

Currentness

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

**Credits**
Amended by Acts 1987, 70th Leg., ch. 1004, § 1, eff. Sept. 1, 1987.

Notes of Decisions (253)

V. T. C. A., Bus. & C. § 24.006, TX BUS & COM § 24.006
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works

7

| |
|---|
| Vernon's Texas Rules Annotated<br>  Texas Rules of Appellate Procedure<br>    Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)<br>      Rule 43. Judgment of the Court of Appeals (Refs & Annos) |

TX Rules App.Proc., Rule 43.3

43.3. Rendition Appropriate Unless Remand Necessary

Currentness

When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when:

(a) a remand is necessary for further proceedings; or

(b) the interests of justice require a remand for another trial.

**Credits**
Eff. Sept. 1, 1997.

Notes of Decisions (52)

Rules App. Proc., Rule 43.3, TX R APP Rule 43.3
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

 2015 Thomson Reuters. No claim to original U.S. Government Works.

8

CAUSE NO. D-1-GN-14-003207

| BARBARA PAMPALONE, | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ERIC HINOJOSA AND AUSTIN | § | |
| CAPITAL COLLISION, LLC, | § | |
| | § | |
| *Defendants.* | § | 419TH JUDICIAL DISTRICT |

## Summary of Payments Made by Defendants to Plaintiff

| No. | Date | Amount | Bank Account |
|---|---|---|---|
| 1. | 05/20/2005 | $675.09 | |
| 2. | 06/20/2005 | $675.09 | |
| 3. | 07/20/2005 | $675.09 | Bank of America Business Advantage |
| 4. | 08/19/2005 | $675.09 | Checking Account No. XXXX XXXX |
| 5. | 09/20/2005 | $675.09 | 9118 |
| 6. | 10/20/2005 | $675.09 | |
| 7. | 11/18/2005 | $675.09 | Capital Collision |
| 8. | 12/20/2005 | $675.09 | Eric A. Hinojosa |
| 9. | 01/20/2006 | $675.09 | |
| 10. | 02/17/2006 | $675.09 | |
| 11. | 03/20/2006 | $675.09 | |
| 12. | 04/20/2006 | $675.09 | |
| 13. | 05/19/2006 | $675.09 | |
| 14. | 06/20/2006 | $675.09 | |
| 15. | 07/20/2006 | $675.09 | |
| 16. | 08/18/2006 | $675.09 | |
| 17. | 09/20/2006 | $675.09 | |
| 18. | 10/20/2006 | $675.09 | |
| 19. | 11/20/2006 | $675.09 | |
| 20. | 12/20/2006 | $675.09 | |
| 21. | 01/19/2007 | $675.09 | |
| 22. | 02/20/2007 | $675.09 | |
| 23. | 03/20/2007 | $675.09 | |
| 24. | 04/20/2007 | $675.09 | |
| 25. | 05/18/2007 | $675.09 | |
| 26. | 06/20/2007 | $675.09 | |
| 27. | 07/20/2007 | $675.09 | |
| 28. | 08/06/2007 | $505.07 | |
| | 08/20/2007 | $170.02 | |

PLAINTIFF'S EXHIBIT 3


| No. | Date | Amount | Bank Account |
|---|---|---|---|
| 29. | 09/20/2007 | $675.09 | |
| 30. | 10/19/2007 | $675.09 | |
| 31. | 11/20/2007 | $675.09 | |
| 32. | 12/20/2007 | $675.09 | |
| 33. | 01/18/2008 | $675.09 | |
| 34. | 02/20/2008 | $675.09 | |
| 35. | 03/20/2008 | $675.09 | |
| 36. | 04/18/2008 | $675.09 | |
| 37. | 05/20/2008 | $675.09 | |
| 38. | 06/20/2008 | $675.09 | |
| 39. | 07/18/2008 | $675.09 | |
| 40. | 08/20/2008 | $675.09 | |
| 41. | 09/19/2008 | $675.09 | |
| 42. | 10/20/2008 | $675.09 | |
| 43. | 11/20/2008 | $675.09 | |
| 44. | 12/19/2008 | $675.09 | |
| 45. | 01/20/2009 | $675.09 | |
| 46. | 02/20/2009 | $675.09 | |
| 47. | 03/20/2009 | $675.09 | |
| 48. | 04/20/2009 | $675.09 | |
| 49. | 05/20/2009 | $675.09 | |
| 50. | 06/19/2009 | $675.09 | |
| 51. | 07/20/2009 | $675.09 | |
| 52. | 08/20/2009 | $675.09 | |
| 53. | 09/18/2009 | $675.09 | |
| 54. | 10/20/2009 | $675.09 | |
| 55. | 11/20/2009 | $675.09 | |
| 56. | 12/20/2009 | $675.09 | |
| 57. | 01/20/2010 | $675.09 | |
| 58. | 02/19/2010 | $675.09 | |
| 59. | 03/19/2010 | $675.09 | |
| 60. | 04/20/2010 | $675.09 | Bank of America Business Advantage Checking Account No. XXXX XXXX 4193 |
| 61. | 05/20/2010 | $675.09 | |
| 62. | 06/18/2010 | $675.09 | |
| 63. | 07/20/2010 | $675.09 | |
| 64. | 08/20/2010 | $675.09 | Capital Collision GP |
| 65. | 09/20/2010 | $675.09 | Eric A. Hinojosa |
| 66. | 10/20/2010 | $675.09 | |
| 67. | 11/19/2010 | $675.09 | |
| 68. | 12/20/2010 | $675.09 | |
| 69. | 01/20/2011 | $675.09 | |
| 70. | 02/18/2011 | $675.09 | |
| | 03/--/2011 | -- | |
| | 04/--/2011 | -- | |

| No. | Date | Amount | Bank Account |
|-----|------|--------|--------------|
|  | 05/--/2011 | -- |  |
| 71. | 06/10/2011 | $675.00 |  |
| 72. | 06/20/2011 | $675.00 |  |
| 73. | 07/20/2011 | $675.00 |  |
| 74. | 08/19/2011 | $675.00 |  |
| 75. | 09/20/2011 | $675.00 |  |
| 76. | 10/20/2011 | $675.00 |  |
| 77. | 11/18/2011 | $675.00 |  |
| 78. | 12/20/2011 | $675.00 |  |
| 79. | 01/20/2012 | $675.00 |  |
| 80. | 02/17/2012 | $675.00 |  |
| 81. | 03/20/2012 | $675.00 |  |
| 82. | 04/20/2012 | $675.00 |  |
| 83. | 05/18/2012 | $675.00 |  |
| 84. | 06/20/2012 | $675.00 |  |
| 85. | 07/20/2012 | $675.00 |  |
| 86. | 08/20/2012 | $675.00 |  |
| 87. | 09/20/2012 | $675.00 |  |
| 88. | 10/19/2012 | $675.00 |  |
| 89. | 11/20/2012 | $675.00 |  |
| 90. | 12/20/2012 | $675.00 |  |
| 91. | 01/18/2013 | $675.00 |  |
| 92. | 02/20/2013 | $675.00 |  |
| 93. | 03/20/2013 | $675.00 |  |
| 94. | 04/19/2013 | $675.00 |  |
|  | 05/--/2013 |  |  |
|  | 06/--/2013 |  |  |
|  | 07/--/2013 |  |  |
|  | 08/--/2013 |  |  |
|  | 09/--/2013 |  |  |
| 95. | 10/25/2013 | $6,000.00 |  |

9



Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Page 1 of 4
Statement Period
02/01/10 through 02/28/10
CO P PE OF 48          0142209
Enclosures 0
Account Number ████████

01059 001 SCM999 I 2 4 0

CAPITAL COLLISION
ERIC A HINOJOSA
4304 BURCH DR
DEL VALLE TX 78617-3273

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

**Customer Service Information**
**www.bankofamerica.com**

For additional information or service you may call          Or you may write to:
1.888.BUSINESS (1.888.287.4637)          Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

We recently made changes to our Overdraft Protection Transfer Fee to better serve you. Effective immediately, when we determine your account is overdrawn by a total amount less than $10 for a day and we transfer funds from your linked savings account or line of credit to cover it, we will not charge an Overdraft Protection Transfer Fee. Overdraft Protection lets you link your checking account to another account to help avoid overdrafts. If you haven't already signed up, call the number on your statement or visit your nearby banking center and an associate can help you.

Stay ahead of your bills - such as rent, mortgage, credit card or utility payments - by setting up automatic reminders to be sent right to your e-mail or smart phone. With Payment Reminders from Bank of America®, it's easy to know when a payment is due.

Get started at bankofamerica.com/solutions today.

H

Page 2 of 4
Statement Period
02/01/10 through 02/28/10
EO   P  PE   OE  48
Enclosures 0
Account Number

CAPITAL COLLISION
ERIC A HINOJOSA

## Deposit Accounts

## Business Advantage Checking
### CAPITAL COLLISION   ERIC A HINOJOSA

#### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | | Statement Beginning Balance | $3,711.24 |
| Statement Period 02/01/10 through 02/28/10 | | Amount of Deposits/Credits | $7,002.90 |
| Number of Deposits/Credits | 8 | Amount of Withdrawals/Debits | $10,501.42 |
| Number of Withdrawals/Debits | 21 | Statement Ending Balance | $212.72 |
| Number of Deposited Items | 6 | | |
| | | Average Ledger Balance | $2,174.17 |
| Number of Days in Cycle | 28 | Service Charge | $0.00 |

Your account has overdraft protection provided by Line of Credit number 6871 1022 401299.

#### Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | | 2,549.01 | Average | 02-25 |
| | Total Qualifying Balance | $2,549.01 | | |

Please note that the balances in your account(s) are below the minimum required to avoid the monthly maintenance fee. To give you time to make adjustments, we have waived the monthly maintenance fee for this statement cycle ending 02/28/10. If you have questions about your account or would like to discuss how you may avoid the monthly fee, please call us at the number listed above.

#### Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 02/04 | 2,022.19 | Deposit | 813204730657492 |
| 02/05 | 1,756.00 | Deposit | 813204730902628 |
| 02/09 | 1,628.46 | Deposit | 813204730269247 |
| 02/11 | 321.16 | Deposit | 813204730526383 |
| 02/16 | 675.09 | Online Banking transfer from Chk 4193 Confirmation# 0136551719 | 957202167505928 |
| 02/19 | 300.00 | Overdraft Protection From 68711022401299 | 080602190005922 |
| 02/22 | 100.00 | Overdraft Protection From 68711022401299 | 080602220011991 |
| 02/25 | 200.00 | BankCard       Des:Merch Setl ID:430134840051477 Indn:Capital Collision       Co ID:1210001923 Ccd | 902556010903684 |

H

Page 3 of 4
Statement Period
02/01/10 through 02/28/10
EO P PE OE 48          0142211
Enclosures 0
Account Number ███████

CAPITAL COLLISION
ERIC A HINOJOSA

## Withdrawals and Debits

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 02/01 | 436.45 | Mitchell International Bill Payment | 943202010008790 |
| 02/01 | 71.15 | BankCard          Des:Merch Fees ID:430134840051477 Indn:Capital Collision       Co ID:3210001923 Ccd | 902532006926873 |
| 02/01 | 6.47 | Mitchell International Bill Payment | 943202010008800 |
| 02/02 | 39.95 | Discover Network Des:Settlement ID:601101323656387 Indn:Eric A. Hinojosa, Dba   Co ID:1510020270 Ccd | 902532010206729 |
| 02/04 | 1,000.00 | Online Banking transfer to Chk 4193 Confirmation# 3932735010 | 957102947530162 |
| 02/04 | 700.00 | Home Depot          Des:Online Pmt ID:560028980320388 Indn:Capital Collision Gp    Co ID:Citiccsweb Web | 902534010998444 |
| 02/05 | 500.00 | Ge Money          Des:Payment    ID:504662014152661 Indn:Hinojosa,Eric       Co ID:1061537262 Web | 902535005381136 |
| 02/05 | 200.00 | Mbna Credit Cards Bill Payment | 943202050008802 |
| 02/08 | 516.35 | Exxonmobil Comm  Des:Online Pmt ID:560030708322458 Indn:Capital Collision       Co ID:Citioilweb Web | 902536010818361 |
| 02/09 | 1,600.00 | Online Banking transfer to Chk 4193 Confirmation# 0375764844 | 957202097591378 |
| 02/16 | 3,211.69 | Online Banking transfer to Chk 4193 Confirmation# 6228127454 | 957302167513449 |
| 02/16 | 1,146.06 | 2 Pawnee Leasing Des:Lease Pmt  ID:320955 Indn:Capital Collision G.P.  Co ID:3840884553 Ppd | 902547007520285 |
| 02/16 | 100.00 | Dell Commercial Credit Bill Payment | 943202160008797 |
| 19 | 675.09 | Barbara Pampalone Bill Payment | 943202190008795 |
| 19 | 10.00 | Overdraft Protection Transfer Fee | 080602190005923 |
| 02/22 | 10.00 | Overdraft Protection Transfer Fee | 080602220011992 |
| Card Account # ███████ : | | | |
| 02/01 | 25.91 | CheckCard  0129 LA Madeline Corps | 905701291164022 |
| 02/01 | 8.04 | CheckCard  0129 Exxonmobil    47647839 | 905701290007749 |
| 02/04 | 79.80 | CheckCard  0202 Mamacitas San Antonio | 905702020337081 |
| 02/04 | 43.24 | CheckCard  0202 Sac N Pac 108 | 905702020739800 |
| 02/22 | 121.22 | CheckCard  0220 Umi Sushi Bar&grillbar | 905702200677744 |
| Subtotal | 278.21 | | |

### Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 02/01 | 3,163.22 | 02/08 | 3,862.07 | 02/19 | 43.94 |
| 02/02 | 3,123.27 | 02/09 | 3,890.53 | 02/22 | 12.72 |
| 02/04 | 3,322.42 | 02/11 | 4,211.69 | 02/25 | 212.72 |
| 02/05 | 4,378.42 | 02/16 | 429.03 | | |





Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

01099 001 SCM999 1 2 4 0

CAPITAL COLLISION GP
ERIC A HINOJOSA
4304 BURCH DR
DEL VALLE TX 78617-3273

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information

### www.bankofamerica.com

For additional information or service you may call:          Or you may write to:
☎  1-888-BUSINESS (1-888-287-4637)          ✉  Bank of America, N.A.
                                                      P.O. Box 25118
                                                      Tampa, FL 33622-5118

We recently made changes to our Overdraft Protection Transfer Fee to better serve you. Effective immediately, when we determine your account is overdrawn by a total amount less than $10 for a day and we transfer funds from your linked savings account or line of credit to cover it, we will not charge an Overdraft Protection Transfer Fee. Overdraft Protection lets you link your checking account to another account to help avoid overdrafts. If you haven't already signed up, call the number on your statement or visit your nearby banking center and an associate can help you.

Stay ahead of your bills - such as rent, mortgage, credit card or utility payments - by setting up automatic reminders to be sent right to your e-mail or smart phone. With **Payment Reminders** from Bank of America®, it's easy to know when a payment is due.

**Get started at bankofamerica.com/solutions today.**

H

CAPITAL COLLISION GP
ERIC A HINOJOSA

## Business Advantage Checking

CAPITAL COLLISION GP   ERIC A HINOJOSA

### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | ██████████ | Statement Beginning Balance | $2,524.80 |
| Statement Period | 02/01/10 through 02/28/10 | Amount of Deposits/Credits | $28,160.08 |
| Number of Deposits/Credits | 7 | Amount of Withdrawals/Debits | $23,675.12 |
| Number of Withdrawals/Debits | 38 | Statement Ending Balance | $7,009.76 |
| Number of Deposited Items | 7 | | |
| | | Average Ledger Balance | $6,613.07 |
| Number of Days in Cycle | 28 | Service Charge | $29.95 |

Help avoid Overdraft & NSF: Returned Item fees. Use Alerts to get messages by email or text to inform you when your balance is low. Use Overdraft Protection to transfer available funds from linked savings, credit card, or credit line to your checking account to help cover items that would overdraw your account. Call us for details.

### Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | ██████████ | 6,129.33 | Average | 02-25 |
| | Total Qualifying Balance | $6,129.33 | | |

Based on your combined balance of $6,129.33, your Business Advantage account has been charged a monthly maintenance fee. You can avoid this fee in the future by maintaining $35,000 in combined balances.

### Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 02/02 | 5,000.00 | Online Banking advance from Loc 1299 Confirmation# 3915169063 | 957102027580889 |
| 02/04 | 1,000.00 | Online Banking transfer from Chk 9118 Confirmation# 3932735010 | 957102047530163 |
| 02/09 | 1,600.00 | Online Banking transfer from Chk 9118 Confirmation# 0375764844 | 957202097591379 |
| 02/16 | 3,211.69 | Online Banking transfer from Chk 9118 Confirmation# 6228127454 | 957302167513450 |
| 02/17 | 11,872.04 | Deposit | 813204830622344 |
| 02/17 | 1,164.60 | Deposit | 813204830622348 |
| 02/23 | 4,311.75 | Deposit | 813204730584475 |



CAPITAL COLLISION GP
ERIC A HINOJOSA

## Withdrawals and Debits
### Checks

| Check Number | Amount ($) | Date Posted | Bank Reference | Check Number | Amount ($) | Date Posted | Bank Reference |
|---|---|---|---|---|---|---|---|
| 5095 | 557.40 | 02/01 | 813009992893654 | 20148 | 2.20 | 02/04 | 813009692604239 |
| 5097° | 550.00 | 02/12 | 813009892284554 | 20149 | 23.52 | 02/08 | 813006892470800 |
| 5103° | 184.38 | 02/16 | 813009292032928 | 20150 | 92.31 | 02/17 | 813009292693306 |
| 20061° | 95.00 | 02/03 | 813009392452627 | 20151 | 215.57 | 02/17 | 813009292693305 |
| 20088° | 340.00 | 02/03 | 813009392452626 | 20152 | 69.99 | 02/11 | 813009692786278 |
| 20091° | 12.98 | 02/08 | 813008792676531 | 20153 | 830.00 | 02/10 | 813006592162010 |
| 20123° | 500.00 | 02/18 | 813204730039963 | 20154 | 150.00 | 02/16 | 813008992748692 |
| 20129° | 71.00 | 02/01 | 813008892690586 | 20156° | 261.63 | 02/24 | 813009592563760 |
| 20131° | 95.00 | 02/05 | 813009892124599 | 20157 | 178.14 | 02/23 | 813009292733366 |
| 20139° | 671.25 | 02/08 | 813008892194461 | 20159° | 6,109.14 | 02/22 | 813008992027080 |
| 20140 | 116.65 | 02/02 | 813005992002173 | 20161° | 2,198.63 | 02/22 | 813006092750085 |
| 20141 | 747.81 | 02/04 | 813009592350002 | 20162 | 406.48 | 02/25 | 813004092553813 |
| 20143° | 600.00 | 02/08 | 813008792668691 | 20163 | 1,829.41 | 02/22 | 813002992359349 |
| 20144 | 3,272.55 | 02/08 | 813007692811653 | 20164 | 360.80 | 02/22 | 813204730398781 |
| 20145 | 172.00 | 02/08 | 813008792910492 | 20170° | 192.57 | 02/26 | 813009992586446 |
| 20147° | 64.88 | 02/12 | 813009992791685 | | | | |

° Gap in sequential check numbers.

## Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 02/04 | 303.00 | Data Check      Des:Redepcheck ID:020085 Indn:Capital Collision Gp    Co ID:1261961596 Rck | 902535001904590 |
| 02/04 | 32.48 | Data Check      Des:NSF Fee      ID:020085 Indn:Capital Collision Gp    Co ID:1261961596 Ppd | 902535001904592 |
| 02/09 | 400.00 | Online Banking payment to Loc 1299 Confirmation# 5375071826 | 957302095105249 |
| 02/16 | 675.09 | Online Banking transfer to Chk 9118 Confirmation# 0136551719 | 957202167505927 |
| 02/25 | 663.31 | Trail Creek Inve Des:Note Pmt    ID:Capital Collisi Indn:Capital Collision      Co ID:3262646872 Ccd | 902555005209896 |
| 02/26 | 600.00 | Mbna Line Of Credit Bill Payment | 943202260005105 |
| 02/26 | 29.95 | Monthly Maintenance Fee | |

## Total Overdraft Fees and NSF: Returned Item Fees

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $35.00 |
| Total NSF: Returned Item Fees | $0.00 | $105.00 |

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 02/01 | 1,896.40 | 02/09 | 2,611.96 | 02/18 | 15,528.07 |
| 02/02 | 6,779.75 | 02/10 | 1,781.96 | 02/22 | 5,030.09 |
| 02/03 | 6,344.75 | 02/11 | 1,711.97 | 02/23 | 9,163.70 |
| 02/04 | 6,259.26 | 02/12 | 1,097.09 | 02/24 | 8,902.07 |
| 02/05 | 6,164.26 | 02/16 | 3,299.31 | 02/25 | 7,832.28 |
| 02/08 | 1,411.96 | 02/17 | 16,028.07 | 02/26 | 7,009.76 |

H

Page 1 of 4
Statement Period
03/01/10 through 03/31/10
EO  P PE  OE 48          0132656
Enclosures 0
Account Number

**Bank of America**

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

01099 001 SCM999 I1     0

CAPITAL COLLISION
ERIC A HINOJOSA
4304 BURCH DR
DEL VALLE TX 78617-3273

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information
### www.bankofamerica.com

For additional information or service, you may call:          Or you may write to:
☎ 1.888.BUSINESS (1.888.287.4637)                    ✉ Bank of America, N.A.
                                                                          P.O. Box 25118
                                                                          Tampa, FL 33622-5118

## Deposit Accounts

## Business Advantage Checking

### CAPITAL COLLISION  ERIC A HINOJOSA

#### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | | Statement Beginning Balance | $212.72 |
| Statement Period | 03/01/10 through 03/31/10 | Amount of Deposits/Credits | $14,318.31 |
| Number of Deposits/Credits | 5 | Amount of Withdrawals/Debits | $14,531.03 |
| Number of Withdrawals/Debits | 8 | Statement Ending Balance | $0.00 |
| Number of Deposited Items | 0 | | |
| | | Average Ledger Balance | $961.76 |
| Number of Days in Cycle | 31 | Service Charge | $0.00 |

Your account has overdraft protection provided by Line of Credit number 6871 1022 401299.

Page 2 of 4
Statement Period
03/01/10 through 03/31/10
E0   P  PE   0E 48
Enclosures 0
Account Number

CAPITAL COLLISION
ERIC A HINOJOSA

## Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | | 922.81 | Average | 03-30 |
| | Total Qualifying Balance | $922.81 | | |

Please note that the balances in your account(s) are below the minimum required to avoid the monthly maintenance fee. We have waived the monthly maintenance fee for an additional cycle in case you need time to make balance adjustments. If your balances are below the minimums next month you'll still enjoy all the many benefits that come with your Business Advantage account, but the monthly maintenance fee will apply. Please call us at the number listed above if you have questions about your account.

## Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/04 | 2,658.42 | Sf Mutual          Des:A25Sf0001   ID:xxxxx6250Ka0301 Indn:Capital Collision       Co ID:9A25Sf0001 Ccd Pmt Info:Nte°zzz*xxxxx6250Ka03011370533100 \ | 902562006583464 |
| 03/17 | 2,797.16 | Sf Mutual          Des:A25Sf0001   ID:xxxxx1236Ka0312 Indn:Capital Collision       Co ID:9A25Sf0001 Ccd Pmt Info:Nte°zzz*xxxxx1236Ka03121370533100 \ | 902575003591285 |
| 18 | 7,316.73 | Sf Mutual          Des:A25Sf0001   ID:xxxxx1784Ka0315 Indn:Capital Collision       Co ID:9A25Sf0001 Ccd Pmt Info:Nte*zzz*xxxxx1784Ka03151370533100 \ | 902576008234102 |
| 03/26 | 805.00 | BankCard          Des:Merch Setl ID:430134840051477 Indn:Capital Collision       Co ID:1210001923 Ccd | 902585006694446 |
| 03/29 | 741.00 | Online Banking transfer from Chk 4193 Confirmation# 5288477014 | 957303297562545 |

## Withdrawals and Debits

## Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/01 | 67.85 | BankCard          Des:Merch Fees ID:430134840051477 Indn:Capital Collision       Co ID:3210001923 Ccd | 902560012434131 |
| 03/02 | 89.90 | Discover Network Des:Settlement ID:601101323656387 Indn:Eric A. Hinojosa, Dba   Co ID:1510020270 Ccd | 902560015685838 |
| 03/04 | 794.00 | Home Depot          Des:Online Pmt ID:560053172331112 Indn:Capital Collision Gp   Co ID:Citiccsweb Web | 902562007188203 |
| 03/08 | 100.00 | Mbna Credit Cards Bill Payment | 943203080008804 |
| 03/18 | 11,342.43 | Online Banking transfer to Chk 4193 Confirmation# 0692331669 | 957203187554340 |
| 03/26 | 805.00 | Online Banking transfer to Chk 4193 Confirmation# 3762903721 | 957103267571096 |
| 03/31 | 741.00 | Home Depot          Des:Online Pmt ID:560076464300917 Indn:Capital Collision Gp   Co ID:Citiccsweb Web | 902589010785632 |

Card Account #

| Date | Amount | Description | Bank Reference |
|---|---|---|---|
| 03/17 | 590.85 | CheckCard  0316 Enterprise Rent-A-Car | 905703161184929 |

H

Page 3 of 4
Statement Period
03/01/10 through 03/31/10
EO  P  PE   OE 48          0132658
Enclosures 0
Account Number

CAPITAL COLLISION
ERIC A HINOJOSA

## Withdrawals and Debits - Continued
### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| Subtotal | 590.85 | | |

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 03/01 | 144.87 | 03/08 | 1,819.39 | 03/29 | 741.00 |
| 03/02 | 54.97 | 03/17 | 4,025.70 | 03/31 | 0.00 |
| 03/04 | 1,919.39 | 03/18 | 0.00 | | |

# Bank of America



Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

||..||.|.||.....||...|.||..|.|||...|..||.|.|.|.|.|.|.|.|

01099 001 SCM939 11     0

CAPITAL COLLISION GP
ERIC A HINOJOSA
4304 BURCH DR
DEL VALLE TX 78617-3273

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information
### www.bankofamerica.com

For additional information or service, you may call:
☎ 1.888.BUSINESS (1.888.287.4637)

Or you may write to:
✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

## Deposit Accounts

## Business Advantage Checking

### CAPITAL COLLISION GP   ERIC A HINOJOSA

### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | ▮▮▮▮▮▮▮▮ | Statement Beginning Balance | $7,009.76 |
| Statement Period | 03/01/10 through 03/31/10 | Amount of Deposits/Credits | $16,357.41 |
| Number of Deposits/Credits | 6 | Amount of Withdrawals/Debits | $21,525.79 |
| Number of Withdrawals/Debits | 26 | Statement Ending Balance | $1,841.38 |
| Number of Deposited Items | 4 | | |
| | | Average Ledger Balance | $3,195.62 |
| Number of Days in Cycle | 31 | Service Charge | $29.95 |

**Help avoid Overdraft & NSF: Returned Item fees.** Use Alerts to get messages by email or text to inform you when your balance is low. Use Overdraft Protection to transfer available funds from linked savings, credit card, or credit line to your checking account to help cover items that would overdraw your account. Call us for details.

CAPITAL COLLISION GP
ERIC A HINOJOSA

## Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | ████████ | 3,582.49 | Average | 03-30 |
| | Total Qualifying Balance | 3,582.49 | | |

Based on your combined balance of $3,582.49, your Business Advantage account has been charged a monthly maintenance fee.
You can avoid this fee in the future by maintaining $35,000 in combined balances.

## Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/08 | 497.50 | Deposit | 813204730856298 |
| 03/18 | 11,342.43 | Online Banking transfer from Chk 9118 Confirmation# 0692331669 | 957203187554341 |
| 03/22 | 2,593.20 | Deposit | 813204730423785 |
| 03/23 | 319.20 | Deposit | 813204730616062 |
| 03/26 | 805.00 | Online Banking transfer from Chk 9118 Confirmation# 3762903721 | 957103267571097 |
| 03/29 | 800.08 | Deposit | 813204730042952 |

## Withdrawals and Debits
### Checks

| Check Number | Amount ($) | Date Posted | Bank Reference | Check Number | Amount ($) | Date Posted | Bank Reference |
|---|---|---|---|---|---|---|---|
| 5101 | 557.40 | 03/01 | 813008992894512 | 20172 | 213.10 | 03/02 | 813003092277479 |
| 5102 | 550.00 | 03/12 | 813009092482164 | 20173 | 434.51 | 03/01 | 813008992065404 |
| 5106° | 675.09 | 03/18 | 813008992036196 | 20174 | 15.00 | 03/04 | 813009892820470 |
| 20160° | 271.00 | 03/09 | 813009692184126 | 20175 | 500.00 | 03/23 | 813009792480484 |
| 20167° | 219.96 | 03/01 | 813006192752812 | 20176 | 10,113.89 | 03/19 | 813008992770587 |
| 20169° | 1,142.98 | 03/01 | 813006192220154 | 20177 | 623.77 | 03/25 | 813204730673173 |
| 20171° | 380.00 | 03/01 | 813008792863716 | | | | |

° Gap in sequential check numbers.

## Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/01 | 100.00 | 3 Pawnee Leasing Des:Lease Pmt  ID:320955 Indn:Capital Collision G.P.  Co ID:4840884553 Ppd | 902560009530707 |
| 03/02 | 400.00 | Bank of America - Line of Credit Bill Payment | 943203020005110 |
| 03/04 | 500.00 | Ge Money         Des:Payment    ID:504662014152661 Indn:Hinojosa,Eric         Co ID:1061537262 Web | 902562006293580 |
| 03/11 | 91.37 | 3 Pawnee Leasing Des:Lease Pmt  ID:320955 Indn:Capital Collision G.P.  Co ID:4840884553 Ppd | 902569012489754 |
| 03/15 | 1,146.06 | 2 Pawnee Leasing Des:Lease Pmt  ID:320955 Indn:Capital Collision G.P.  Co ID:3840884553 Ppd | 902574003359778 |
| 03/16 | 100.00 | Dell Commercial Credit Bill Payment | 943203160005104 |
| 03/25 | 663.31 | Trail Creek Inve Des:Note Pmt  ID:Capital Collisi Indn:Capital Collision       Co ID:3262646872 Ccd | 902583009909906 |



CAPITAL COLLISION GP
ERIC A HINOJOSA

Account Number [REDACTED]

## Withdrawals and Debits – Continued
### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 03/26 | 600.00 | Mbna Line Of Credit Bill Payment | 943203260005108 |
| 03/29 | 741.00 | Online Banking transfer to Chk 9118 Confirmation# 5288477014 | 957303297562544 |
| 03/29 | 500.00 | Ge Money          Des:Payment    ID:504662014152661 Indn:Hinojosa,Eric         Co ID:1061537262 Web | 902588010526693 |
| 03/29 | 400.00 | Bank of America - Line of Credit Bill Payment | 943203290005114 |
| 03/30 | 557.40 | Marlin Leasing  Bill Payment | 943203300005107 |
| 03/31 | 29.95 | Monthly Maintenance Fee | |

## Total Overdraft Fees and NSF: Returned Item Fees

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $35.00 |
| Total NSF: Returned Item Fees | $0.00 | $105.00 |

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 03/01 | 4,174.91 | 03/12 | 2,631.94 | 03/23 | 4,351.73 |
| 03/02 | 3,561.81 | 03/15 | 1,485.88 | 03/25 | 3,064.65 |
| 03/04 | 3,046.81 | 03/16 | 1,385.88 | 03/26 | 3,269.65 |
| 03/08 | 3,544.31 | 03/18 | 12,053.22 | 03/29 | 2,428.73 |
| 03/09 | 3,273.31 | 03/19 | 1,939.33 | 03/30 | 1,871.33 |
| 03/11 | 3,181.94 | 03/22 | 4,532.53 | 03/31 | 1,841.38 |

Page 1 of 4
Statement Period
04.01.10 through 04.30.10
I.0  P PE  OE 48          0128301
Enclosures 0
Account Number  ▓▓▓▓▓▓▓▓▓▓



Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Ħ

|I::Il:l:Il:II:n::IlI::Il:l:Il:n:I:II:n:l:nIl:l:Il:n:Il:I:l:l:l|

03099 001 SCM999 1 2 4 0

CAPITAL COLLISION
ERIC A HINOJOSA
4304 BURCH DR
DEL VALLE TX 78617-3273

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information

### www.bankofamerica.com

For additional information or service, you may call:          Or you may write to:
1.888.BUSINESS (1.888.287.4637)                                Bank of America, N.A.
                                                               P.O. Box 25118
                                                               Tampa, FL 33622-5118

## Deposit Accounts

## Business Advantage Checking

### CAPITAL COLLISION  ERIC A HINOJOSA

### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | ▓▓▓▓▓▓▓▓ | Statement Beginning Balance | $0.00 |
| Statement Period | 04/01/10 through 04/30/10 | Amount of Deposits/Credits | $8,686.37 |
| Number of Deposits/Credits | 3 | Amount of Withdrawals/Debits | $8,716.32 |
| Number of Withdrawals/Debits | 6 | Statement Ending Balance | $29.95- |
| Number of Deposited Items | 0 | | |
| | | Average Ledger Balance | $9.74- |
| Number of Days in Cycle | 30 | Service Charge | $29.95 |

Your account has overdraft protection provided by Line of Credit number 6871 1022 401299.

Page 2 of 4
Statement Period
04/01/10 through 04/30/10
E0    P  PE    0E  48
Enclosures 0
Account Number ████████

CAPITAL COLLISION
ERIC A HINOJOSA

H

## Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying ($) Balance | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | ██████ | -9.74 | Average | 04-29 |
| | Total Qualifying Balance | - $9.74 | | |

Based on your combined balance of $9.74-, your Business Advantage account has been charged a monthly maintenance fee. You can avoid this fee in the future by maintaining $35,000 in combined balances.

## Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 04/01 | 70.05 | Online Banking transfer from Chk 4193 Confirmation# 3813438100 | 957104017596899 |
| 04/13 | 82.31 | Online Banking transfer from Chk 4193 Confirmation# 6217702175 | 957304137545894 |
| 04/19 | 8,534.01 | Online Banking transfer from Chk 4193 Confirmation# 1568911673 | 957204197556974 |

## Withdrawals and Debits

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 04/01 | 70.05 | BankCard        Des:Merch Fees ID:430134840051477 Indn:Capital Collision     Co ID:3210001923 Ccd | 902591009342190 |
| 04/13 | 35.00 | Overdraft Item Fee For Activity Of 04-12 Electronic Transaction | 934804120008265 |
| 04/19 | 35.00 | Extended Overdrawn Balance Charge | 971404190000102 |
| 04/19 | 8,464.01 | IRS              Des:Usataxpymt ID:270050900391617 Indn:Capital Collision Gp     Co ID:3387702000 Ccd | 902509010633189 |
| 04/30 | 29.95 | Monthly Maintenance Fee | |
| Card Account # ██████ : | | | |
| 04/12 | 82.31 | CheckCard  0410 Waterfront Restaurant | 905704101027032 |
| Subtotal | 82.31 | | |

## Total Overdraft Fees and NSF: Returned Item Fees

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $70.00 | $70.00 |
| Total NSF: Returned Item Fees | $0.00 | $0.00 |

H

Page 3 of 4
Statement Period
04/01/10 through 04/30/10
EO   P PE   OE 48          0128303
Enclosures 0
Account Number ▓▓▓▓▓▓

CAPITAL COLLISION
ERIC A HINOJOSA

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) |
|------|-------------|------|-------------|
| 04/12 | 82.31 - | 04/19 | 0.00 |
| 04/13 | 35.00 - | 04/30 | 29.95 - |



Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118



llllllllllllllllllllllllllllllllllllllllllll

03099 001 SCM099 I 2 4 0

CAPITAL COLLISION GP
ERIC A HINOJOSA
4304 BURCH DR
DEL VALLE TX 78617-3273

Our free Online Banking service allows you to check balances, track account activity, pay bills and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information
### www.bankofamerica.com

For additional information or service, you may call:        Or you may write to:
1.888.BUSINESS (1.888.287.4637)        Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

## Deposit Accounts

## Business Advantage Checking

CAPITAL COLLISION GP   ERIC A HINOJOSA

### Your Account at a Glance

| | | | |
|---|---|---|---|
| Account Number | ████████ | Statement Beginning Balance | $1,841.38 |
| Statement Period | 04/01/10 through 04/30/10 | Amount of Deposits/Credits | $15,241.47 |
| Number of Deposits/Credits | 5 | Amount of Withdrawals/Debits | $17,458.75 |
| Number of Withdrawals/Debits | 18 | Statement Ending Balance | $375.90- |
| Number of Deposited Items | 4 | | |
| | | Average Ledger Balance | $2,736.93 |
| Number of Days in Cycle | 30 | Service Charge | $29.95 |

Help avoid Overdraft & NSF: Returned Item fees. Use Alerts to get messages by email or text to inform you when your balance is low. Use Overdraft Protection to transfer available funds from linked savings, credit card, or credit line to your checking account to help cover items that would overdraw your account. Call us for details.

CAPITAL COLLISION GP
ERIC A HINOJOSA

## Your Business Advantage Pricing Relationship

| Account Name | Account Number | Qualifying Balance ($) | Type of Balance | Date |
|---|---|---|---|---|
| Business Advantage Checking | ███████████ | 2,809.84 | Average | 04-29 |
| | Total Qualifying Balance | 52,809.84 | | |

Based on your combined balance of $2,809.84, your Business Advantage account has been charged a monthly maintenance fee. You can avoid this fee in the future by maintaining $35,000 in combined balances.

## Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 04/06 | 5,506.64 | Deposit | 813204730146319 |
| 04/16 | 7,645.00 | Counter Credit | 813204730364109 |
| 04/16 | 183.00 | Deposit | 813204730364111 |
| 04/26 | 1,763.31 | Deposit | 813204730379002 |
| 04/26 | 143.52 | Deposit | 813204730379004 |

## Withdrawals and Debits
### Checks

| Check Number | Amount ($) | Date Posted | Bank Reference | Check Number | Amount ($) | Date Posted | Bank Reference |
|---|---|---|---|---|---|---|---|
| 20178 | 2,032.60 | 04/07 | 813008892579215 | 20180 | 635.47 | 04/14 | 813009292043338 |
| 20179 | 82.50 | 04/19 | 813009992337563 | 20181 | 500.00 | 04/16 | 813204730341334 |

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 04/01 | 70.05 | Online Banking transfer to Chk 9118 Confirmation# 3813438100 | 957104017596898 |
| 04/02 | 550.00 | Leaf        Bill Payment | 943204020005109 |
| 04/08 | 200.00 | Business Card   Bill Payment | 943204080005117 |
| 04/13 | 82.31 | Online Banking transfer to Chk 9118 Confirmation# 6217702175 | 957304137545893 |
| 04/15 | 1,146.06 | 2 Pawnee Leasing Des:Lease Pmt  ID:320955 Indn:Capital Collision G.P.  Co ID:3840884553 Ppd | 902505010153924 |
| 04/15 | 500.00 | Home Depot       Des:Online Pmt ID:560089433223077 Indn:Capital Collision Gp    Co ID:Citicesweb Web | 902504008383098 |
| 04/16 | 100.00 | Dell Commercial Credit Bill Payment | 943204160005111 |
| 04/19 | 8,534.01 | Online Banking transfer to Chk 9118 Confirmation# 1568911673 | 957204197556973 |
| 04/20 | 675.09 | Barbara Pampalone Bill Payment | 943204200005112 |
| 04/26 | 663.31 | Trail Creek Inve Des:Note Pmt    ID:Capital Collisi Indn:Capital Collision      Co ID:3262646872 Ccd | 902513010940091 |
| 04/26 | 600.00 | Mbna Line Of Credit Bill Payment | 943204260005115 |
| 04/29 | 500.00 | Ge Money      Des:Payment   ID:504662014152661 Indn:Hinojosa,Eric        Co ID:1061537262 Web | 902518006435221 |
| 04/30 | 557.40 | Marlin Leasing  Bill Payment | 943204300005113 |
| 04/30 | 29.95 | Monthly Maintenance Fee | |



CAPITAL COLLISION GP
ERIC A HINOJOSA

## Total Overdraft Fees and NSF: Returned Item Fees

|  | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $35.00 |
| Total NSF: Returned Item Fees | $0.00 | $105.00 |

## Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 04/01 | 1,771.33 | 04/13 | 4,413.06 | 04/20 | 67.93 |
| 04/02 | 1,221.33 | 04/14 | 3,777.59 | 04/26 | 711.45 |
| 04/06 | 6,727.97 | 04/15 | 2,131.53 | 04/29 | 211.45 |
| 04/07 | 4,695.37 | 04/16 | 9,359.53 | 04/30 | 375.90 - |
| 04/08 | 4,495.37 | 04/19 | 743.02 | | |

10

**Bank of America**



Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

CAPITAL COLLISION GP
ERIC A HINOJOSA
4304 BURCH DR STE A4
DEL VALLE, TX  78617-3275

01099 E01 SCM999          0

Our Online Banking service allows you to check balances, track account activity and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information
### www.bankofamerica.com

For additional information or service, you may call:
☎ 1.888.BUSINESS (1.888.287.4637)

Or you may write to:
✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

We're improving the system that supports automatic transfers for deposit accounts which will change the timing of certain automatic transfers. Effective April 23, when an automatic transfer between two of your Bank of America accounts falls on a weekend or federal holiday, it will now occur the prior business day. Please keep this change in mind when you schedule bill payments. Any other scheduled transfer that falls on a weekend or federal holiday will continue to occur the following business day. Additionally, you'll now be able to manage your transfers through Online Banking by going to the Transfers tab, as well as by calling the number on this statement or visiting your nearby banking center.

Good News! In response to customer feedback we've made some changes to your statements to make them easier to read. Soon you will notice color and graphics to highlight account details and draw attention to notifications and special offers. Over the next few months, a guide will be included with your new statement that will detail the enhancements. Stay tuned!

CAPITAL COLLISION GP
ERIC A HINOJOSA

| Deposit Accounts |
|---|

## Business Economy Checking
### CAPITAL COLLISION GP ERIC A HINOJOSA

### Your Account at a Glance

| Account Number | ████████ | Statement Beginning Balance | $15.46 |
|---|---|---|---|
| Statement Period | 04/01/13 through 04/30/13 | Amount of Deposits/Credits | $1,505.00 |
| Number of Deposits/Credits | 3 | Amount of Withdrawals/Debits | $1,498.18 |
| Number of Withdrawals/Debits | 4 | Statement Ending Balance | $22.28 |
| Number of Deposited Items | 2 | | |
| | | Average Ledger Balance | $574.45 |
| Number of Days in Cycle | 30 | | |

### Deposits and Credits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 04/01 | 1,300.00 | Deposit | 813008930688463 |
| 04/10 | 15.00 | Online Business Suite And Wire Transfer Refund Fdes Nmo 0006576 Nbksloz | 945004105761959 |
| 04/19 | 190.00 | Deposit | 813008930066384 |

### Withdrawals and Debits
### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 04/05 | 15.00 | Online Business Suite Acct Mgmt Services | 943204050129517 |
| 04/11 | 789.11 | Bank Of America · Line Of Credit Bill Payment | 943204110005312 |
| 04/19 | 675.00 | Barbara Pampalone Bill Payment | 943204190005310 |
| Card Account # ████████ | | | |
| 04/02 | 19.07 | CheckCard 0401 Experian °creditrepo | 905704011364961 |
| Subtotal | 19.07 | | |

### Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 04/01 | 1,315.46 | 04/05 | 1,281.39 | 04/11 | 507.28 |
| 04/02 | 1,296.39 | 04/10 | 1,296.39 | 04/19 | 22.28 |



0015108

# How To Balance Your Bank of America Account

**FIRST, start with your Account Register/Checkbook:**

1. List your Account Register/Checkbook Balance here ........................................................................ $ _____

2. Subtract any service charges or other deductions not previously recorded that are listed on this statement ............. $ _____

3. Add any credits not previously recorded that are listed on this statement (for example interest) ....................... $ _____

4. This is your NEW ACCOUNT REGISTER BALANCE .......................................................................... $ _____

**NOW, with your Account Statement:**

1. List your Statement Ending Balance here ................................................................................... $ _____

2. Add any deposits not shown on this statement ............................................................................. $ _____

SUBTOTAL ........................... $ _____

3. List and total all outstanding checks, ATM, Check Card and other electronic withdrawals

| Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | | Checks, ATM, Check Card, Electronic Withdrawals | |
|---|---|---|---|---|---|
| Date/Check # | Amount | Date/Check # | Amount | Date/Check # | Amount |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

4. TOTAL OF OUTSTANDING CHECKS, ATM, Check Card and other electronic withdrawals ............................ $ _____

5. Subtract total outstanding checks, ATM, Check Card and other electronic withdrawals from Subtotal
This Balance should match your new Account Register Balance .................................................... $ _____

Upon receipt of your statement, differences, if any, should be reported to the bank promptly in writing and in accordance with provisions in your deposit agreement.

## IMPORTANT INFORMATION FOR BANK DEPOSIT ACCOUNTS

**Change of Address.** Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

**Deposit Agreement.** When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule, which contain the current version of the terms and conditions of your account relationship, may be obtained at our banking centers.

**Electronic Transfers: In case of errors or questions about your electronic transfers**
If you think your statement or receipt is wrong or if you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
* Tell us your name and account number.
* Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
* Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

**Reporting Other Problems.** You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or unauthorized transactions within the time periods specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree not to make a claim against us for the problems or unauthorized transactions.

**Direct Deposits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.

# Bank of America



Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

ll..ll.l.ll....ll..l..lll

01099 E01 SCH999        0

CAPITAL COLLISION GP
ERIC A HINOJOSA
4304 BURCH DR STE A4
DEL VALLE, TX  78617-3275

Our Online Banking service allows you to check balances, track account activity and more.
With Online Banking you can also view up to 18 months of this statement online.
Enroll at www.bankofamerica.com/smallbusiness.

## Customer Service Information
### www.bankofamerica.com

For additional information or service, you may call:        Or you may write to:
☎ 1.888.BUSINESS (1.888.287.4637)                          ✉ Bank of America, N.A.
                                                              P.O. Box 25118
                                                              Tampa, FL 33622-5118

Good News! In response to customer feedback we've made some changes to your statements to make them easier to read. Soon you will notice color and graphics to highlight account details and draw attention to notifications and special offers. Over the next few months, a guide will be included with your new statement that will detail the enhancements. Stay tuned!

**Bank of America**

P.O. Box 15284
Wilmington, DE 19850

Customer service information

Customer service: 1.888.BUSINESS

bankofamerica.com

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

CAPITAL COLLISION GP
ERIC A HINOJOSA
1950 RUTLAND DR
AUSTIN, TX 78758-5420

# Your Business Fundamentals Chk

for October 1, 2013 to October 31, 2013

Account number:

## Account summary

| | |
|---|---|
| Beginning balance on October 1, 2013 | $21.79 |
| Deposits and other credits | 6,050.00 |
| Withdrawals and other debits | -6,021.20 |
| Checks | -0.00 |
| Service fees | -0.00 |
| Ending balance on October 31, 2013 | $50.59 |

# of deposits/credits: 1

# of withdrawals/debits: 2

# of deposited items: 0

# of days in cycle: 31

Average ledger balance: $598.04

## IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

Change of address – Please call us at the telephone number listed on the front of this statement to tell us about a change of address.

Deposit agreement – When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our banking centers.

Electronic transfers: In case of errors or questions about your electronic transfers – If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

Tell us your name and account number.

Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.

Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems – You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you for, and you agree to not make a claim against us for the problems or unauthorized transactions.

Direct deposits – If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us at the telephone number listed on the front of this statement to find out if the deposit was made as scheduled.

© 2013 Bank of America Corporation

**Bank of America, N.A. Member FDIC and** ⌂ **Equal Housing Lender**

**BankofAmerica**

CAPITAL COLLISION GP | Account # ███████████ | October 01, 2013 to October 31, 2013

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 10/22/13 | Deposit | 6,050.00 |
| **Total deposits and other credits** | | **$6,050.00** |

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|
| 10/25/13 | Barbara Pampalone Bill Payment | -6,000.00 |
| Card account # ███████████ 2 | | |
| 10/02/13 | CHECKCARD 1001 EXPERIAN   *CREDITREPO 877-2847942  CA 24351783274003500053334 RECURRING CKCD 5968 4635720007146432 4635 7200 0714 6432 | -21.20 |
| Subtotal for card account # ███████████ | | -$21.20 |
| **Total withdrawals and other debits** | | **-$6,021.20** |

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 10/01 | 21.79 | 10/22 | 6,050.59 | 10/25 | 50.59 |
| 10/02 | 0.59 | | | | |

This page intentionally left blank

11

NOTICE THIS DOCUMENT CONTAINS SENSITIVE DATA

NO. D-1-GN-14-003207

| | | |
|---|---|---|
| BARBARA PAMPALONE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ERIC HINOJOSA AND AUSTIN | § | |
| CAPITAL COLLISION, LLC, | § | |
| | § | |
| *Defendants.* | § | 419TH JUDICIAL DISTRICT |

## STIPULATION OF THE PARTIES

Plaintiff Barbara Pampalone and Defendants Eric Hinojosa and Austin Capital Collision, LLC, hereby agree and stipulate as follows:

1. If Plaintiff is entitled to damages arising from default on the loan she has alleged, then the amount of damages is $56,758.68 as of June 8, 2015. This amount is calculated pursuant to the amortization schedule attached as Exhibit A to Plaintiff's Second Amended Petition, and is exclusive of attorneys' fees and other pleaded for relief.

2. The attorneys' fees and costs incurred by Plaintiff through April 2015 total $44,950.30. This amount is established by the documents Bates-labeled BP_000403-BP_00431. These documents are preadmitted for the purposes of attorneys' fees testimony and the hourly rates reflected therein are reasonable. Further, Nelia J. Robbi may testify as to attorneys' fees in lieu of Plaintiff's designated testifying expert, Joe Lea. Ms. Robbi is qualified in all respects to present testimony as to attorneys' fees and costs on behalf of Plaintiff and may present direct testimony in the narrative form. This agreement shall not preclude Plaintiff from offering testimony and evidence as to attorneys' fees incurred and/or anticipated after April 2015.

3. Any document produced by any Party in this lawsuit and used at trial as an exhibit by any Party shall be preadmitted; the Parties reserve relevancy objections. This agreement shall apply to

those documents which have been produced by the Parties as of the date of this stipulation.

4.    The Summary of Payments to Plaintiffs, attached hereto as Exhibit A, is a true and accurate reflection of the information it purports to summarize.

5.    There is no signed promissory note for the loan at issue in this lawsuit.

Respectfully submitted,

McGINNIS LOCHRIDGE
600 Congress Avenue, Suite 2100
Austin, Texas  78701
(512) 495-6065
(512) 495-6093 (Fax)

By:_____
Joe Lea
State Bar No. 12082000
jlea@mcginnislaw.com
Nelia J. Robbi
State Bar No. 24052296
nrobbi@mcginnislaw.com
Jordan K. Mullins
State Bar No. 24070308
jmullins@mcginnislaw.com

ATTORNEYS FOR BARBARA PAMPALONE


SLATER PUGH, Ltd. LLP
8400 N. Mopac Expressway
Suite 100
Austin, Texas 78759
Telephone: (512) 472-2431
Telecopier (512) 472-0432

By: _____
Adam Pugh
State Bar No. 24044341
apugh@slaterpugh.com

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via facsimile and/or electronic mail on this the 5th June 2015 on the following:

Adam Pugh
8400 N. Mopac Expressway
Suite 100
Austin, Texas 78759
(512) 472-2431
(512) 472-0432 fax

Nelia Robbi

3

# Exhibit A

CAUSE NO. D-1-GN-14-003207

| BARBARA PAMPALONE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ERIC HINOJOSA AND AUSTIN | § | |
| CAPITAL COLLISION, LLC, | § | |
| | § | |
| *Defendants.* | § | 419TH JUDICIAL DISTRICT |

## Summary of Payments to Plaintiff

| No. | Date | Amount | Bank Account |
|-----|------|--------|--------------|
| 1. | 05/20/2005 | $675.09 | |
| 2. | 06/20/2005 | $675.09 | |
| 3. | 07/20/2005 | $675.09 | Bank of America Business Advantage |
| 4. | 08/19/2005 | $675.09 | Checking Account No. XXXX XXXX |
| 5. | 09/20/2005 | $675.09 | 9118 |
| 6. | 10/20/2005 | $675.09 | |
| 7. | 11/18/2005 | $675.09 | Capital Collision |
| 8. | 12/20/2005 | $675.09 | Eric A. Hinojosa |
| 9. | 01/20/2006 | $675.09 | |
| 10. | 02/17/2006 | $675.09 | |
| 11. | 03/20/2006 | $675.09 | |
| 12. | 04/20/2006 | $675.09 | |
| 13. | 05/19/2006 | $675.09 | |
| 14. | 06/20/2006 | $675.09 | |
| 15. | 07/20/2006 | $675.09 | |
| 16. | 08/18/2006 | $675.09 | |
| 17. | 09/20/2006 | $675.09 | |
| 18. | 10/20/2006 | $675.09 | |
| 19. | 11/20/2006 | $675.09 | |
| 20. | 12/20/2006 | $675.09 | |
| 21. | 01/19/2007 | $675.09 | |
| 22. | 02/20/2007 | $675.09 | |
| 23. | 03/20/2007 | $675.09 | |
| 24. | 04/20/2007 | $675.09 | |
| 25. | 05/18/2007 | $675.09 | |
| 26. | 06/20/2007 | $675.09 | |
| 27. | 07/20/2007 | $675.09 | |
| 28. | 08/06/2007 | $505.07 | |
| | 08/20/2007 | $170.02 | |

| No. | Date | Amount | Bank Account |
|---|---|---|---|
| 29. | 09/20/2007 | $675.09 | |
| 30. | 10/19/2007 | $675.09 | |
| 31. | 11/20/2007 | $675.09 | |
| 32. | 12/20/2007 | $675.09 | |
| 33. | 01/18/2008 | $675.09 | |
| 34. | 02/20/2008 | $675.09 | |
| 35. | 03/20/2008 | $675.09 | |
| 36. | 04/18/2008 | $675.09 | |
| 37. | 05/20/2008 | $675.09 | |
| 38. | 06/20/2008 | $675.09 | |
| 39. | 07/18/2008 | $675.09 | |
| 40. | 08/20/2008 | $675.09 | |
| 41. | 09/19/2008 | $675.09 | |
| 42. | 10/20/2008 | $675.09 | |
| 43. | 11/20/2008 | $675.09 | |
| 44. | 12/19/2008 | $675.09 | |
| 45. | 01/20/2009 | $675.09 | |
| 46. | 02/20/2009 | $675.09 | |
| 47. | 03/20/2009 | $675.09 | |
| 48. | 04/20/2009 | $675.09 | |
| 49. | 05/20/2009 | $675.09 | |
| 50. | 06/19/2009 | $675.09 | |
| 51. | 07/20/2009 | $675.09 | |
| 52. | 08/20/2009 | $675.09 | |
| 53. | 09/18/2009 | $675.09 | |
| 54. | 10/20/2009 | $675.09 | |
| 55. | 11/20/2009 | $675.09 | |
| 56. | 12/20/2009 | $675.09 | |
| 57. | 01/20/2010 | $675.09 | |
| 58. | 02/19/2010 | $675.09 | |
| 59. | 03/19/2010 | $675.09 | |
| 60. | 04/20/2010 | $675.09 | Bank of America Business Advantage Checking Account No. XXXX XXXX 4193 |
| 61. | 05/20/2010 | $675.09 | |
| 62. | 06/18/2010 | $675.09 | |
| 63. | 07/20/2010 | $675.09 | |
| 64. | 08/20/2010 | $675.09 | Capital Collision GP |
| 65. | 09/20/2010 | $675.09 | Eric A. Hinojosa |
| 66. | 10/20/2010 | $675.09 | |
| 67. | 11/19/2010 | $675.09 | |
| 68. | 12/20/2010 | $675.09 | |
| 69. | 01/20/2011 | $675.09 | |
| 70. | 02/18/2011 | $675.09 | |
| | 03/--/2011 | -- | |
| | 04/--/2011 | -- | |

46

| No. | Date | Amount | Bank Account |
|---|---|---|---|
| | 05/--/2011 | -- | |
| 71. | 06/10/2011 | $675.00 | |
| 72. | 06/20/2011 | $675.00 | |
| 73. | 07/20/2011 | $675.00 | |
| 74. | 08/19/2011 | $675.00 | |
| 75. | 09/20/2011 | $675.00 | |
| 76. | 10/20/2011 | $675.00 | |
| 77. | 11/18/2011 | $675.00 | |
| 78. | 12/20/2011 | $675.00 | |
| 79. | 01/20/2012 | $675.00 | |
| 80. | 02/17/2012 | $675.00 | |
| 81. | 03/20/2012 | $675.00 | |
| 82. | 04/20/2012 | $675.00 | |
| 83. | 05/18/2012 | $675.00 | |
| 84. | 06/20/2012 | $675.00 | |
| 85. | 07/20/2012 | $675.00 | |
| 86. | 08/20/2012 | $675.00 | |
| 87. | 09/20/2012 | $675.00 | |
| 88. | 10/19/2012 | $675.00 | |
| 89. | 11/20/2012 | $675.00 | |
| 90. | 12/20/2012 | $675.00 | |
| 91. | 01/18/2013 | $675.00 | |
| 92. | 02/20/2013 | $675.00 | |
| 93. | 03/20/2013 | $675.00 | |
| 94. | 04/19/2013 | $675.00 | |
| | 05/--/2013 | | |
| | 06/--/2013 | | |
| | 07/--/2013 | | |
| | 08/--/2013 | | |
| | 09/--/2013 | | |
| 95. | 10/25/2013 | $6,000.00 | |

47

12

873 S.W.2d 73
Court of Appeals of Texas,
Austin.

626 JOINT VENTURE d/b/a Cedar Canyon
Ranch, Charles Steger, John Gantt, and Jim
Caskey, Appellants,
v.
James H. SPINKS and Claudette L. Spinks,
Appellees.

No. 3–92–638–CV. | Dec. 29, 1993.

Vendors brought suit against joint venture and its individual venturers to recover deficiency following foreclosure of deed of trust. The 368th Judicial District Court, Williamson County, Burt Carnes, J., rendered judgment for vendors, and defendants appealed. The Court of Appeals, Jones, J., held that: (1) references in note and other sale document to individual as "Trustee" were ambiguous, and thus, parol evidence rule did not bar introduction of evidence showing that individual was acting as representative of joint venture; (2) statute of frauds defense was unavailable to defendants; (3) even if absence of individual joint ventures' signatures would prevent them from being liable on note, it would not preclude their liability for underlying indebtedness assumed when they agreed to purchase land; and (4) jury's finding that joint venture agreed to pay indebtedness established not only joint venture's liability, but also that of individual venturers.

Affirmed.

West Headnotes (12)

[1] **Appeal and Error**
🔑Interrogatories and Special Verdicts

In deciding no-evidence point, Court of Appeals must consider only the evidence and inferences tending to support trier of fact and disregard all evidence and inferences to the contrary.

Cases that cite this headnote

[2] **Appeal and Error**
🔑Extent of Review
**Appeal and Error**
🔑Clear or Palpable Weight or Preponderance

When reviewing jury verdict to determine factual sufficiency of evidence, Court of Appeals must consider and weigh all evidence and should set aside judgment only if it is so contrary to overwhelming weight of evidence as to be clearly wrong and unjust.

Cases that cite this headnote

[3] **Evidence**
🔑Evidence for Purpose Other Than Varying Rights or Liabilities Dependent Upon Terms of Writing

Parol evidence rule is inapplicable when suit is brought on underlying transaction rather than note itself.

Cases that cite this headnote

[4] **Evidence**
🔑Grounds for Exclusion of Extrinsic Evidence

Parol evidence rule only excludes evidence that varies terms of unambiguous contract.

Cases that cite this headnote

[5] **Evidence**
🔑Grounds for Admission of Extrinsic Evidence

Parol evidence rule does not exclude evidence offered to clarify or explain ambiguous writing.

Cases that cite this headnote

[6] **Evidence**
🔑Contracts of Sale

References in note and other sale documents to individual as "Trustee" were ambiguous, and, thus, parol evidence rule did not bar introduction of evidence showing that individual was acting as representative of joint venture with respect to purchase of real property; references to "trustee" showed that note was signed by individual in representative capacity, but did not show for whom he was acting.

Cases that cite this headnote

[7] **Frauds, Statute Of**
🔑Contracts Completely Performed

When one party to contract has fully performed his obligations under it, statute of frauds is unavailable to the other who knowingly accepts benefits and partly performs. V.T.C.A., Bus. & C. § 26.01.

6 Cases that cite this headnote

[8] **Frauds, Statute Of**
🔑Agreements to Convey Land

Defense of statute of frauds was unavailable to preclude finding that joint venture was liable for underlying indebtedness for purchase of real property, where vendors fully performed their part of transaction by deeding land to individual joint venturer as trustee, trustee paid vendors $300,000 in cash and signed note for $445,000, and joint venture, over the next three years, managed property, made improvements to it, and made payments to vendors. V.T.C.A., Bus. & C. § 26.01.

6 Cases that cite this headnote

[9] **Joint Adventures**
🔑Actions by or Against Third Persons

Legally and factually sufficient evidence allowed jury to find that joint venture agreed to pay indebtedness underlying note signed in connection with purchase of real property, even though note was signed only by one individual joint venturer as "Trustee," where, over the next three years, joint venture managed property, made improvements to property, and made payments to vendors.

1 Cases that cite this headnote

[10] **Joint Adventures**
🔑Rights and Liabilities of Parties as to Third Persons

Even if absence of signatures of individual joint venturers would prevent them from being liable on note signed in connection with purchase of real property, it would not preclude their liability for underlying indebtedness assumed when they agreed to buy property. V.T.C.A., Bus. & C. § 3.401.

2 Cases that cite this headnote

[11] **Joint Adventures**
🔑Joint Adventures

Joint venture is generally governed by same legal rules as partnership.

2 Cases that cite this headnote

[12] **Joint Adventures**
🔑Actions by or Against Third Persons

Jury's finding that joint venture agreed to pay indebtedness for purchase of real property established not only joint venture's liability, but also that of individual venturers. Vernon's Ann.Texas Civ.St. art. 6132b, § 15(1).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*74** Dennis L. Roossien, Jr., Strasburger & Price, L.L.P., Dallas, for appellants.

Donna Gregg, Law Offices of Jim Dear, P.C., Austin, for appellees.

Before POWERS, JONES and KIDD, JJ.

**Opinion**

JONES, Justice.

James H. Spinks and Claudette L. Spinks, appellees, brought suit against 626 Joint Venture d/b/a Cedar Canyon Ranch, Charles Steger, John Gantt, and Jim Caskey (collectively, "defendants"), appellants, for a debt allegedly owed to the Spinkses. Trial was to a jury, which found that (1) Steger, Gantt, Caskey, and Don Bizzell were partners;[1] (2) the partnership's agent, Bizzell, signed a note and deed of trust on behalf of the partnership; and (3) the partnership agreed, through its agent, to pay the indebtedness to the Spinkses. Based on these findings, the trial court rendered judgment for the Spinkses.

[1]    Bizzell was initially named as a defendant, but apparently was dropped from the lawsuit after he filed bankruptcy.

Defendants bring four points of error. They assert that (1) as a matter of law, defendants are not liable for the indebtedness evidenced by the note because the note does not bear any of their names; (2) there is no evidence, or alternatively insufficient evidence, to sustain the jury's finding that the agent signed the note and deed of trust on behalf of the partnership; (3) there is no evidence, or alternatively insufficient evidence, to sustain the jury's finding that the partnership agreed, through its agent, to pay the indebtedness evidenced by the note; and (4) there

was no evidence to support the jury instruction on ratification. We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Spinkses owned 626 acres of land in Lampasas County known as Cedar Canyon Ranch. In 1985 they listed the land for sale with a real estate agent. The realtor told them a group of businessmen were interested in purchasing the property. In touring the property, Gantt and Caskey introduced themselves to the Spinkses as two of the people who were going to buy the land. A short time later, the Spinkses entered into a contract for the sale of the land with "Don Bizzell, Trustee." The Spinkses believed Bizzell signed the contract on behalf of the group, and was not signing the contract as an individual. Bizzell testified that he entered into the contract for the group.

On the date of closing, the group had not yet executed any formal written joint venture agreement, and apparently the venture did not yet have a name. The Spinkses deeded the property to "Don Bizzell, Trustee" in exchange for $300,000 cash, a note for $445,000, and a deed of trust covering 446 of the 626 acres. The note and deed of trust were executed by "Don Bizzell, Trustee." None of the documents reflected for whom Bizzell was acting as trustee.

**\*75** Some months after closing, Bizzell, Steger, Gantt, and Caskey executed a written joint venture agreement to form the "626 Joint Venture." The agreement was made effective as of the date of the sale of the property. Over the next three years, the joint venture actively managed the property, including paying taxes, making permanent improvements, imposing restrictive covenants, listing it as a partnership asset on tax returns, and making payments to the Spinkses.

In 1989 Bizzell informed the Spinkses by letter that the next payment due under the note would not be made. Bizzell signed the letter as Trustee for "626 Joint Venture d/b/a Cedar Canyon Ranch." After the note went into default, the Spinkses foreclosed on the property and later brought this suit to recover the deficiency balance.

## DISCUSSION

The Spinkses asserted several causes of action in their

suit. They alleged that the joint venture and its individual venturers were liable for the deficiency balance both on the note and on the underlying transaction for the sale of land. In their first and third points of error, defendants assert that they are not liable because neither the joint venture's name nor the individual venturers' names are on the note. *See* Tex.Bus. & Com.Code Ann. § 3.401(a) (West 1968). Defendants argue that if they are not liable on the note, they likewise cannot be liable on the underlying transaction. They also contend that any evidence that the joint venture agreed to pay the debt was barred (1) by the parol evidence rule because it contradicts the note of which only "Bizzell, Trustee" was maker and (2) by the statute of frauds because it was not in writing.

[1] In deciding a no-evidence point, we must consider only the evidence and inferences tending to support the finding of the trier of fact and disregard all evidence and inferences to the contrary. *Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 593 (Tex.1986), *cert. denied,* 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *see generally* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515 (1991).

[2] When reviewing a jury verdict to determine the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986); *see generally* Powers & Ratliff, *supra.*

Steger, Gantt, and Caskey testified that they authorized Bizzell to purchase the land in Bizzell's name as trustee for the group. Bizzell was authorized to pay $300,000 to the Spinkses and execute, as trustee, a note for $445,000. Steger, Gantt, and Caskey testified that they intended for the obligation to be "non-recourse." They meant for the note to be an obligation of the group, but not the individual members of the group. They apparently believed that as long as Bizzell executed the note as "trustee," they would not incur personal liability on the debt.

[3] [4] [5] [6] Defendants contend first that any evidence that the joint venture agreed to pay the debt was barred by the parol evidence rule. We disagree. Where suit is brought on the underlying transaction rather than the note itself, the parol evidence rule is inapplicable. *National Mar–Kit,*

*Inc. v. Forrest,* 687 S.W.2d 457, 459 (Tex.App.—Houston [14th Dist.] 1985, no writ). Moreover, even when the parol evidence rule applies, it only excludes evidence that varies the terms of an unambiguous contract. *Denman v. Hall,* 144 Tex. 633, 193 S.W.2d 515 (1946); *Lassiter v. Rotogravure Comm., Inc.,* 727 S.W.2d 8 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). The rule does not exclude evidence offered to clarify or explain an ambiguous writing. *Lassiter,* 727 S.W.2d at 9; *Byrd v. Southwest Multi–Copy, Inc.,* 693 S.W.2d 704 (Tex.App.—Houston [14th Dist.] 1985, no writ). In the present case, the references in the note and other sale documents to "Don Bizzell, **\*76** Trustee" are ambiguous.[2] They show that the note was signed by Bizzell in a representative capacity, but do not show for whom he was acting. Accordingly, evidence showing that Bizzell was acting as a representative of the joint venture was admissible.

[2] This case is distinguishable from *Vector Corp. v. First State Bank & Trust Co.,* 430 S.W.2d 536 (Tex.Civ.App.—Waco 1968, writ ref'd n.r.e.), on which defendants rely. The *Vector* court held that there was no ambiguity in a note signed by an agent "individually and as Trustee." *Id.* at 538. The evidence in *Vector* was undisputed, however, that the Bank relied on the agent personally to pay the note. *Id.* The court held that because the principal was disclosed and the agent was bound, the Bank elected to look to the agent, and the principal was not liable. *Id.* However, *Vector* involved a suit on a note, not on the underlying transaction. *Id.* at 537. In addition, the evidence in the present case showed that both the Spinkses and defendants believed the debt was an obligation of the joint venture and not solely of Bizzell. Finally, while in *Vector* the agent was individually liable on the note, the agent in the present case, Bizzell, who signed the note only as trustee, may not be liable on the note. *See Bradford v. McElroy,* 746 S.W.2d 294 (Tex.App.—Austin 1988, no writ).

[7] [8] [9] We also disagree with defendants' contention that any liability based on the underlying indebtedness is barred by the statute of frauds. The statute of frauds provides that certain types of promises and agreements, including contracts for the sale of real estate, are unenforceable unless in writing and signed by the person to be charged or by someone lawfully authorized to sign for him. *See* Tex.Bus. & Com.Code Ann. § 26.01 (West 1987). However, where one party to a contract has fully performed his obligations under it, the statute of frauds is unavailable to the other who knowingly accepts benefits and partly performs. *Estate of Kaiser v. Gifford,* 692 S.W.2d 525, 526 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *LeSage v. Dunaway,* 195 S.W.2d 729,

731 (Tex.Civ.App.—Waco 1946, no writ). In the present case, the Spinkses fully performed their part of the transaction by deeding the land to Bizzell as trustee. Bizzell paid the Spinkses $300,000 cash, and signed a note for $445,000. Over the next three years, the joint venture managed the property, made improvements to the property, and made payments to the Spinkses. Therefore, the defense of the statute of frauds is unavailable to defendants. We conclude there was legally and factually sufficient evidence for the jury to find that the joint venture agreed to pay the indebtedness underlying the note.

[10] Defendants also argue that the absence of their names from the note relieves them of liability, notwithstanding any agreement to pay for the land. *See* Tex.Bus. & Com.Code Ann. § 3.401(a) (West 1968) ("No person is liable on an instrument unless his signature appears thereon."). We disagree. Even if the absence of their signatures would prevent defendants from being liable "on the note," it would not preclude their liability for the underlying indebtedness assumed when they agreed to buy the land: "Nothing in this section is intended to prevent any liability arising apart from the instrument itself. The party who does not sign may still be liable on the original obligation for which the instrument was given...." Tex.Bus. & Com.Code Ann. art. 3.401 cmt. 1 (West 1968). The Spinkses' pleadings clearly reflect that they brought suit both on the note *and* on the original indebtedness. Under these circumstances, section 3.401 does not relieve defendants of liability.

[11] [12] A joint venture is generally governed by the same legal rules as a partnership. *Pardco v. Spinks,* 836 S.W.2d 649, 651 (Tex.App.—El Paso 1992, writ denied); *Woodrum v. Cowan,* 468 S.W.2d 592, 598–99 (Tex.Civ.App.—Austin 1971), *modified on other grounds,* 472 S.W.2d 749 (Tex.1971). It is, of course, settled law that "[a]ll partners are liable jointly and severally for all debts and obligations of the partnership." Tex.Rev.Civ.Stat.Ann. art. 6132b, § 15(1) (West 1970 & Supp.1994). Therefore, the jury's finding that the joint venture agreed to pay the indebtedness establishes not only the joint venture's liability, but also that of the individual venturers.

We overrule points of error one and three. Because the jury's finding challenged by these points of error will support the judgment, we need not address the remaining points of error.

### *77 CONCLUSION

We affirm the trial court's judgment.

### All Citations

873 S.W.2d 73, 24 UCC Rep.Serv.2d 151

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

13

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Dynegy, Inc. v. Yates, Tex.App.-San Antonio,
August 25, 2010

692 S.W.2d 525
Court of Appeals of Texas,
Houston 1st Dist.

The ESTATE OF Herbert KAISER, Appellant,
v.
Myrvin H. GIFFORD, Appellee.

No. 01–84–0438–CV. | April 11, 1985. | Rehearing
Denied June 27, 1985.

Administratrix of decedent lender's estate brought suit to recover balance due under loan given to decedent's nephew. The 149th District Court, Brazoria County, Paul Ferguson, J., held that action to enforce payment of loan was barred by statute of frauds, and administratrix appealed. The Court of Appeals, Warren, J., held that oral installment loan agreement, although payable in 300 monthly installments, was not barred by statute of frauds.

Reversed and judgment rendered.

West Headnotes (4)

[1]     **Frauds, Statute Of**
        Contracts Completely Performed

        Oral installment loan agreement, although payable in 300 monthly installments, was not barred by statute of frauds [V.T.C.A., Bus. & C. § 26.01(b)(6)], because lender had made full performance under the agreement, thereby taking the oral agreement out of the prohibition of the statute.

        25 Cases that cite this headnote

[2]     **Costs**
        Particular Actions or Proceedings
        **Costs**
        Attorney Fees on Appeal or Error

Lender who was entitled to judgment on its debt was also entitled to reasonable attorney's fees for preparation and trial as well as those fees allowed for appeal. Vernon's Ann.Texas Civ.St. art. 2226.

2 Cases that cite this headnote

[3]     **Contracts**
        Acts Constituting Renunciation and Liabilities Therefor

        After borrower repudiated entire loan agreement, lender was entitled to consider the repudiation as an anticipatory breach and sue for the entire amount due under the agreement.

        4 Cases that cite this headnote

[4]     **Gifts**
        Gift of Money or Bank Deposits in General

        Trial court's finding that transfer of funds from uncle to nephew was loan, rather than gift, was not against great weight and preponderance of evidence, as nephew had issued monthly checks to uncle after the transaction, several of which contained the notation "for house."

        Cases that cite this headnote

**Attorneys and Law Firms**

**\*525** Floyd H. Christian, Jr., Angleton, for appellant.

Leland B. Kee, Kee & Patterson, Angleton, for appellee.

Before WARREN, DUGGAN and HOYT, JJ.

**OPINION**

WARREN, Justice.

This is an appeal from a take nothing judgment on appellant's suit for debt.

The court found that Herbert Kaiser, deceased, and appellee had entered into an oral installment loan agreement, but also found that the appellant estate's action to enforce payment of the loan was barred by the Statute of Frauds, prohibiting oral contracts not to be performed within one year.

[1] We hold that the oral installment agreement, although payable in 300 monthly installments, was not barred by the Statute of Frauds, because the deceased lender had made full performance under the agreement, thereby taking the oral agreement out of the prohibition of the statute.

In May 1975, appellee purchased a home in Brazoria County. Appellee's uncle, Herbert Kaiser, issued one check for $14,692.16 to Southwest Land Title Company as payment for the home, and one check **\*526** for $2,308 to appellee for the purchase of the household furnishings. Appellee and Kaiser never executed a written agreement providing for the repayment of the loan. However, between October 1975 and July 1979, when Kaiser died, appellee made 44 monthly payments to Kaiser totalling $6,685.14.

Following Kaiser's death in 1979, appellee quit making monthly installments, claiming that the money advanced by Kaiser was a gift rather than a loan.

After several written demands for payment of the installments were refused by appellee, Dorothy M. Kaiser, administratrix of Kaiser's estate, filed suit to recover the balance due under the loan.

After a non-jury trial, the court entered a take nothing judgment for appellee and found: (1) that Kaiser loaned appellee $17,000.16; (2) that appellee agreed to repay the $17,000.06 in 300 monthly installments of $151.49 each; (3) that appellee had paid interest and principal of $6,685.41; (4) that a principal balance of $16,276.37 was owed under the loan; (5) that the debt was barred by Tex.Bus. & Comm.Code Ann. art. 26.01(b)(6) (Tex.U.C.C.) (Vernon Supp.1985), the Statute of Frauds.

In two points of error, appellant claims that the trial court erred in holding the debt was barred by the Statute of Frauds, because there was complete performance by Kaiser, and appellee was estopped to claim the Statute of Frauds. In his second point of error, appellant claims that the trial court erred in not awarding appellant attorney's fees.

In two cross points of error, appellee claims: (1) that the trial court erred in finding that appellant's pre-trial demand for payment of the amount due under the loan agreement was not excessive, and (2) that the trial court's finding that the money furnished by Kaiser was a loan was against the great weight and preponderance of the evidence.

Article 26.01 provides in part:

(a) A promise or agreement described in Subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

(b) Subsection (a) of this section applies to:

....

(6) an agreement which is not to be performed within one year from the date of making the agreement

In *Ware v. Poindexter Furniture & Carpet Co.,* 88 S.W.2d 718 (Tex.Civ.App.—Fort Worth 1935), *rev'd on other grounds,* 131 Tex. 568, 117 S.W.2d 420 (1938), the court held that the oral contracts to sell $7744.96 worth of furniture for $500 down with the balance to be paid in monthly installments of not less than $100, was not barred by the Statute of Frauds, because the seller had fully performed and the buyer had knowingly accepted the benefits. Thus, the court followed the rule that where one party fully performs a contract, the Statute of Frauds is unavailable to the other who knowingly accepts benefits and partly performs. *Callahan v. Walsh,* 49 S.W.2d 945 (Tex.Civ.App.—San Antonio 1932, writ ref'd). The court further cited *Texas Co. v. Burkett,* 117 Tex. 16, 296 S.W. 273 (1927), for the general rule that:

where one party to an oral contract has, in reliance thereon, so far performed his part of the agreement

that it would be permitting a fraud on him to allow the other party to repudiate the contract and set up the statute of frauds in justification thereof, equity will regard the case as being removed from the operation of the statute, and will enforce the contract.

The Restatement (Second) of Contracts, sec. 130(d) (1982) sets forth the general rules regarding the inapplicability of the Statute of Frauds to our situation as follows:

> If either party promises a performance that cannot be completed within a year, **\*527** the Statute applies to all promises in the contract, including those which can or even must be performed within a year. But unlike other provisions of the Statute, the one-year provision does not apply to a contract which is performed on one side at the time it is made, such as a loan of money, nor to any contract which has been fully performed on one side, whether the performance is completed within a year or not.

A great majority of jurisdictions agree with the rule that full performance by one party to an oral contract removes the contract from the prohibitions of the Statute. *See* 3 S. Williston, A Treatise on the Law of Contracts, sec. 504 (3d ed. 1970 and Supp.1983); 2 A. Corbin, Contracts sec. 457 (1962 and Supp.1984).

In our case there was not only full performance by Kaiser, but there were 42 separate written instruments evidencing an agreement that a monthly installment of a fixed amount was payable to Kaiser in satisfaction of the debt. Allowing appellee to invoke the Statute, under these facts, would tend more to encourage fraud rather than discourage it as is contemplated by the Statute.

Appellant's first point of error is sustained.

We also sustain appellant's second point of error which contends that the court should have awarded attorney's fees to the appellant.

[2] The court found: (1) that appellant made timely written demand on appellee to pay the amount owing on the debt,

as required by Tex.Rev.Civ.Stat.Ann. art. 2226 (Vernon Supp.1985); (2) that the demand made was not excessive; and (3) that a reasonable attorney's fee would be $5564.23 for the trial and its preparation, and an additional $2500 would be reasonable if the case was appealed to the Court of Appeals. Based on its holding that the claim was unenforceable, the trial court correctly refused to award appellant the attorney's fees. *Magids v. Dorman,* 430 S.W.2d 910 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). However, since we have found that appellant is entitled to judgment on its debt, it follows that it is also entitled to reasonable attorney's fees for preparation and trial as well as those fees allowed for the appeal.

[3] Appellee's first cross point urges that the trial court erred in finding that appellant's pre-trial demand for payment was excessive, because it demanded payment of the entire, accelerated amount due prior to maturity, without proving that it was entitled to accelerate the amount due. We disagree with this contention. After appellee repudiated the entire loan agreement, appellant was entitled to consider the repudiation as an anticipatory breach and sue for the entire amount due under the agreement. *Universal Life & Accident Insurance Co. v. Sanders,* 129 Tex. 344, 102 S.W.2d 405 (1937).

[4] Appellee's remaining cross-point contends that the trial court's finding that the transfer of funds from Kaiser to Gifford constituted a loan was against the great weight and preponderance of the evidence. In reviewing this contention, we must review all of the evidence in the record to determine if the finding that a loan existed was so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). The evidence showed that Kaiser's check to the title company included a notation in the corner that matched the description of the land Gifford purchased with the money received from his uncle. Dorothy Kaiser, the decedent's widow, testified that she found an envelope in a box in Kaiser's closet on which he had written two notations: "May 5, 1975, loan to Myrvin Gifford" and "loan papers." She also testified that inside the box was an amortization schedule calculating monthly payments of $151.49. Also in evidence are copies of 42 checks written essentially on a monthly basis by Gifford to Kaiser in the amount of $151.49 or $152.00. Several of the checks contained the notation, "for house."

**\*528** The evidence tending to show that the funds were a gift, rather than a loan, is the testimony by Gifford that the parties considered the funds a gift, copies of Gifford's income tax returns indicating that he did not claim an interest deduction for the payments to his uncle, and

testimony of Kaiser's sister, who is Gifford's mother, that Kaiser had never indicated to her that the funds were a loan. We hold that the trial court's finding that the transaction was a loan is not against the great weight and preponderance of the evidence. Appellee's cross points are overruled.

The judgment of the trial court is reversed, and judgment is rendered for appellant for $16,276.37, plus attorney's fees of $8,064.23, together with interest at the legal rate as provided by statute.

**All Citations**

692 S.W.2d 525

---

  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

14

KeyCite Yellow Flag - Negative Treatment

**Called into Doubt by** Westergren v. National Property Holdings, L.P.,
Tex.App.-Hous. (14 Dist.), June 28, 2013

82 S.W.3d 429
Court of Appeals of Texas,
Dallas.

EXXON CORPORATION, Appellant,

v.

BREEZEVALE LIMITED, Appellee.

No. 05–98–02050–CV. | April 4, 2002.

Local liaison hired by oil company to assist the company in procuring Nigerian oil development rights brought action against the company for breach of contract. The 101st Judicial District Court, Dallas County, Jay Patterson, J., entered judgment on jury verdict awarding the liaison $34.3 million for breach of oral contract, $1 million for breach of implied-in-law contract, and $3.495 million in attorney fees. Appeal was taken. The Court of Appeals, David F. Farris, J., (Retired), held that: (1) the oral agreement involved an interest derived from rights to oil in the ground, and was thus subject to the statute of frauds; (2) the oil company could not be bound by the oral agreement under the doctrine of promissory estoppel; (3) enforcement of the oral agreement under the partial performance exception to the statute of frauds was precluded; (4) evidence was sufficient to show that liaison had presented claim for compensation for services rendered; and (5) evidence did not show that oil company and liaison had been involved in either formal fiduciary relationship or informal confidential relationship.

Affirmed in part; reversed in part.

West Headnotes (33)

**[1]** **Frauds, Statute Of**
 Questions for jury

Whether contract falls within statute of frauds is question of law to be decided by the court. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[2]** **Frauds, Statute Of**
 Agreements as to mining claims

Conveyance of working interest in oil and gas is real property interest, subjecting agreement conveying the interest to the statute of frauds. V.T.C.A., Bus. & C. § 26.01.

3 Cases that cite this headnote

**[3]** **Property**
 Ownership and incidents thereof
**Property**
 Right of alienation

Right to land essentially implies right to profits accruing from it; without the latter, the former can be of no value, and thus devise of the profits of land, or even the grant of them, will pass right to the land itself.

Cases that cite this headnote

**[4]** **Mines and Minerals**
 Nature of estate granted or reserved

Conveyance of interest in minerals that are produced from land, such as working interest or royalty interest, passes right to the land itself.

2 Cases that cite this headnote

**[5]** **Frauds, Statute Of**
 Agreements as to mining claims

Agreement between oil company and its local liaison to share in the risks, losses, production, and profits from oil development in deepwater block which had been obtained from the Nigerian government involved an interest derived from rights to oil in the ground, and was thus subject to the Texas statute of frauds, notwithstanding whether the oil company had merely obtained, through its "production sharing contract" with the Nigerian government, an interest in the production of oil rather than an interest in the oil itself; conveyance of an interest in the oil produced from the land effectively passed right to the land itself. V.T.C.A., Bus. & C. § 26.01.

2 Cases that cite this headnote

**[6]** **Frauds, Statute Of**
⚷ What law governs

Company which provided local assistance to oil developer seeking to procure territory off the Nigerian coast, and which expected to obtain percentage interest in the profits of the venture by way of compensation, was precluded from arguing that Nigerian law rather than the Texas statute of frauds should determine whether the compensation agreement, which had not been executed in writing, was enforceable; the local company neither gave the requisite notice that its intent was to raise an issue of foreign law, nor proved the foreign law which it was seeking to apply. V.T.C.A., Bus. & C. § 26.01; Rules of Evid., Rule 203.

Cases that cite this headnote

**[7]** **Action**
⚷ What law governs

If one fails to give notice and prove the foreign law that he seeks to apply at trial, the foreign law may not be applied. Rules of Evid., Rule 203.

Cases that cite this headnote

**[8]** **Appeal and Error**
⚷ Verdict

**Appeal and Error**
⚷ Sufficiency of Evidence in Support

When considering the legal sufficiency of the evidence, an appellate court considers only the evidence and inferences tending to support the jury's finding, disregarding all evidence to the contrary; if the record contains any evidence of probative force to support the jury's finding, the finding will be upheld.

Cases that cite this headnote

**[9]** **Appeal and Error**
⚷ Manifest weight of evidence

When considering the factual sufficiency of the evidence, an appellate court assesses all the evidence and reverse for new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust.

Cases that cite this headnote

**[10]** **Appeal and Error**
⚷ Power of appellate court in general

When both legal and factual sufficiency of the evidence points are raised on appeal, an appellate court first reviews legal sufficiency to determine if there is any evidence of probative value to support the jury's findings.

4 Cases that cite this headnote

**[11]** **Estoppel**
⚷ Future events; promissory estoppel

**Frauds, Statute Of**
⚷ Waiver of bar of statute; estoppel

Promissory estoppel applies to bar the application of the statute of frauds and allow the enforcement of an otherwise unenforceable oral agreement when: (1) the promisor makes a promise that he should have expected would lead the promisee to some definite and substantial injury; (2) such an injury occurred; and (3) the court must enforce the promise to avoid the injury. V.T.C.A., Bus. & C. § 26.01.

11 Cases that cite this headnote

**[12]** **Estoppel**
⚷ Future events; promissory estoppel

**Frauds, Statute Of**
⚷ Waiver of bar of statute; estoppel

To invoke the application of promissory estoppel where there is an oral promise to sign an agreement, the agreement that is the subject of the promise must comply with the statute of frauds, meaning that the agreement must be in writing at the time of the oral promise to sign it. V.T.C.A., Bus. & C. § 26.01.

11 Cases that cite this headnote

**[13]** **Estoppel**
👉 Future events; promissory estoppel

**Frauds, Statute Of**
👉 Waiver of bar of statute; estoppel

There was no probative evidence that agreement under which oil company seeking to develope Nigerian reserves had allegedly bound itself to convey "working interest" in production and profits to local company assisting in the procurement of development rights had been reduced to writing, as required by the Texas statute of frauds, by the date on which the parties had allegedly promised to sign it, and thus the oil company could not have been bound thereby under the doctrine of promissory estoppel; the oil company had merely indicated on the date in question that the terms of the "working interest" would be memorialized in the future. V.T.C.A., Bus. & C. § 26.01.

1 Cases that cite this headnote

**[14]** **Appeal and Error**
👉 Ratification, estoppel, waiver, and res judicata

Local liaison which had assisted oil developer in the procurement of development rights for Nigerian oil reserves, and which claimed to have entered into oral agreement with the oil company for compensation in the form of "working interest" in production and profits, failed to preserve for appeal its claim that the oil company was bound under the agreement by the doctrine of equitable estoppel; the issue of equitable estoppel was never submitted to the jury. Vernon's Ann.Texas Rules Civ.Proc., Rule 279.

Cases that cite this headnote

**[15]** **Frauds, Statute Of**
👉 Part Performance in General

Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to virtual fraud; the fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the agreement has suffered substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap unearned benefit. V.T.C.A., Bus. & C. § 26.01.

52 Cases that cite this headnote

**[16]** **Frauds, Statute Of**
👉 Necessity that part performance relied on be referable to contract

For purposes of the partial performance exception to the statute of frauds, "partial performance" must be unequivocally referable to the agreement and corroborative of the fact that an agreement actually was made. V.T.C.A., Bus. & C. § 26.01.

44 Cases that cite this headnote

**[17]** **Frauds, Statute Of**
👉 Necessity that part performance relied on be referable to contract

Acts of performance relied upon to take parol contract out of the statute of frauds under the partial performance exception must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced; otherwise, such acts do not tend to prove the existence of the parol agreement. V.T.C.A., Bus. & C. § 26.01.

51 Cases that cite this headnote

**[18]** **Frauds, Statute Of**
👉 Necessity that part performance relied on be referable to contract

There was no evidence that local liaison assisting oil company in the procurement of Nigerian oil development rights had taken any action that was unequivocally referable to an alleged oral agreement between the parties conveying "working interest" in production and profits to

the local company, and thus enforcement of the agreement under the partial performance exception to the statute of frauds was precluded; the liaison claimed that in reliance upon the oral agreement, it had sent one of its representatives to meet with Nigerian government officials, but this action was also consistent with an ordinary services agreement then under negotiation. V.T.C.A., Bus. & C. § 26.01.

15 Cases that cite this headnote

**[19] Frauds, Statute Of**

 Part Performance in General

Even if local liaison assisting oil company in the procurement of Nigerian oil development rights had taken certain actions which could have been characterized as unequivocally referable to an alleged oral agreement between the parties conveying "working interest" in production and profits to the local company, the local company had adequate remedy at law for any detriment suffered by it in reliance upon the agreement, and thus the agreement was not enforceable under the partial performance exception to the Texas statute of frauds; the local company received $1 million on an implied-in-law contract claim, and thus had adequate remedy at law for its reliance damages, which consisted merely of costs associated with one trip to meet with Nigerian government officials. V.T.C.A., Bus. & C. § 26.01.

15 Cases that cite this headnote

**[20] Appeal and Error**

 Fees

Oil company which had hired local liaison to assist in the procurement of foreign oil development rights failed to preserve for appeal its claim that the liaison, by virtue of having stated in pretrial proceedings that it would not seek to recover for services rendered, was precluded from recovering attorney fees on that basis; without complaint from the oil company, the trial court submitted the issue of compensation for services rendered to the jury and the jury awarded compensation, thus

precluding the oil company from arguing on appeal that the issue had neither been raised nor litigated.

1 Cases that cite this headnote

**[21] Implied and Constructive Contracts**

 Services Rendered, Weight and Sufficiency

Evidence was sufficient to show that local liaison which had been hired by oil company to assist in the procurement of foreign oil development rights had presented claim for compensation for services rendered, notwithstanding that the liaison had stated during pretrial proceedings that it would not seek to recover for services rendered; after the oil company had informed the liaison of its intent to sever their relationship, the liaison communicated its belief in the existence of an enforceable contract between the parties, that the oil company should fulfill the contract, and that it had performed valuable services for the company.

Cases that cite this headnote

**[22] Trial**

 Sufficiency to present issue of fact

Court may direct verdict if no evidence of probative force raises any fact question on the material issue.

1 Cases that cite this headnote

**[23] Appeal and Error**

 Effect of evidence and inferences therefrom on direction of verdict

On appeal from directed verdict, appellate court examines the evidence in the light most favorable to the party against whom the verdict was rendered, disregarding all contrary evidence and inferences.

1 Cases that cite this headnote

**[24] Trial**

 Speculation or conjecture; choice of probabilities or theories

**Trial**

☞ Sufficiency to present issue of fact

When no evidence of probative force on an ultimate fact element exists, or when the probative force of the evidence is so weak that only mere surmise or suspicion is raised as to the existence of essential facts, the trial court has the duty to instruct the verdict.

1 Cases that cite this headnote

**[25] Appeal and Error**

☞ Direction of verdict, dismissal, or nonsuit

Reviewing court may affirm directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided the directed verdict can be supported on another basis.

5 Cases that cite this headnote

**[26] Attorney and Client**

☞ The relation in general

**Fraud**

☞ Fiduciary or confidential relations

**Joint Adventures**

☞ Nature of relation in general

**Partnership**

☞ Fiduciary Duty

**Principal and Agent**

☞ Nature of agent's obligation

The two types of fiduciary relationships are formal and informal; formal fiduciary relationships arise in law, and include relationships between attorney and client, principal and agent, partners, and joint venturers, whereas informal fiduciary relationships arise from moral, social, domestic, or purely personal relationships of trust and confidence, generally referred to as confidential relationships.

Cases that cite this headnote

**[27] Fraud**

☞ Fiduciary or confidential relations

"Confidential relationships" creating fiduciary obligations between the parties may arise when one party has dealt with another at length in

certain fashion such that one party is justified in expecting the other to act in its best interest, or where influence has been acquired and abused, in which confidence has been reposed and betrayed; however, to give full force to contracts, courts do not recognize such relationships lightly.

4 Cases that cite this headnote

**[28] Fraud**

☞ Fiduciary or confidential relations

To impose confidential relationship in business transaction and thus impose fiduciary obligations upon the parties, the relationship must exist prior to, and apart from, the agreement concerning which the parties have become involved in court action.

1 Cases that cite this headnote

**[29] Fraud**

☞ Fiduciary or confidential relations

The fact that businessmen trust each another and that each relies upon the other to perform the contract between them does not necessarily mean that their relationship is confidential, giving rise to fiduciary obligations; something apart from the transaction between the parties is required.

5 Cases that cite this headnote

**[30] Fraud**

☞ Questions for Jury

Although the existence of a confidential relationship is ordinarily a question of fact, where there is no evidence to establish the relationship, it is a question of law.

1 Cases that cite this headnote

**[31] Fraud**

☞ Fiduciary or confidential relations

**Frauds, Statute Of**

☞ Agreements as to mining claims

**Partnership**

☞ As between partners

Evidence did not show that oil company and local liaison assisting the company in the procurement of foreign oil development rights were partners, and thus there was no evidence of any formal fiduciary relationship existing between the parties; oral agreement under which the oil company had allegedly pledged to convey "working interest" in production and profits to the local company violated the Texas statute of frauds, and without such an agreement, the local liaison was merely engaged in the provision of services for the oil company.

2 Cases that cite this headnote

[32]    **Fraud**
&#128073; Fiduciary or confidential relations

Evidence that local liaison hired by oil company to assist the company in procuring foreign oil development rights had been involved in alleged confidential relationship with the oil company, and that the liaison had relied upon promises made by the oil company to convey "working interest" in oil production and profits to it, was insufficient to show that the oil company and liaison had been involved in an informal confidential relationship such as would have given rise to fiduciary obligations between the parties; the liaison had merely engaged in arms-length relations with an affiliate of the oil company and the oil company itself.

1 Cases that cite this headnote

[33]    **Fraud**
&#128073; Fiduciary or confidential relations

Mere subjective trust does not transform arms-length dealing into fiduciary relationship.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*433** David J. Beck, Beck Redden & Secrest, L.L.P., Houston, Nina Cortell, Haynes & Boone, L.L.P., Dallas, for Appellant.

Stephen D. Susman, Susman Godfrey, L.L.P., Houston, for Appellee.

Before Justices BRIDGES, FITZGERALD, and FARRIS. [1]

**OPINION**

Opinion By Justice David F. FARRIS (Retired).

Exxon Corporation (Exxon) appeals the trial court's judgment following a jury verdict awarding Breezevale Limited (Breezevale) $34.3 million as damages for breach of an oral contract, $1 million for breach of a contract implied in law, and $3.495 million in attorneys' fees. In its first three issues, Exxon asserts (1) the evidence is legally and factually insufficient to support a finding that the parties reached an enforceable oral agreement, (2) the claimed agreement is not enforceable under the statute of frauds, and (3) the trial court incorrectly instructed the jury regarding the doctrine of promissory estoppel. In its **\*434** final five issues, Exxon complains about the lost profits award, the attorneys' fees award, some of the trial court's evidentiary rulings, and the judgment being contrary to public policy.

Breezevale brings three issues in a cross appeal. Breezevale first contends the trial court erred in its calculation of interest on the breach of contract award. In two conditional cross-points, Breezevale complains of the trial court's dismissal of its breach of fiduciary duty claim by directed verdict and the trial court's exclusion of evidence.

For the reasons that follow, we reverse the trial court's award of $34.3 million on Breezevale's breach of contract claim, affirm the award of $3.495 million in attorneys' fees, and affirm the trial court's directed verdict on Breezevale's breach of fiduciary duty claim. [2]

**FACTUAL BACKGROUND**

In the early 1990s, the Nigerian government opened its deepwater offshore to oil and gas exploration, inviting bids from international oil companies for deepwater blocks. Exxon submitted a bid requesting blocks 209 and 210. In June 1993, the Nigerian government formally awarded block 209 to Exxon. Exxon subsequently leveraged some of its interest in

block 209, through trades and farm-ins, to acquire interests in other blocks that had been awarded to other companies.

This case arises from a dispute between Exxon and Breezevale, a company hired by Exxon to provide local assistance in its effort to procure exploration rights in Nigeria. Breezevale, a London-based corporation, operated in various countries in Europe, the Middle East, and Africa, including Nigeria. Exxon contacted Breezevale in 1990, requesting its assistance with services such as arranging appointments, conducting briefings, obtaining information and technical data on available blocks of interest to Exxon, and speaking with government officials on Exxon's behalf. Breezevale provided these types of services to Exxon over a period of approximately eighteen months, with no formal agreement in place as to Breezevale's compensation for its services. As the business relationship progressed, the parties began negotiating the terms of a contract to formalize their relationship. Although Exxon initially pursued only a short-term services agreement with Breezevale, Breezevale expressed an interest in a more involved, long-term relationship in which Breezevale would share the risk and rewards of Exxon's Nigerian exploration. Representatives of Exxon and Breezevale met several times to discuss their business relationship.

The last of these meetings occurred on April 3, 1992. In this and previous meetings, the parties discussed both a services contract and a participation agreement. The parties discussed different options that would provide Breezevale with a participation interest in Exxon's Nigerian exploration and production, including a 2 ½ percent paid working interest, whereby Breezevale would pay 2 ½ percent of the costs of production and receive 2 ½ percent of the production profits. The parties' dispute as to whether an oral working interest agreement was reached at the April 3rd meeting became the basis for Breezevale's lawsuit against Exxon. Breezevale claimed Exxon offered, and it accepted, a 2 ½ percent working interest in all of Exxon's Nigerian oil operations. Exxon **\*435** claimed an agreement on essential terms was never reached and it terminated negotiations with Breezevale before a contract was formed. Neither party disputes an agreement on the services contract was never reached.

The day after the April 3, 1992 meeting, Exxon's main contact at Breezevale, Habib Bou–Habib, traveled to Nigeria to speak with the Ministry of Petroleum on Exxon's behalf. Breezevale contends the trip was made at the request of Exxon; Exxon asserts it never requested nor authorized the visit. On April 9, 1992, Habib contacted Gerald Mudd, an Exxon representative, telling him to "[g]o open the champagne," because Exxon had been awarded a block. Block 209 was formally awarded to Exxon by the Nigerian government in June 1993.

On April 13, 1992, Exxon sent Breezevale a letter terminating its relationship with Breezevale and enclosing a $30,000 check to cover Breezevale's services. According to Mudd, Exxon had begun to have concerns about Habib's actions in Nigeria; consequently, Exxon decided to terminate the business relationship. Habib returned the check.

Breezevale sued Exxon, claiming, among other things, that Exxon breached its oral contract with Breezevale and its fiduciary duty to Breezevale. The case was tried to a jury. After Breezevale rested its case, Exxon moved for a directed verdict on all counts. The trial court granted Exxon's motion for a directed verdict with regard to Breezevale's breach of fiduciary duty claim, but denied the remainder of the motion. The jury found the parties had entered into an oral agreement that Breezevale would acquire a 2 ½ percent working interest in "any deepwater blocks awarded to Exxon by the government of Nigeria" and "any deepwater blocks in which Exxon obtains a farm-in from a private company by trading any interest awarded to Exxon by the government of Nigeria." The jury valued the working interest at $34.3 million and additionally awarded Breezevale $1 million for services on an implied contract in law, and $3.495 million for attorneys' fees. The trial court entered judgment on the jury verdict. Exxon appealed.

### EXXON'S APPEAL

In its first three issues, Exxon attacks the jury's findings that an enforceable contract existed between the parties. Specifically, Exxon claims there is no or insufficient evidence to support the jury's finding that the parties reached an agreement on all the material terms necessary to the formation of an enforceable agreement. Additionally, Exxon contends that, as a matter of law, the claimed oral agreement is unenforceable under the statute of frauds. Finally, Exxon argues the trial court erred in its submission of the jury question on promissory estoppel. Because we agree with Exxon that the statute of frauds applies, we assume without deciding the parties reached an oral agreement, and address Exxon's second issue regarding the applicability of the statute of frauds.

### Statute of Frauds

[1]  The statute of frauds, in section 26.01 of the Texas Business and Commerce Code, provides in pertinent part:

(a) A promise or agreement described in subsection (b) of this section is not enforceable unless the promise or agreement, or a memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

**\*436 ...**

(b) Subsection (a) of this section applies to:

(4) a contract for the sale of real estate;

**...**

(6) an agreement which is not to be performed within one year from the date of making of the agreement.
TEX. BUS. & COM.CODE ANN. § 26.01 (Vernon 1987). Whether a contract falls within the statute of frauds is a question of law to be decided by the court. *Gerstacker v. Blum Consulting Eng'rs, Inc.,* 884 S.W.2d 845, 849 (Tex.App.-Dallas 1994, writ denied).

In its second issue, Exxon contends the claimed agreement is not enforceable under the statute of frauds because it was not in writing, and (1) the agreement involved the transfer of working interests in oil and gas properties, which are interests in real estate, and (2) the agreement could not possibly have been performed within one year. Breezevale responds that the agreement does not involve real estate and could possibly have been performed within one year. Breezevale alternatively contends that, if this Court determines the statute of frauds applies, Breezevale avoids the application of the statute of frauds on the ground of either promissory estoppel or partial performance.

### Interest in Real Estate

[2]  It is undisputed that no written and signed working interest agreement existed between the parties. We, therefore, first turn to the issue of whether the alleged agreement conveyed an interest in real estate. Under Texas law, a conveyance of a working interest in oil and gas is a real property interest that subjects the agreement conveying the interest to the statute of frauds. *Hill v. Heritage Res., Inc.,* 964 S.W.2d 89, 134 (Tex.App.-El Paso 1997, pet. denied); *EP Operating Co. v. MJC Energy Co.,* 883 S.W.2d 263, 267 (Tex.App.-Corpus Christi 1994, writ denied); *see also Procom Energy, L.L.A. v. Roach,* 16 S.W.3d 377, 381 (Tex.App.-Tyler 2000, pet. denied) (working interest and overriding royalty interest in oil and gas lease come within ambit of statute of frauds).

Conceding that the transfer of severable mineral interests in oil and gas leases are regarded as a sale of real estate under the Texas statute of frauds, Breezevale contends on appeal that its agreement with Exxon conveyed an interest in Nigerian Production Sharing Contracts (PSC), not a working interest in mineral production. According to Breezevale, a PSC differs from a Texas oil and gas lease in that the foreign state retains title to the minerals in the ground, giving the holder of the PSC only a contractual right to a share of the production. Consequently, an interest in a PSC is not an interest in real estate and is not subject to the statute of frauds.

[3]  [4]  Even if the conveyed interest were an interest in a PSC, the relevant issue in determining whether the contract involves real estate is not whether title to the minerals passes, but whether the interest is derived from rights to oil and gas in the ground, making the interest a realty interest subject to the statute of frauds. As the Texas Supreme Court has stated, "a right to land essentially implies a right to profits accruing from it, since, without the latter, the former can be of no value ... [t]hus a devise of the profits of land, or even a grant of them, will pass a right to land itself." *Sheffield v. Hogg,* 124 Tex. 290, 77 S.W.2d 1021, 1028 (1934) (quoting *Green v. Biddle,* 21 U.S. 1, 76, 5 L.Ed. 547 (8 Wheat. 1823)); *see also* **\*437** *United States Pipeline Corp. v. Kinder,* 609 S.W.2d 837, 839 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.). Thus, a conveyance of an interest in the minerals that are produced from land, such as a working interest or a royalty interest, passes a right to the land itself. *Pecos Dev. Corp. v. Hydrocarbon Horizons, Inc.,* 803 S.W.2d 266, 267 (Tex.1991) (overriding royalty interest in future production from unleased land is subject to statute of frauds; specifically disapproving court of appeals's holding to contrary).

**[5]** Here, Breezevale argues Exxon offered it a 2 ½ percent working interest in its Nigerian production. One of Breezevale's experts, Patrick Rooney, testified the parties' use of the term "working interest" connoted agreement in part to share in the risks, losses, production, and profit of Exxon's mineral development. The PSC gave Exxon unrestricted right of ingress to and egress from "the Contract area,"and the right to lift and export oil from the allocated block. We conclude the interest in this case is derived from rights to oil in the ground and is a property interest subject to the statute of frauds.

**[6]** Breezevale nonetheless contends the characterization a working interest carries under Texas law is irrelevant because the Texas statute of frauds does not apply to an agreement involving property located in a foreign country. According to Breezevale, the nature of a transferred interest is determined by the law of the place where the property is located; thus, the law of Nigeria should apply to the characterization of the agreement. Even if Breezevale is correct in claiming that Nigerian law should apply to determine the nature of the interest conveyed, Breezevale failed to give notice and prove Nigerian law in the trial court.

**[7]** A party who intends to raise an issue about foreign law shall give notice and, at least thirty days before trial, furnish all parties copies of any written materials or sources the party intends to use as proof of foreign law. TEX.R. EVID. 203; *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A. de C.V.,* 49 S.W.3d 347, 350 (Tex.2001). If a party fails to give notice and prove foreign law as provided by the rule, the foreign law may not be applied. *In re Garcia–Chapa,* 33 S.W.3d 859, 863 (Tex.App.-Corpus Christi 2000, no pet.); *see also Pellow v. Cade,* 990 S.W.2d 307, 313 (Tex.App.-Texarkana 1999, no pet.) (absent proper invocation of foreign law by pleading and proof, Texas courts must presume foreign law to be same as that of Texas).

Because Breezevale did not give notice and prove up Nigerian law in the trial court, it cannot rely on *Hunt v. Coastal States Gas Producing Co.,* 583 S.W.2d 322, 325–26 (Tex.1979), to support its assertion that the language of the PSC should control the nature of the interest. In *Hunt,* the parties properly proved up Libyan law in a pretrial hearing that included testimony of international and foreign law experts. *Id.* at 327 (Steakley, J., dissenting). Conversely, in this case, Breezevale told the court there was "no need to invoke Nigerian law" and, consistent with that statement, did not submit any evidence of Nigerian law. Breezevale cannot now rely on Nigerian law to claim the conveyed interest was not an interest in real estate. *See Garcia–Chapa,* 33 S.W.3d at 863; *Pellow,* 990 S.W.2d at 313.

Because the interest is an interest in real estate, we conclude the oral agreement is subject to the statute of frauds.

### Exceptions to the Statute of Frauds

At trial, Breezevale sought to avoid the statute of frauds based upon two exceptions to the statute: promissory estoppel and partial performance. The jury answered "yes" to questions on both of these exceptions. Exxon contends the evidence **\*438** is legally and factually insufficient to support the jury's answers to both questions.

### *Standard of Review*

**[8]** **[9]** **[10]** When considering the legal sufficiency of the evidence, we consider only the evidence and inferences tending to support the jury's finding, disregarding all evidence to the contrary. *Weirich v. Weirich,* 833 S.W.2d 942, 945 (Tex.1992). If the record contains any evidence of probative force to support the jury's finding, the finding will be upheld. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). When considering the factual sufficiency of the evidence, we assess all the evidence and reverse for a new trial only if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986). When both legal and factual sufficiency points are raised, we first review legal sufficiency to determine if there is any evidence of probative value to support the jury's findings. *Glover v. Tex. Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

### *Promissory Estoppel*

In its third issue, Exxon complains the trial court erred in its submission of the jury question on promissory estoppel because it was an incorrect statement of the law. Exxon also attacks the sufficiency of the evidence to support the jury's answer. Jury question No. 3 asked, "Did Breezevale reasonably rely upon the oral promise of Exxon, if any, to reduce its oral agreement to writing?"

 [11]    [12]    Promissory estoppel applies to bar the application of the statute of frauds and allow the enforcement of an otherwise unenforceable oral agreement when (1) the promisor makes a promise that he should have expected would lead the promisee to some definite and substantial injury; (2) such an injury occurred; and (3) the court must enforce the promise to avoid the injury. *Nagle v. Nagle,* 633 S.W.2d 796, 800 (Tex.1982); *"Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 936 (Tex.1972). To invoke the application of promissory estoppel where there is an oral promise to sign an agreement, as in this case, the agreement that is the subject of the promise must comply with the statute of frauds. *"Moore" Burger,* 492 S.W.2d at 940 (op. on reh'g). That is, the agreement must be in writing at the time of the oral promise to sign it. *Sonnichsen v. Baylor Univ.,* 47 S.W.3d 122, 126 (Tex.App.-Waco 2001, no pet.); *Mann v. NCNB Tex. Nat'l Bank,* 854 S.W.2d 664, 668 (Tex.App.-Dallas 1992, no writ); *Beta Drilling, Inc. v. Durkee,* 821 S.W.2d 739, 741 (Tex.App.-Houston [14th Dist.] 1992, writ denied).

 [13]    Breezevale first contends the law is unclear as to whether the doctrine of promissory estoppel may be applied in the absence of a written contract in existence at the time of the promise. However, we agree with the court in *Sonnichsen* that "the holding from *"Moore" Burger* is clear" that the agreement must be in writing at the time the promise is made. *Sonnichsen,* 47 S.W.3d at 126; *see also Mann,* 854 S.W.2d at 668 (where this Court held an agreement in writing at time of promise is required element of promissory estoppel). According to Breezevale, because Mudd told Habib at the April 3rd meeting that Exxon was going to memorialize the working interest agreement into an attachment to the draft service agreement, "there was every reason for Mr. Habib to believe this either had been done or could be done and [would be] ready to sign during their next meeting." Irrespective of what Habib believed, there is no evidence **\*439** either that (1) the attachment was ever prepared or (2) Mudd or any other Exxon representative told Habib the working interest agreement had *already* been prepared. Thus, there is no probative evidence in the record that the working interest agreement was in writing on April 3, 1992.

Pointing out that the promissory estoppel question submitted to the jury did not include the requirement that a writing exist when the promise was made, Breezevale argues Exxon waived any charge error by not submitting a substantially correct jury question. However, if there is no evidence to support one or more of the elements of the doctrine, it is irrelevant whether Exxon submitted a proper question. *See* TEX.R. CIV. P. 279 ("A claim that the evidence was legally or factually insufficient to warrant the submission of any question may be made for the first time after the verdict, regardless of whether the submission of such question was requested by the complainant.") Rather, the issue is whether the evidence supports the finding, including any deemed findings on elements not included in the question. *See Crosbyton Seed Co. v. Mechura Farms,* 875 S.W.2d 353, 363–64 (Tex.App.-Corpus Christi 1994, no writ); *see also Auto. Ins. Co. v. Davila,* 805 S.W.2d 897, 902 (Tex.App.-Corpus Christi 1991, writ denied) (element may not be deemed found by court if no evidence supports it).

 [14]    We conclude that, because there is no evidence there was a written working interest agreement in existence on April 3, 1992, there is no evidence to support the jury finding of promissory estoppel. We therefore overturn the jury's finding on Question No. 3. [3]

### *Partial Performance*

Breezevale also relies on the jury's affirmative answer to the question, "Did Breezevale partially perform the agreement, if any?" in arguing the doctrine of partial performance bars application of the statute of frauds in this case. Exxon contends there is no or insufficient evidence to support a finding of partial performance.

 [15]    [16]    [17]    Under the partial performance exception to the statute of frauds, contracts that have been partly performed, but do not meet the requirements of the statute of frauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud. *Carmack v. Beltway Dev. Co.,* 701 S.W.2d 37, 40 (Tex.App.-Dallas 1985, no writ). The fraud arises when there is strong evidence establishing the existence of an agreement and its terms, the party acting in reliance on the contract has suffered a substantial detriment for which he has no adequate remedy, and the other party, if permitted to plead the statute, would reap an unearned benefit. *Id.; see also Hooks v. Bridgewater,* 111 Tex. 122, 229 S.W. 1114, 1116 (1921). The partial performance must be "unequivocally referable to the agreement and corroborative of the fact that a contract actually was made." *Wiley v. Bertelsen,* 770 S.W.2d 878, 882 (Tex.App.-Texarkana 1989, no writ) (citing *Chevalier v. Lane's, Inc.,* 147 Tex. 106, 213 S.W.2d 530, 533–34 (1948)). The acts of performance relied

upon to take a parol contract out of the statute of frauds must be such as could have been done with no other design than **\*440** to fulfill the particular agreement sought to be enforced; otherwise, they do not tend to prove the existence of the parol agreement relied upon by the plaintiff. *Teague v. Roper,* 526 S.W.2d 291, 293 (Tex.Civ.App.-Amarillo, 1975 writ ref'd n.r.e.) (citing *Francis v. Thomas,* 129 Tex. 579, 106 S.W.2d 257, 260 (1937)).

 **[18]**     Exxon contends Breezevale's claim of partial performance is not "unequivocally referable" to the working interest contract because Breezevale's actions could be referable to the services contract. Breezevale does not dispute that it never paid Exxon any of the costs associated with a working interest in Exxon's blocks. The action on which Breezevale relies as evidence of its partial performance is Habib's trip to Nigeria on April 4, 1992. [4] Breezevale contends Habib's trip to Nigeria during this time period constituted sufficient partial performance to take the contract out of the statute of frauds because Habib went to Nigeria in reliance on Exxon's promise of a working interest in any block awarded. Exxon argues that such performance does not "show strong evidence establishing the existence of the [working interest] agreement and its terms," *see Carmack,* 701 S.W.2d at 40, and is more referable to the services agreement the parties were negotiating than the working interest agreement.

Applying the no-evidence standard of review, and viewing the evidence in the light most favorable to Breezevale, we find there is no evidence that Habib's actions in going to Nigeria were *unequivocally* referable to the working interest contract, because even Breezevale admits there was a services contract being negotiated between the parties and that it had been providing Exxon with liaison services similar to those provided during the trip throughout the eighteen-month period. *See Teague,* 526 S.W.2d at 293 (performance must be such as could have been done with *no other design* than to fulfill particular agreement sought to be enforced); *see also Rodriguez v. Klein,* 960 S.W.2d 179, 186 (Tex.App.-Corpus Christi 1997, no pet.) (because party's performance was required under one or more of three agreements, including bill of sale, it could not be unequivocally referable to bill of sale); *Beta Drilling,* 821 S.W.2d at 741 (overturning jury finding on partial performance because appellee's employment services were not unequivocally referable to oral agreement for sale of securities). In a no-evidence review of whether the performance was "unequivocally referable," the relevant issue is not whether there is evidence that the performance could be referable to the contract which the party is trying to enforce; rather, it is whether there is evidence that the performance is *solely* referable to the contract. *See Teague,* 526 S.W.2d at 293; *Rodriguez,* 960 S.W.2d at 186.

Habib's actions in traveling to Nigeria and speaking with the government officials on Exxon's behalf were consistent with the services Breezevale had performed in the previous eighteen months and could be referable to the services agreement. Further, nothing in Habib's trip to Nigeria, even if made at the request of Exxon, showed "strong evidence establishing the existence of the [working interest] agreement and its terms." *See Carmack,* 701 S.W.2d at 40. We conclude there is no evidence that Breezevale's performance was unequivocally referable to the working interest agreement.

 **\*441** **[19]**     Moreover, even assuming there was evidence that Breezevale's actions were unequivocally referable to the working interest agreement, the doctrine of partial performance also requires that the party acting in reliance on the agreement suffer a substantial detriment for which there is no adequate remedy. *See Hooks,* 229 S.W. at 1116; *Carmack,* 701 S.W.2d at 40. If Breezevale were successful in removing the oral agreement from the statute of frauds because of partial performance, Breezevale would be entitled to only reliance damages. *See Magcobar N. Am. v. Grasso Oilfield Servs., Inc.,* 736 S.W.2d 787 (Tex.App.-Corpus Christi 1987) (court's holding that party may recover reliance damages and not breach of contract damages in case where promissory estoppel takes case out of statute of frauds is consistent with equity, the principle underlying all exceptions to statute of frauds), *writ dism'd by agr.,* 754 S.W.2d 646 (Tex.1988); *see also Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 708 (Tex.App.-Houston [1st Dist.] 1988, writ denied) (relying on "settled law" that party's damages based on promissory estoppel as exception to statute of frauds are not measured by profits that reliance led him to expect, but limited to amount necessary to compensate party for loss already suffered). Breezevale's reliance damages would encompass only the services Habib performed during his April trip to Nigeria. *See Fretz Constr. Co. v. Southern Nat'l Bank,* 626 S.W.2d 478, 483 (Tex.1981) (reliance damages are amount necessary to restore plaintiff to position he would have been in had he not acted in reliance on promise). We conclude that because Breezevale received $1 million on its contract implied in law claim, it had an adequate remedy as a matter of law. *Cf. Carmack,* 701 S.W.2d at 40 (in analyzing partial performance of Beltway, court noted Beltway had no other adequate remedy because broker could not recover for same services on implied contract, quasi contract, or

quantum meruit theory); *Wiley,* 770 S.W.2d 878, 882 (if person receives payment for services, those services will not constitute partial performance as exception to statute of frauds).

Because there is no evidence that Breezevale's partial performance was unequivocally referable to the working interest agreement, and because Breezevale did not suffer a substantial detriment for which it had no adequate remedy, there is no evidence to support the jury's finding on partial performance. We overturn the jury's finding to Jury Question No. 4.

## Attorneys' Fees

 **[20]** Exxon contends if the award for breach of contract is reversed, this Court must likewise reverse the trial court's award of $3.495 million in attorneys' fees. Breezevale responds that even if this Court reverses the breach of contract claim, it is still entitled to attorneys' fees on its $1 million award for the contract implied in law, or quantum meruit, claim. We agree with Breezevale.

Exxon does not appeal the jury's finding that Breezevale performed compensable services in the amount of $1 million, nor does it argue attorneys' fees are not recoverable for the cause of action underlying the $1 million award. Rather, Exxon asserts Breezevale cannot recover attorneys' fees based on the award because Breezevale claimed, in a pretrial hearing, that it was not seeking compensation for services rendered. According to Exxon, because Breezevale could not have expended attorney time and expenses on a claim it disavowed, there would be no evidence to support an award of attorneys' fees on that basis. Exxon further claims there could have been no presentment of a claim that Breezevale denied it was seeking.

 **\*442** **[21]** The fact that Breezevale stated in a pretrial hearing it was not seeking compensation for services rendered is irrelevant in light of the fact that the trial court submitted a jury question on the issue, which Exxon does not appeal. Because Exxon did not complain of the trial court's submission of the question and the jury's affirmative answer to it, it cannot now complain the issue was not raised and litigated at trial. Further, because the issues involved in the quantum meruit claim are necessarily interrelated with Breezevale's breach of contract claim, we also decline to find there was no presentment of the attorneys' fees claim.

The record shows that, after receiving the letter from Exxon terminating the relationship, Breezevale communicated with Exxon regarding its belief that it had a valid contract with Exxon, that Exxon should fulfill the contract, and that it had performed valuable services for Exxon. We conclude this is sufficient evidence of presentment. *See Jones v. Kelley,* 614 S.W.2d 95, 100 (Tex.1981) (no particular form of presentment required); *see also Criton Corp. v. Highlands Ins. Co.,* 809 S.W.2d 355, 358 (Tex.App.-Houston [14th Dist.] 1991, writ denied) (holding oral request to tender full performance under contract, which was refused, sufficient to establish presentment).

Exxon does not dispute that attorneys' fees may be awarded for claims arising out of quantum meruit, or that the quantum meruit claim is not so interrelated with the contract claim as to be more or less inseparable. *See Weitzul Constr., Inc. v. Outdoor Environs,* 849 S.W.2d 359, 366 (Tex.App.-Dallas 1993, writ denied). Therefore, because attorneys' fees are authorized on the quantum meruit cause of action, Breezevale may recover the total amount of attorneys' fees the trial court awarded. *See id.*

## Conclusion

Because we conclude the statute of frauds applies to render the oral agreement unenforceable, we need not reach Exxon's other issues. We reverse the jury's finding to Question No. 1 and its award of $34.3 million. We render judgment that Breezevale take nothing on its claim for breach of an oral contract. We affirm the $3.495 million award of attorneys' fees.

## BREEZEVALE'S CROSS APPEAL

Breezevale brings three issues in a cross appeal. Because of our disposition of Exxon's appeal, we address only one of Breezevale's issues.

In its second issue, Breezevale contends the trial court erred in granting a directed verdict on Breezevale's breach of fiduciary duty claim based on a two-year statute of limitations. In a "reply point and conditional cross point," [5] Exxon contends that even if the trial court erred in granting the directed verdict based on the statute of limitations, the breach of fiduciary duty claim was still properly dismissed because there was no

evidence of a fiduciary relationship. We agree with Exxon's conditional cross point.

[22] [23] [24] [25] A court may direct a verdict if no evidence of probative force raises a fact issue on the material issue. *Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). On review, we examine the evidence in the light most favorable to the party against whom the verdict was rendered, **\*443** disregarding all contrary evidence and inferences. *Id.; Rodriguez v. United Van Lines, Inc.,* 21 S.W.3d 382, 383 (Tex.App.-San Antonio 2000, pet. denied). When no evidence of probative force on an ultimate fact element exists, or when the probative force of the evidence is so weak that only mere surmise or suspicion is raised as to the existence of essential facts, the trial court has the duty to instruct the verdict. *Villarreal v. Art Inst. of Houston, Inc.* 20 S.W.3d 792, 796 (Tex.App.-Corpus Christi 2000, no pet.). The reviewing court may affirm a directed verdict even if the trial court's rationale for granting the directed verdict is erroneous, provided the directed verdict can be supported on another basis. *Id.*

[26] [27] [28] [29] [30] There are two types of fiduciary relationships-formal and informal. *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 593–94 (Tex.1992). Formal fiduciary relationships arise as a matter of law, and include the relationships between attorney and client, principal and agent, partners, and joint venturers. *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 674 (Tex.1998). Informal fiduciary relationships arise from "a moral, social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship." *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 287 (Tex.1998). Confidential relationships may arise when one party has dealt with another in a certain manner for a long period of time such that one party is justified in expecting the other to act in its best interest, *Morris,* 981 S.W.2d at 674, and in cases where "influence has been acquired and abused, in which confidence has been reposed and betrayed." *Associated Indem. Corp.,* 964 S.W.2d at 287. However, to give full force to contracts, we do not recognize such a relationship lightly. *Burleson State Bank v. Plunkett,* 27 S.W.3d 605, 611 (Tex.App.-Waco 2000, pet. denied) (citing *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962)). To impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex.1997). The fact that one businessman trusts another and

relies on another to perform a contract does not give rise to a confidential relationship, because something apart from the transaction between the parties is required. *Crim,* 823 S.W.2d at 594. Although the existence of a confidential relationship is ordinarily a question of fact, where there is no evidence to establish the relationship, it is a question of law. *Seymour v. Am. Engine & Grinding Co.,* 956 S.W.2d 49, 60 (Tex.App.-Houston [14th Dis.] 1996, writ denied); *Kline v. O'Quinn,* 874 S.W.2d 776, 786 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

[31] Breezevale first asserts that a formal fiduciary relationship existed because it was partners with Exxon. However, we have held there was no working interest agreement between the parties because any oral agreement violated the statute of frauds. Therefore, there is no evidence the parties were working interest partners. *See Schlumberger,* 959 S.W.2d at 176 (partnership consists of express or implied agreement containing four required elements: (1) community of interest in venture, (2) agreement to share profits, (3) agreement to share losses, and mutual right of control or management of enterprise). Without an agreement, there is no evidence the parties were partners and no evidence to support Breezevale's argument that a formal fiduciary relationship existed arising from the partnership.

[32] Breezevale also argues it submitted evidence that Breezevale and Exxon **\*444** had developed a relationship of trust and confidence and there was some evidence of an informal fiduciary relationship between the parties. It relies on evidence that before Exxon and Breezevale began the dealings at issue in this suit, Breezevale had a ten-year distributorship relationship with Exxon Chemical in Nigeria. However, the evidence shows Exxon Chemical is a separate Exxon affiliate, and nothing in the record indicates this relationship was anything more than an arms-length business relationship. *See Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 568 (Tex.App.-Dallas 1989, no writ) (plaintiff could not bootstrap prior relationship with two separate entities to claim twenty-six year confidential relationship with defendant hospital).

[33] Breezevale also relies on evidence it "trusted Exxon's numerous promises that an agreement ... would be forthcoming;" it clearly informed Exxon it wanted a long-term relationship; it shared with Exxon confidential information it learned from the Nigerian officials regarding the bidding process; and Exxon requested that Breezevale work exclusively for Exxon. Even if true, these facts are not

evidence of an informal fiduciary relationship. Breezevale's claim that it subjectively trusted Exxon to provide it a working interest agreement is insufficient to impose fiduciary obligations on Exxon as a matter of law. Mere subjective trust does not transform arms-length dealing into a fiduciary relationship. *Schlumberger,* 959 S.W.2d at 177; *Crim,* 823 S.W.2d at 595; *see also Tyra v. Woodson,* 495 S.W.2d 211, 213 (Tex.1973) ("[T]he fact that one businessman trusts another, and relies upon his promise to carry out a contract, does not create a constructive trust ... [t]o hold otherwise would render the Statute of Frauds meaningless.") The record shows the parties had an arms-length relationship, with each party separately represented by its own counsel. There is no evidence of a long-term relationship apart from the parties' negotiations for the services contract and working interest agreement. *See Crim,* 823 S.W.2d at 594. We conclude that, because the record contains no evidence of a fiduciary relationship between the parties, the trial court did not erred in granting Exxon's motion for directed verdict on Breezevale's breach of fiduciary duty claim. Furthermore, the trial court erred in denying Exxon's motion for directed verdict on Breezevale's claim that it had a "special relationship of trust and confidence" with Exxon. Consequently, we find no merit in Breezevale's second issue in its cross appeal.

We reverse the trial court's award of $34.3 million against Exxon for breach of contract and affirm the remaining portions of the trial court's judgment that are the subject of this appeal.

**All Citations**

82 S.W.3d 429, 157 Oil & Gas Rep. 785

Footnotes

1    The Honorable David F. Farris, Retired Justice, Second District Court of Appeals, Fort Worth, Texas, sitting by assignment.
2    Exxon does not appeal the portion of the trial court's judgment awarding Breezevale $1 million for breach of contract implied in law, acknowledging that Breezevale provided services for which it should be compensated. Therefore, we express no opinion as to the validity of that portion of the judgment, and the $1 million award stands.
3    In its appellate brief, Breezevale also argues Exxon should be equitably estopped from relying on the statute of frauds because of its claims that Exxon misled Breezevale. The doctrine of equitable estoppel, being distinct from the doctrine of promissory estoppel, was never submitted to the jury. Breezevale thus waived any equitable estoppel claim. *See* TEX.R. CIV. P. 279; *Brown v. Bank of Galveston, N.A.,* 963 S.W.2d 511, 515 (Tex.1998).
4    Any performance by Breezevale in reliance on the contract necessarily had to occur between April 3, 1992, the date of the agreement, and mid-April, when Exxon terminated the relationship by letter, because only during this time could Breezevale have reasonably relied on the existence of an agreement.
5    Because the trial court denied Exxon's motion for directed verdict on Breezevale's claim that it had enjoyed a "special relationship of trust and confidence" with Exxon, Exxon conditionally appeals this ruling in the event we reach the issue of whether there was a special relationship.

15

KeyCite Yellow Flag - Negative Treatment
**Distinguished by** Orca Assets, G.P., L.L.C. v. JPMorgan Chase Bank, N.A., Tex.App.-Dallas, August 11, 2015

**453 S.W.3d 419**
**Supreme Court of Texas.**

**National Property Holdings, L.P., Michael Plank and Russell Plank, Petitioners,**
v.
**Gordon Westergren, Respondent**

**NO. 13–0801 | Opinion Delivered: January 9, 2015**

**Synopsis**
**Background:** Seller of option to purchase 190 acres brought action against buyer and consultant, alleging breach of contract, breach of partnership duties, common-law fraud, and statutory fraud. Buyer and consultant counterclaimed for breach of settlement agreement and release. The 269th District Court, Harris County, No. 2008-36847, Dan T. Hinde, J., granted judgment notwithstanding the verdict (JNOV) to buyer and consultant on seller's claims, but entered judgment on special jury verdict for seller on buyer's and consultant's claims. Seller, buyer, and consultant appealed. The Houston Court of Appeals, 14th District, affirmed in part and reversed in part. Buyer and consultant petitioned for review.

**Holdings:** The Supreme Court held that:

[1] seller did not justifiably rely on consultant's representations as to contents of release;

[2] partial performance exception to statute of frauds did not apply to allow enforcement of oral contract;

[3] seller did not breach mediated agreement settling prior lawsuit by bringing action; and

[4] seller did not breach release agreement by bringing action.

Affirmed in part and reversed in part.

West Headnotes (12)

[1] **Release**
Fraud and Misrepresentation

Plaintiff did not justifiably rely, as element of fraudulent inducement, on defendant's representations as to contents of release, in signing release of rights to real property and rights under oral contract; defendant's representations that release was just a "receipt" for $500,000 check and that plaintiff did not need to worry about the release, directly contradicted the contents of the release, and plaintiff had ample opportunity to read the release but chose not to read it before signing because he was "in a hurry" and did not have his reading glasses with him. Restatement (Second) of Torts, § 541.

1 Cases that cite this headnote

[2] **Fraud**
Acts induced by fraud

Fraudulent inducement is a particular species of fraud that arises only in the context of a contract.

1 Cases that cite this headnote

[3] **Fraud**
Elements of Actual Fraud

To prove a claim of fraudulent inducement, a plaintiff must establish that: (1) defendant made a material representation; (2) defendant's representation was false and was either known to be false when made or made without knowledge of its truth; (3) defendant's representation was intended to be and was relied upon by the injured party; and (4) plaintiff's injury complained of was caused by the reliance.

2 Cases that cite this headnote

[4] **Fraud**
🔑 Reliance on Representations and Inducement to Act

A party to a written contract cannot justifiably rely, as element of fraudulent inducement, on oral misrepresentations regarding the contract's unambiguous terms.

2 Cases that cite this headnote

[5] **Contracts**
🔑 Presumptions and burden of proof

Instead of excusing a party's failure to read a contract when the party has an opportunity to do so, the law presumes that the party knows and accepts the contract terms.

4 Cases that cite this headnote

[6] **Contracts**
🔑 Effect in general; enforcement in general

It is not the courts' role to protect parties from their own agreements.

1 Cases that cite this headnote

[7] **Frauds, Statute of**
🔑 Necessity that part performance relied on be referable to contract

Partial performance exception to statute of frauds did not apply to allow enforcement of oral contract requiring defendant to pay plaintiff $1 million from development and future sale of real property, where defendant paid plaintiff $500,000 and had plaintiff sign release of his claims to the property; defendant's payment of

$500,000 was not unequivocally referable to the oral agreement, but instead was made to avoid performance of the oral contract. Tex. Bus. & C. Code § 26.01.

1 Cases that cite this headnote

[8] **Appeal and Error**
🔑 Cases Triable in Appellate Court

Whether a contract comes within the statute of frauds is a question of law, which an appellate court reviews de novo.

2 Cases that cite this headnote

[9] **Frauds, Statute of**
🔑 Necessity that part performance relied on be referable to contract

One of the requirements of the partial performance exception to the statute of frauds is that the performance on which the party relies must be unequivocally referable to the agreement, in other words, the purpose of the alleged acts of performance must be to fulfill a specific agreement; if the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable. Tex. Bus. & C. Code § 26.01.

1 Cases that cite this headnote

[10] **Frauds, Statute of**
🔑 Necessity that part performance relied on be referable to contract

A party cannot rely upon oral representations to satisfy the partial performance exception to the statute of frauds; rather, the kind of performance that justifies the exception to the statute of frauds is performance which alone and without

the aid of words of promise is unintelligible or at least extraordinary unless as an incident of ownership, assured, if not existing. Tex. Bus. & C. Code § 26.01.

1 Cases that cite this headnote

[11]     **Compromise and Settlement**
         Persons concluded
         **Compromise and Settlement**
         Performance or Breach of Agreement

Plaintiff did not breach mediated agreement settling prior lawsuit by bringing action against defendant for fraudulent inducement and breach of oral contract; although defendant had been involved in negotiating settlement and although oral contract involved same real property as the prior lawsuit, defendant had not been a party to prior lawsuit, and settlement agreement did not contain any language in which plaintiff agreed not to sue defendant.

Cases that cite this headnote

[12]     **Release**
         Covenant not to sue or execute

Plaintiff did not breach release agreement by bringing action against defendant for fraudulent inducement and breach of oral contract; although release required plaintiff to relinquish his rights under oral contract and provided an affirmative defense to future lawsuits, release could not be construed as a covenant not to sue, since it contained no language barring plaintiff from bringing suit or stating that he would breach the release by doing so.

1 Cases that cite this headnote

**\*421** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTEENTH

DISTRICT OF TEXAS

**Attorneys and Law Firms**

Mark Ryan Trachtenberg, Michael J. Mazzone, Polly Benton Graham, Haynes and Boone LLP, Houston, for Petitioner

Mark C. Sparks, John Andrew Cowan, Provost Umphrey Law Firm L.L.P., Beaumont, for Respondent.

**Opinion**

PER CURIAM

This dispute involves a mediated settlement agreement, an oral side agreement, and a subsequent written release. A pivotal issue is whether Gordon Westergren released his claims for breach of the oral side agreement or whether, as he insists and the jury found, he was fraudulently induced into signing the release. On that issue, we conclude that Westergren's fraudulent inducement defense must fail as a matter of law because the record conclusively establishes that he had a reasonable opportunity to read the release before he signed it and elected not to do so. We also conclude that the oral side agreement did not satisfy the statute of frauds and that Westergren did not breach the mediated settlement agreement or the release by filing this suit. For these reasons, we reverse in part and affirm in part the court of appeals' judgment and reinstate in part the trial court's take-nothing judgment and award of costs.

The facts giving rise to the parties' claims relate to a 190–acre tract of land in La Porte, Texas. The parties hotly dispute the facts, but because we are reviewing the reversal of a judgment notwithstanding a jury verdict in favor of Westergren, we "credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Tanner v. Nationwide Mut. Fire Ins. Co.,* 289 S.W.3d 828, 830 (Tex. 2009) (quoting *Cent. Ready Mix Concrete Co., Inc. v. Islas,* 228 S.W.3d 649, 651 (Tex. 2007)). The evidence favoring the jury verdict establishes that Westergren was the first to enter into an option contract to purchase the highly desired property. When he discovered that the owner had later entered into similar option contracts with two other interested buyers, he sued all three and filed a *lis pendens* against the **\*422** property, preventing any further development or sale (the Haynsworth litigation). The three defendants appeared and filed counterclaims. Meanwhile, several developers, including National Property Holdings, L.P. (NPH), were also interested in acquiring the property but could not

pursue it while the Haynsworth litigation remained pending. In an apparent attempt to overcome that obstacle, Russell Plank, who was NPH's consultant, contacted Westergren's attorney and offered to help pay Westergren's attorney's fees in the Haynsworth litigation. When asked why NPH would do that, Plank replied: "[because] we're going to be partners." Consistent with Plank's call, NPH and Plank each sent Westergren's attorney a $5,000 check.

When the lawsuit later went to mediation, Plank attended on behalf of NPH, although NPH was not a party to the suit. The mediation was successful: NPH agreed to purchase the property, and all defendants agreed to release their rights to the property and their counterclaims against Westergren. All of the parties later memorialized the settlement in a written Mediated Settlement Agreement (MSA), in which Westergren and the defendants agreed to release any *lis pendens* and all claims asserted by and between the parties, including any cross-claims and counterclaims, and NPH agreed to purchase the property. Separately, in exchange for Westergren's agreement to settle the lawsuit, release the *lis pendens,* and allow NPH to purchase the property, Plank orally promised Westergren that he would become a partner with Plank and his brother Michael, who was president of NPH's corporate general partner, and would receive $1 million plus an interest in the profits from NPH's development and future sale of the property (the oral contract). The MSA did not memorialize the oral promises that Plank made to Westergren. After Westergren released the *lis pendens* and the parties dismissed the suit, NPH and an affiliated company purchased the property. A few months later NPH sold 20 of the 190 acres. When Westergren asked for the promised $1 million and a share of the profits, Plank replied that they could only pay Westergren $500,000 "right now."

When Plank and Westergren later met, Plank presented a $500,000 check from NPH, and in return, Westergren signed a release. The title of the document, stated in bold and underlined capital letters, read "***AGREEMENT AND RELEASE***." The release stated that Westergren agreed to relinquish any and all interest in the property and all claims against NPH, Michael Plank, and other listed parties in exchange for the total payment of $500,000. Without reading the release, Westergren signed it in front of a notary and accepted the check. Several months later, after Westergren had not received any additional payments, he reviewed the release and discovered what he had signed. When NPH, Plank, and Plank's brother Michael (collectively, the Plank parties) refused to make any additional payments, Westergren filed this suit

against them, asserting claims for breach of the oral contract, breach of partnership duties, common law and statutory fraud, and attorney's fees. The Plank parties asserted that Westergren had released all claims by signing the release and that the oral contract was unenforceable under the statute of frauds. They also filed counterclaims for breach of contract, asserting that Westergren breached the MSA and the release by filing this suit against them.

The jury found in Westergren's favor on all claims, although it also found that the Plank parties' statutory and common law fraud caused Westergren "$0.00" damages. On the Plank parties' motion, however, the **\*423** trial court granted a judgment notwithstanding the verdict and entered a take-nothing judgment as to all parties, assessing costs against Westergren. Westergren appealed and the Plank parties filed cross-appeals. With one justice dissenting, the court of appeals concluded, *inter alia,* that there was more than a scintilla of evidence to support the jury's findings that (1) an oral contract existed between Westergren and Plank, (2) Plank breached the oral contract, (3) NPH paid the $500,000 pursuant to the oral contract (not as consideration for the release), (4) this partial performance excepted the oral contract from the statute of frauds, (5) Plank fraudulently induced Westergren to sign the release, and (6) Westergren did not breach the MSA or the release by suing the Plank parties. Having found in Westergren's favor on his breach of contract claim, the court concluded that it did not need to address his claims for common law and statutory fraud and for breach of partnership duties. The court awarded costs to Westergren and remanded the case for a new trial on Westergren's claim for attorney's fees.

[1]Before this Court, the Plank parties contend that the evidence was legally insufficient to support the jury's finding that Plank fraudulently induced Westergren to sign the release, the release was therefore valid and extinguished all claims under the oral contract, and the jury's related findings are thus irrelevant and cannot support the judgment. To overcome the jury's verdict, the Plank parties must show that there was no evidence to support the jury's finding of fraudulent inducement, no reasonable jury could conclude otherwise, and thus the release was valid as a matter of law. *Tanner,* 289 S.W.3d at 830.

[2] [3]Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract." *Haase v. Glazner,* 62 S.W.3d 795, 798 (Tex. 2001). To prove that Plank fraudulently induced him to sign the release, Westergren had to establish that (1) Plank "made a material representation"; (2) Plank's "representation was

false and was either known to be false when made or made without knowledge of its truth"; (3) Plank's "representation was intended to be and was relied upon by the injured party"; and (4) Westergren's "injury complained of was caused by the reliance." *In re Int'l Profit Assocs., Inc.,* 274 S.W.3d 672, 678 (Tex. 2009) (citing *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 436 (Tex. 1997)); *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 181 (Tex. 1997). The Plank parties argue that there is no evidence to establish the fourth element in this case. Specifically, they contend that no evidence supports a finding that Westergren's reliance on Plank's representations was "justifiable," because the release's plain language conflicted with Plank's representations, and Westergren had ample opportunity to read the release and chose not to do so.

At trial, Westergren admitted that he did not read the release before he signed it and accepted the $500,000 check. Specifically, he explained that:

— In a telephone conversation before the meeting at which Plank delivered the $500,000 check, Plank told Westergren that the check would be payment of the first half of the $1 million that Plank had promised in the oral contract;

— At the meeting, Plank never mentioned that the document was a release, and instead told Westergren that the release "was a receipt. It's nothing. You don't have to worry about it";

— Plank also told Westergren he would get "the other half" of the $1 **\*424** million when "we get another building coming out of the ground";

— Westergren did not read the release because he was "in a hurry" and did not have his reading glasses with him;

— Although he wore a watch that had a magnifying glass, which he could have used to read the release, he did not use it;

— He did not ask Plank or the notary to read the release to him; and

— Instead, he relied on Plank's statements and representations and signed the release without reading it first.

Under the facts of this case, we agree with the Plank parties that Westergren could not justifiably rely on Plank's statements about the content of the release, which directly conflict with the content of the release itself. On

its face, the release's intent and effect is obvious and unambiguous. Consistent with its large, bolded, capitalized, and underlined title (" ***AGREEMENT AND RELEASE*** "), and utilizing bolded and capitalized key words within its text, the release provided that

> **WESTERGREN** ... in consideration of the sum of **FIVE HUNDRED THOUSAND AND NO/100ths DOLLARS** ($500,000.00), and other good and valuable consideration, the receipt of which of considerations being hereby acknowledged and the adequacy of which considerations being hereby confessed, ... does hereby fully and unconditionally **RELEASE AND FOREVER RELINQUISH** any and all right, title, and/or interest ... in or to (i) ... the *"Subject Property;"* ... (ii) [NPH and certain affiliated companies] (collectively, the *"Owning Entities");* and (iii) any income, rent, profits, or other proceeds related to [the property or the Owning Entities] ... (collectively, the *"Income and Proceeds")* ....

> In addition, and for the same consideration, the receipt of which considerations being hereby acknowledged and the adequacy of which consideration being hereby confessed, Westergren ... does hereby fully and unconditionally **REMISE, RELEASE AND FOREVER DISCHARGE** ... **MICHAEL J. PLANK, THE PLANK COMPANIES, INC**., the Owning Entities, and [others] ... of and from any and all manner of action and actions, cause and causes of action, and all claims and demands whatsoever, ... which [Westergren] ... can, shall or may have for, upon or by reason of any matter, cause [or] occurrence ... proximately or remotely, from the beginning of the world to and through the day of the date of this release arising out of, relating to, or pertaining in any way, directly or indirectly, to: *(i) the Subject Property; (ii) the Owning Entities; and (iii) the Income and Proceeds*. This release is intended to release all liability described above of any character for damages of any type or nature ... with respect to the matters released above.

Westergren chose not to read this release before he signed it in the presence of a notary and instead relied on Plank's representations regarding its contents. We hold that, as a matter of law, that reliance was not justifiable.

[4]It is well-established that "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." RESTATEMENT (SECOND) OF TORTS § 541 (1977). Thus, as Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous

terms. *See, e.g., ***425** *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex. 1962) ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests.... [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party.") (citation omitted). This is particularly true when the party had a reasonable opportunity to review the written agreement but failed to exercise ordinary care to do so. *See Tex. & Pac. Ry. Co. v. Poe,* 131 Tex. 337, 115 S.W.2d 591, 592 (1938) (holding that evidence was legally insufficient to support a finding of fraud where party who relied on oral statement that release was receipt had an opportunity to read the document which plainly identified itself as a release); *see also Thigpen,* 363 S.W.2d at 251.

[5]The court of appeals concluded that Westergren did not have an adequate opportunity to review the release. Under these facts, we disagree. Westergren's testimony conclusively established that he had ample opportunity to read the release but instead chose to rely solely on Plank's representations because he was "in a hurry" and did not have his reading glasses with him.[1] Yet he acknowledged that he could have used the magnifier on his watch or had someone read the document to him, and no evidence indicates that anyone prevented him from doing so. *See* 409 S.W.3d 110, 151 (Frost, J., dissenting) (finding "no legal basis for the majority's conclusion" that Plank used "trickery or artifice" to prevent Westergren from reading the release). Instead of excusing a party's failure to read a contract when the party has an opportunity to do so, the law presumes that the party knows and accepts the contract terms. *See, e.g., Poe,* 115 S.W.2d at 592; *Indem. Ins. Co. of N. Am. v. W.L. Macatee & Sons,* 129 Tex. 166, 101 S.W.2d 553, 556 (1937); *cf. In re Lyon Fin. Servs., Inc.,* 257 S.W.3d 228, 232 (Tex. 2008); *In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 133–34 (Tex. 2004); *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505 (Tex. 1993). Here, Westergren's decision not to read the release and instead to rely on Plank's representations because he did not have his glasses and was "in a hurry" was not justifiable.

---

1    The court of appeals thought it relevant that Plank knew that Westergren had an attorney and had communicated with him but did not involve him in the drafting of the Release or send him a copy. 409 S.W.3d at 126–28. While these facts might be relevant to the issue of whether Westergren could *understand* the Release had he read it, we disagree that they could support a conclusion that he had no reasonable opportunity to *read* it. At a minimum, the language of the Release unambiguously made it clear that it was a "**RELEASE**," and that Westergren was releasing all claims to the property and against NPH and Michael

Plank related to the property, and there is no basis to conclude that he was incapable of understanding that. In fact, Westergren's ability to understand the Release is not disputed, and his own testimony establishes that he was a sophisticated businessman who had personally participated in many contractual transactions. Any issue over whether he needed help to understand it would be irrelevant when, by his own admission, he made no effort to read it.

[6]As we have recently observed, it is not the courts' role "to protect parties from their own agreements." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 810–11 (Tex. 2012). Thus, as the United States Supreme Court explained long ago:

> It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. **426** But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.

*Upton v. Tribilcock,* 91 U.S. 45, 50, 23 L.Ed. 203 (1875); *see also Indem. Ins.,* 101 S.W.2d at 556 ("One is presumed to intend what he does or undertakes to do by the terms of a written instrument voluntarily signed by him."). We conclude that Westergren's evidence was legally insufficient to support the jury's finding that he justifiably relied on Plank's representations, and thus constitutes no evidence of fraudulent inducement to negate the release's validity.

[7] [8]However, the parties also dispute the scope of the release. In particular, the jury found that the oral contract was an agreement only between Westergren and Plank, in Plank's individual capacity, and Westergren argues that the release did not release any claims against Plank. We need not resolve this issue, however, because we agree with Plank's alternative argument that the oral contract is unenforceable under the statute of frauds. Under the statute of frauds, "a contract for the sale of real estate" is unenforceable unless it is in writing and signed by the person to be charged. TEX. BUS. & COM. CODE § 26.01. Whether a contract comes within the statute of frauds is a question of law, which we review de novo. *Dynegy, Inc. v. Yates,* 422 S.W.3d 638, 642 (Tex. 2013).

Westergren concedes that the contract at issue was for the sale of real estate and was not in writing or signed, but he relies on the "partial performance exception" to the statute of frauds. Under this exception, he contends, an otherwise unenforceable oral contract becomes enforceable in equity if one party partially performs its obligations and "denial of enforcement would amount to a virtual fraud." Westergren contends that Plank partially performed his obligations under the oral contract by paying half of the promised $1 million payment, and thus the oral contract is enforceable in equity despite the statute of frauds.

[9]Without adopting Westergren's description of the "partial performance exception,"[2] we conclude that, even under his theory, the exception does not apply here. As argued by Westergren, one of the exception's requirements is that the performance on which the party relies must be *unequivocally referable* to the agreement." *Chevalier,* 213 S.W.2d at 533 (emphasis added). In other words, the purpose of the alleged acts of performance must be to fulfill a specific agreement. If **\*427** the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable.

[2]     On the few occasions that this Court has discussed this equitable exception to the statute of frauds, we have made it clear that it requires more than just one party's performance of some obligation under the alleged oral contract. *See, e.g., Chevalier v. Lane's, Inc.,* 147 Tex. 106, 213 S.W.2d 530, 533 (1948) (noting that even " 'full performance,' in the sense of full payment of the consideration by the purchaser, is held not to make the contract enforceable unless accompanied by other circumstances, such as change of possession and erection of valuable improvements"). For example, we explained that "to relieve a parol sale of land from the operation of the statute of frauds, three things were necessary: 1. Payment of the consideration, whether it be in money or services. 2. Possession by the vendee. And 3. The making by the vendee of valuable and permanent improvements upon the land with the consent of the vendor; or, without such improvements, the presence of such facts as would make the transaction a fraud upon the purchaser if it were not enforced. Payment of the consideration, though it be a payment in full, is not sufficient." *Hooks v. Bridgewater,* 111 Tex. 122, 229 S.W. 1114, 1116 (1921). In light of Westergren's failure to establish that Plank's $500,000 payment was "unequivocally referable" to the oral contract, we need not and do not provide a complete explanation of *all* of the partial performance exception's requirements here.

Westergren contends that Plank's payment of $500,000

constitutes partial performance of the oral contract in which Plank agreed to pay $1 million, and that the payment is "unequivocally referable" only to that contract.[3] This is so, he contends, "because the release itself makes sense only in the context of an attempt to settle Westergren's claims based on the [oral contract]," and "the jury was free to conclude that the only thing the release might plausibly have sought to compromise was the [oral contract] itself." We disagree. The fact that the payment was made to "settle" and "compromise" Westergren's "claims based on the [oral contract]" does not mean it was made in performance of obligations under that contract. To the contrary, it establishes that the payment was made to *avoid* performance of the oral contract. On its face, the release states that Westergren's agreement to release all claims against the property, the "Owning Entities," and all "Income and Proceeds" was made "in consideration of the sum of **FIVE HUNDRED THOUSAND AND NO/100ths DOLLARS** ($500,000.00), and other good and valuable consideration, the receipt of which of considerations being hereby acknowledged and the adequacy of which considerations being hereby confessed." Contrary to Westergren's arguments, the payment cannot be unequivocally referable to the oral contract, because the release that Westergren signed expressly states that it was made in exchange for Westergren's agreement to the release. Furthermore, the payment could not be performance of the oral contract because it was made by NPH, which was not a party to the oral contract–but was a party to the release.

[3]     Westergren also contends that he fully performed the agreement by releasing the *lis pendens* and giving up his contractual right to the property. Like the $500,000 payment, these actions are not unequivocally referable to the oral contract where the MSA explicitly requires these acts by Westergren.

[10]To find partial performance of the oral contract, the court of appeals relied upon Plank's oral representation that the payment was the first half of the $1 million owed under the oral contract. A party cannot rely upon oral representations to satisfy the partial performance exception, however. Rather, the kind of performance that justifies the exception to the statute of frauds is "performance which alone and *without the aid of words of promise* is unintelligible or at least extraordinary unless as an incident of ownership, assured, if not existing." *Chevalier,* 213 S.W.2d at 533 (emphasis added). The statute of frauds "unmistakably declares a policy that parol testimony is too unreliable for proof of certain types of agreement, and courts must give heed to that policy as

well as to considerations of an equitable character." *Id.* Therefore, Westergren cannot rely on Plank's oral representations to support a finding that the payment was unequivocally referable to the oral contract. We hold that there is nothing in the nature of these acts that supports a jury finding of partial performance to except the oral contract from the statute of frauds.

In summary, we conclude that there is no evidence to support the jury's findings that Plank fraudulently induced Westergren to sign the release, or that the oral contract is excepted from the statute of frauds.

**\*428** We now turn to Westergren's tort claims for common law fraud, statutory fraud, and breach of partnership duties. Although the jury found in favor of Westergren on the liability questions for his common law and statutory fraud claims, the jury awarded him no damages for either claim. Westergren did not appeal those findings. He therefore cannot recover damages on his fraud claims. With respect to his partnership claim, we have held that the oral contract in which Plank promised to make Westergren a partner with him and his brother is unenforceable under the statute of frauds. Westergren's claim for breach of partnership duties therefore must fail as well.

[11]Finally, we turn to the Plank parties' argument that the court of appeals erred in affirming the trial court's take-nothing judgment on their counterclaims against Westergren for breach of the release and the MSA. The Plank parties contend that a party who releases a claim and later files suit on that claim necessarily breaches the release agreement. We disagree. Although the Plank parties rely on a number of cases to support their argument, none of those cases reads a covenant not to sue into a release that does not include such a promise. They also rely on one case in which a court stated that a covenant not to sue can be construed as a release, arguing that the reverse must also be true. *See Dicker v. Lomas & Nettleton Fin. Corp.,* 576 S.W.2d 672, 675 (Tex.Civ.App.–Texarkana 1978, writ ref'd n.r.e.) (noting that "an agreement not to sue can be construed as a release"). Westergren, in turn, argues that the release provides only an affirmative defense because it provides only that it "may be pleaded as an absolute and final bar to any or all suit" and does not include an express or implied covenant not to sue or to indemnify the released parties. We must review the MSA and release language to determine whether either agreement includes a contractual obligation not to sue.

The intent of the MSA was to settle the suit between Westergren and the other parties to the initial litigation,

who are not before the Court in this case. We find no language in the MSA in which Westergren agreed not to sue the Plank parties. In fact, the agreement contemplates that the parties may bring suit by providing that the parties "may not recover attorney's fees or costs in any litigation brought to construe or enforce this agreement. Otherwise, if unsuccessful, the prevailing party or parties shall be entitled to recover reasonable attorney's fees and expenses." This provision indicates that a suit may be brought, even though the agreement is in effect, and in no way suggests that filing a suit concerning the MSA's released claims results in a breach. Therefore, Westergren's claims did not breach the MSA.

[12]We also find that the release is unambiguous as to this point. The parties intended the release "to release all liability described" within the agreement. Like the MSA, it includes no language barring Westergren from bringing suit or stating that he would breach the release by doing so. To the contrary, this agreement has a provision stating essentially that should a future suit be brought, the release may be pleaded as an absolute bar to the suit–in other words, it provides the parties with an affirmative defense.[4] *See* TEX. R. CIV. P. 94 (listing affirmative defenses, including release). Although the release provides an affirmative defense to future suits, we cannot construe it as including a **\*429** covenant not to sue where, in fact, the plain language does not bar future suits. Just as Westergren is bound to the actual language of the release, so are the Plank parties. The court of appeals, therefore, did not err in affirming the trial court's judgment based on the jury verdict in favor of Westergren on the Plank parties' claims for breach of the MSA and release.

---

4    The release states that it "may be pleaded as an absolute and final bar to any or all suit or suits pending or which may hereafter be filed or prosecuted."

---

We grant the Plank parties' petition for review, and without hearing oral argument, we (1) reverse the court of appeals' judgment as to Westergren's claim for breach of the oral contract, Westergren's claim for attorney's fees, and the trial court's allocation of court costs, (2) reinstate the trial court's judgment that Westergren take nothing on his claims for breach of the oral contract and for attorney's fees and the trial court's taxing of court costs against Westergren, and (3) affirm the court of appeals' take-nothing judgment on Westergren's partnership and fraud claims and on the Plank parties' counterclaims for breach of contract and attorney's fees against Westergren. TEX. R. APP. P. 59.1.

58 Tex. Sup. Ct. J. 204

**All Citations**

453 S.W.3d 419, 58 Tex. Sup. Ct. J. 204

                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

16

409 S.W.3d 790
Court of Appeals of Texas,
Dallas.

STOVALL & ASSOCIATES, P.C., Appellant
v.
HIBBS FINANCIAL CENTER, LTD., Appellee.

No. 05–12–00303–CV. | Aug. 13, 2013.

**Synopsis**
**Background:** Landlord brought action against former tenant of office suites, seeking to recover unpaid rent and attorney fees. The 101st Judicial District Court, Dallas County, Martin Lowy, J., entered summary judgment in favor of landlord, and tenant appealed.

**Holdings:** The Court of Appeals, Lewis, J., held that:

[1] statute of frauds did not bar enforcement of unsigned lease agreements, and

[2] landlord could be awarded $35,000 in attorney fees.

Affirmed.

West Headnotes (22)

[1] **Judgment**
🔑Personal knowledge or belief of affiant
**Judgment**
🔑Defects and objections

An affidavit containing hearsay is objectionable and does not support a summary judgment motion if proper objection is made. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

1 Cases that cite this headnote

[2] **Judgment**

🔑Defects and objections
**Judgment**
🔑Defects and objections

Inadmissible hearsay summary judgment evidence admitted without objection shall not be denied probative value merely because it is hearsay. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

Cases that cite this headnote

[3] **Judgment**
🔑Defects and objections

An objection that a summary judgment affidavit contains hearsay is an objection to a defect in the form of the affidavit. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

Cases that cite this headnote

[4] **Appeal and Error**
🔑Nature of evidence in general
**Judgment**
🔑Defects and objections
**Judgment**
🔑Defects and objections

If any part of a piece of summary judgment evidence is admissible, a blanket hearsay objection that does not identify which parts contain hearsay is not enough; rather, the objecting party must make specific objections to each component part of a particular piece of evidence to preserve error on appeal. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

1 Cases that cite this headnote

[5] **Appeal and Error**
🔑Objections to evidence in general

Absent a specific objection to admissibility of a piece of summary judgment evidence, the complaining party waives any argument on appeal to challenge the improper admission or consideration of the evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

2 Cases that cite this headnote

[6]     **Appeal and Error**
        Nature of evidence in general

Tenant waived argument on appeal that landlord's summary judgment affidavits contained inadmissible hearsay, in landlord's action to recover unpaid rent for suites of office building, although tenant generally objected to the affidavits as containing hearsay, tenant failed to direct trial court's attention to any specific statements or explain why any of the statements were hearsay. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(f).

Cases that cite this headnote

[7]     **Contracts**
        Grounds of action

To prevail on a claim for breach of contract, a plaintiff must prove (1) the existence of a valid contract; (2) its performance or tendered performance; (3) defendant's breach of the contract; and (4) damages as a result of the breach.

1 Cases that cite this headnote

[8]     **Frauds, Statute Of**
        Purpose

The statute of frauds exists to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in writing and

signed by the parties. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

[9]     **Frauds, Statute Of**
        Validity and Enforcement of Contracts in General
        **Frauds, Statute Of**
        Necessity

The statute of frauds is an affirmative defense in a breach of contract suit and renders a contract that falls within its purview unenforceable. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

[10]    **Frauds, Statute Of**
        Questions for jury

The question of whether an agreement falls within the statute of frauds is one of law. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

[11]    **Frauds, Statute Of**
        Questions for jury

The question of whether an exception to the statute of frauds applies is generally a question of fact. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

[12]    **Frauds, Statute Of**
        Possibility of Performance
        **Frauds, Statute Of**
        Extensions and renewals

Statute of frauds did not bar enforcement of unsigned agreements to lease suites in office building, since agreements either did not involve the lease of real estate for more than one year or could be performed within one year of being made; unsigned agreements, entered into after tenant executed lease for single suite, covered tenant's expansion into additional suites and contained start and finish dates covering less than one year. V.T.C.A., Bus. & C. § 26.01(b)(5), (6).

Cases that cite this headnote

**[13]** **Frauds, Statute Of**
🔑Statutory provisions

To measure a contract's duration for statute of frauds purposes, a court simply compares the date of the agreement to the date when the performance under the agreement is to be completed; if there is a year or more between those two reference points, then a writing is required to render the agreement enforceable. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[14]** **Frauds, Statute Of**
🔑Part Performance in General

Under partial performance, as an equity-based exception to the statute of frauds, an oral agreement that does not satisfy the traditional statute of frauds but that has been partially performed may be enforced if denying enforcement would itself amount to a fraud. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[15]** **Frauds, Statute Of**
🔑Necessity that part performance relied on be

referable to contract

In order for partial performance to apply as an exception to the statute of frauds, the actions asserted to constitute partial performance must be unequivocally referable to the alleged oral agreement and corroborate the existence of that agreement; they must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[16]** **Frauds, Statute Of**
🔑Possession and payment

Statute of frauds did not bar enforcement of unsigned agreement to lease suite in office building, since tenant had rendered partial performance of the agreement; tenant occupied suite for over a year and a half and paid full rent on the suite on a monthly basis, landlord accepted tenant's possession of the suite and accepted the rent payments, and landlord's officer testified that a written lease agreement was prepared at one point to cover the suite but that execution of the lease was delayed. V.T.C.A., Bus. & C. § 26.01.

Cases that cite this headnote

**[17]** **Appeal and Error**
🔑Reply briefs

An issue raised for the first time in a reply brief is ordinarily waived and may not be considered by an appellate court.

4 Cases that cite this headnote

**[18]** **Appeal and Error**
🔑Attorney fees

An appellate court generally reviews a trial court's decision to award attorney fees for an abuse of discretion.

1 Cases that cite this headnote

**[19]  Costs**
🔑Contracts

To recover attorney fees in a suit based on a contract, a party must prevail on the cause of action and recover damages. V.T.C.A., Civil Practice & Remedies Code § 38.001.

Cases that cite this headnote

**[20]  Costs**
🔑Discretion of court

While the trial court has the discretion to set the amount of an award of attorney fees, it has no discretion to deny the award if it is proper under the statute governing recovery of attorney fees. V.T.C.A., Civil Practice & Remedies Code § 38.001.

1 Cases that cite this headnote

**[21]  Costs**
🔑Evidence as to items

It is presumed that usual and customary attorney's fees are reasonable, but this presumption may be rebutted. V.T.C.A., Civil Practice & Remedies Code § 38.001.

Cases that cite this headnote

**[22]  Landlord and Tenant**
🔑Costs and attorney fees

Landlord could be awarded $35,000 in attorney fees after entry of summary judgment awarding $25,000 in unpaid rent, in action against tenant of suites in office building; landlord's attorney submitted records and testimony showing time and labor involved, skill required, and customary fee charged, and trial court found that fee award exceeding the amount of landlord's damages was warranted due to matter being seriously contested and tenant's dilatory and obstructive behavior. V.T.C.A., Civil Practice & Remedies Code § 38.001.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*792** David R. Weiner, Weiner Law Firm, Dallas, for Appellant.

Roger Anderson, Gillen & Anderson, Tyler, for Appellee. Before Justices FITZGERALD and LEWIS.[1]

[1]  The Honorable Mary L. Murphy was on the panel and participated at the submission of this case. Due to her resignation from this Court on June 7, 2013, she did not participate in the issuance of this Opinion. *See* TEX.R.APP. P. 41.1(a), (b).

**\*793 OPINION**

Opinion by Justice LEWIS.

This is a dispute between landlord, Hibbs Financial Center, Ltd. (HFC), and its tenant, Stovall and Associates, P.C. In two issues, we must determine whether HFC is entitled to (1) summary judgment on its claim for breach of a lease agreement as a result of Stovall's alleged failure to pay rent and (2) reasonable attorney's fees. Stovall challenges HFC's summary-judgment evidence and the trial court's rejection of its statute-of-frauds defense and claimed issues of fact. Stovall also contends the trial court erred in awarding attorney's fees to HFC. We affirm the trial court's judgment.

## BACKGROUND

Stovall is a law firm that leased office space from HFC in a building located at 6750 Hillcrest Plaza Drive in Dallas. Pursuant to the lease agreement signed by the parties, Stovall leased suite 201, which measured approximately 1,680 square feet, and agreed to pay HFC $2,135 per month (or $15.25 per square foot) to lease the suite. The lease agreement was for a period of twenty-four months, beginning October 1, 2008 and ending on September 30, 2010.

During the term of the lease, Stovall also expanded into and occupied seven additional suites within the premises. Stovall first expanded into suite 217 beginning December 15, 2008 and then suites 307 and 309 beginning November 15, 2009. Although a written lease agreement that covered suites 201, 217, 307, and 309 was prepared, it was not signed by the parties. Stovall also moved into suites 311 and 312 beginning February 1, 2010 and suites 305 and 300 beginning March 1, 2010. It is undisputed that the parties did not sign any other lease agreement pertaining to the additional suites Stovall occupied.

The base rental amounts listed for each suite in the unsigned lease agreement reflected that rent for suites 217, 307, and 309 was to be calculated by using the same price of $15.25 per square foot as in the original signed lease agreement. In addition, according to letters of intent signed by firm owner Kimberly Stovall (or on her behalf by her representative), the firm sought to lease suites 311, 312, 305, and 300 for that same price.

After Stovall began using suite 217 in December 2008, Stovall paid HFC monthly rent of $3,442.69 from December 2008 through April 2010, which was the total monthly rent for suites 201 and 217. The memo line on the checks submitted by Stovall for payment during that time indicated the payment was for "Sts 201 & 217." And in May, June, and July of 2010, Stovall made three payments of $9,224.57, which was the approximate monthly amount for leasing all of the suites. According to HFC, however, additional rent was due from December 2009 through April 2010 based on the timing of Stovall's use of suites 307, 309, 311, 312, 305, and 300.

Stovall vacated the premises without notice to HFC in early August 2010, nearly two months before the expiration of the lease agreement. Stovall did not pay any amount to cover the rent for August and September 2010 or the additional amounts HFC requested for unpaid rent from December 2009 through April 2010. Stovall also did not respond to a September 14, 2010 letter HFC sent to Kimberly Stovall demanding payment for the unpaid rent.

**\*794** Two months later, HFC filed this lawsuit to recover unpaid rent in the amount of $37,943.77 and reasonable attorney's fees. HFC alleged Stovall breached the agreements to pay rent for all the suites Stovall occupied. Stovall generally denied the allegations and asserted various affirmative defenses, including the statute of frauds. Stovall also filed a counterclaim against HFC, alleging violations of the Deceptive Trade Practices and Consumer Protection Act (DTPA).

Stovall moved for summary judgment on HFC's claim for unpaid rent, arguing it was entitled to summary judgment because it paid all rents owed under the only signed written lease agreement. Stovall also argued that the unsigned lease agreement for the additional suites was unenforceable under the statute of frauds. It further claimed that the amounts paid in May, June, and July of 2010, did not represent payment of rent for the additional suites; rather, the payments were monies owed for a security deposit. Stovall supported its summary-judgment motion with the signed lease agreement for suite 201 and the unsigned lease agreement. Stovall also attached the affidavit of its business manager, Lesa Jewell, in which she testified that only one executed lease agreement existed between the parties (for suite 201) and no signed lease agreement existed for any of the additional suites. She further stated that Stovall had paid "all rents due and owing for its occupancy of [the] suites."

HFC responded and also filed a motion for partial summary judgment and amended motion on its claim for unpaid rent. HFC argued (1) the undisputed facts established that an agreement existed between the parties showing Stovall agreed to lease all suites at issue through September 30, 2010 for $15.25 per square foot and (2) Stovall breached the agreement by failing to pay the rent due. HFC also maintained the statute of frauds did not operate to preclude HFC's recovery of the unpaid rent. HFC supported its motion with the signed lease agreement, the letters of intent to lease suites 311, 312, 305, and 300 signed by Kimberly Stovall, and excerpts from the depositions of Kimberly Stovall, Jewell, and Kay Wilbanks, who was Kimberly's assistant. HFC also relied on three affidavits it attached as summary-judgment evidence—the affidavits of Kenny Barnes, the facilities manager for the property, Glenda Liegman, a Vice President and Senior Accountant for HFC, and Bill Lamkin, the commercial property manager for the property. The affidavits included various attachments, including e-mail communications with Stovall representatives and copies of checks paid by Stovall.

Attached to Lamkin's affidavit was a June 11, 2010 letter from Lamkin to Kimberly Stovall, notifying her of delinquent rent for June in the amount of $9,224.57, and copy of a Stovall check dated June 18, 2010 for that amount, referencing a June 1, 2010 "Bill." He testified that the requested amount was for rental of all the suites the firm occupied.

Stovall objected to the affidavits of Barnes, Liegman, and Lamkin in its response to HFC's motion and amended motion. Two of the grounds were that "[t]he Affidavits contain inadmissible hearsay" and the "Affidavits are from interested fact witnesses." Stovall also objected to the "exhibits attached to each of the said Affidavits and to [HFC's] Motions" because the exhibits are "irrelevant, contain hearsay, are unauthenticated documents and are not competent summary judgment proof." Stovall responded to HFC's motion by arguing that other than "mere conclusions, speculation, and hearsay, [HFC] has offered no proper, admissible summary judgment evidence to support its alleged claim."

**\*795** The trial court denied Stovall's motion for summary judgment and granted HFC's motion and amended motion with an award of $25,136.83 for unpaid rent. The trial court also overruled Stovall's objections to HFC's summary-judgment evidence. The trial court signed an order on October 28, 2011, which stated that the case would proceed on Stovall's DTPA counterclaim and HFC's claim for attorney's fees. The trial court later granted summary judgment in favor of HFC on Stovall's counterclaim. After a bench trial on the issue of attorney's fees, the trial court awarded HFC $35,000 in attorney's fees for representation in the trial court plus additional fees for successful representation on appeal. The trial court incorporated its rulings in a final judgment signed February 16, 2012.

Stovall appeals that judgment, challenging the trial court's summary judgment rendered on HFC's claim for unpaid rent (Issue One) and award of attorney's fees (Issue Two). Stovall does not challenge the trial court's denial of its summary-judgment motion or the decisions related to its DTPA counterclaim.

## DISCUSSION

In its first issue, Stovall contends the trial court erred in granting HFC's motion for summary judgment, which resulted in HFC's recovery of unpaid rent. Stovall claims the trial court relied upon inadmissible affidavits as evidence of an unenforceable oral contract for the lease of

real property and HFC did not establish its entitlement to summary judgment on its claim as a matter of law.

## Standard of Review

We review de novo the trial court's summary judgment. *Marsh USA Inc. v. Cook,* 354 S.W.3d 764, 768 (Tex.2011); *Mid–Century Ins. Co. of Tex. v. Ademaj,* 243 S.W.3d 618, 621 (Tex.2007). When we review a summary judgment granted in favor of a plaintiff, we determine whether the plaintiff established every element of its claim as a matter of law. *Ohio Cas. Ins. Co. v. Time Warner Entm't Co., L.P.,* 244 S.W.3d 885, 888 (Tex.App.-Dallas 2008, pet. denied). To defeat a plaintiff's cause of action on a traditional motion for summary judgment, the defendant must either "conclusively negate an element of the plaintiff's claim or conclusively establish every element of an affirmative defense." *Id.* A matter is conclusively established if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *Holloway v. Dekkers,* 380 S.W.3d 315, 320 (Tex.App.-Dallas 2012, no pet.). The defendant, however, is not required to respond with evidence if deficiencies in the plaintiff's own proof or legal theories will defeat the movant's right to judgment as a matter of law. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

The movant has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Sysco Food Servs., Inc. v. Trapnell,* 890 S.W.2d 796, 800 (Tex.1994). In deciding whether a disputed material fact issue exists precluding summary judgment, we must take evidence favorable to the nonmovant as true, and we must indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Sysco Food Servs.,* 890 S.W.2d at 800. When, as here, the trial court's order granting summary judgment does not specify the basis for the ruling, we will affirm the summary judgment if any of the theories presented to the trial court are meritorious. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex.2003).

## \*796 Admissibility of HFC's Summary–Judgment Affidavits

We begin with Stovall's contentions related to HFC's summary-judgment evidence. Stovall argues the affidavits

HFC attached as summary-judgment evidence should not have been considered as a basis for granting summary judgment in favor of HFC because the affidavits are inadmissible as hearsay for which there is no exception. Although Stovall lodged objections to three affidavits and various attachments submitted by HFC in the trial court, the hearsay contention Stovall raises on appeal relates only to the affidavits of Barnes and Liegman and does not appear to extend to any of the documents attached to the affidavits.

Both Barnes and Liegman testified to their personal dealings with Stovall, which included communications related to the firm's desire to occupy additional suites in the building because the firm needed extra space and the timing of the firm's possession of the additional suites within the building. They testified to the dates Stovall took possession of each suite and the square footage of the suite. Both also made statements that as Stovall expanded into the other suites, the firm agreed to pay rent for that suite at a certain price, which was based on a price of $15.25 per square foot, and that Stovall agreed to lease each additional suite through September 30, 2010. Liegman testified that at the time she left her employment with HFC in February 2010, there was an agreement between HFC and Stovall that "upon renewal of their lease at the end of September, 2010, a new lease would be prepared to incorporate all the Suites which they intended to occupy." She further stated that Stovall "agreed to pay rent for the Suites which it had occupied."

Stovall complains that "the declarants mention several times that 'Stovall and Associates agreed to pay rent ...' for a specific suite or amount of time." Stovall also complains about this statement in Barnes's affidavit: "Bill Lamkin ... notified Stovall & Associates, P.C. that effective May, 2010, HFC would accept $9,224.57 per month as their monthly rent for Suites 201, 217, 300, 305, 307, 309, 311 and 312." Stovall claims these statements constitute hearsay because they are being offered to prove that it "did indeed orally agree to pay rent on suites that were not included in the original lease." It further maintains that statements regarding Stovall's agreement to pay rent do not constitute admissions by a party opponent.

HFC argues that Stovall waived these complaints to the Barnes and Liegman affidavits by failing to present the trial court with specific objections identifying the particular statements, which were the subject of its hearsay objection. We agree with HFC.

[1] [2] To constitute competent summary-judgment evidence, an affidavit must be based on personal knowledge and set forth facts as would be admissible in evidence. TEX.R. CIV. P. 166a(f). Thus, an affidavit containing hearsay is objectionable and does not support a summary-judgment motion if proper objection is made. See *Querner Truck Lines, Inc. v. Alta Verde Indus., Inc.,* 747 S.W.2d 464, 468 (Tex.App.-San Antonio 1988, no writ); *see also* TEX.R. EVID. 801(d) (defining hearsay). Inadmissible hearsay evidence admitted without objection, however, shall not be denied probative value merely because it is hearsay. See *Pickens v. Pickens,* 62 S.W.3d 212, 216 n. 2 (Tex.App.-Dallas 2001, pet. denied) (citing TEX.R. EVID. 802); *Dolenz v. A.B.,* 742 S.W.2d 82, 83–84 n. 2 (Tex.App.-Dallas 1987, writ denied); *see also Youngstown Sheet & Tube Co. v. Penn,* 363 S.W.2d 230, 234 (Tex.1962) (unchallenged **\*797** deficiencies can support affirmance of summary judgment).

[3] [4] [5] An objection that an affidavit contains hearsay is an objection to a defect in the form of the affidavit. *S & I Mgmt., Inc. v. Choi,* 331 S.W.3d 849, 855 (Tex.App.-Dallas 2011, no pet.). Defects in the form of affidavits are not grounds for reversal unless specifically objected to by the opposing party with the opportunity but refusal to amend. TEX.R. CIV. P. 166a(f). An objection is sufficiently specific if it makes the trial court aware of the precise nature of the complaint such that it can make an informed ruling. TEX.R.APP. P. 33.1(a)(1)(A); TEX.R. EVID. 103(a)(1). If any part of a piece of evidence is admissible, a blanket hearsay objection that does not identify which parts contain hearsay is not enough; rather, the objecting party must make specific objections to each component part of a particular piece of evidence to preserve error on appeal. *See Flores v. City of Liberty,* 318 S.W.3d 551, 560 (Tex.App.-Beaumont 2010, no pet.); *see also Speier v. Webster College,* 616 S.W.2d 617, 619 (Tex.1981) (" 'A general objection to a unit of evidence as a whole, ... which does not point out specifically the portion objected to, is properly overruled if any part of it is admissible.' ") (quoting *Brown & Root, Inc. v. Haddad,* 142 Tex. 624, 180 S.W.2d 339, 341 (1944)). Absent a specific objection, the complaining party waives any argument to the improper admission or consideration of the evidence. *Speier,* 616 S.W.2d at 619.

[6] As part of its response to HFC's motion and amended motion, Stovall generally objected to the three affidavits ("as well as the exhibits attached thereto") as a whole because: "[t]he Affidavits contain inadmissible hearsay" and "[t]hese Affidavit[s] contain nothing but hearsay on top of hearsay ...." Stovall did not direct the trial court's attention to any specific statements contained in the affidavits that it considered problematic, such as the statements it complains about on appeal, or explain why any of the statements were hearsay. Without greater

specificity, the trial court was not given sufficient information to make an informed ruling nor did HFC have an opportunity to correct the defect.

Our examination of the affidavits also shows that some portions of the affidavits certainly were admissible. For example, both Barnes and Liegman testified to the dates Stovall took possession of each additional suite, which were facts stipulated to by the parties. Thus, even assuming Stovall is correct that the complained-of statements are inadmissible as hearsay and no exception applies, because portions of the affidavits were admissible, Stovall was required to specifically object to the statements that were allegedly inadmissible. *See id.* Because Stovall failed to do so, we conclude Stovall's hearsay complaints are waived and the trial court properly considered these affidavits.

### HFC's Entitlement to Summary Judgment As A Matter of Law

Before we address whether HFC is entitled to summary judgment, we note that the complaints Stovall raises on appeal relate solely to the unpaid rent awarded to HFC for the additional suites Stovall occupied that were beyond what was in the original lease agreement. It is undisputed that the parties signed one lease agreement, in which Stovall agreed to lease suite 201 for $2,135 per month through September 30, 2010. Stovall vacated the property in early August 2010 and did not pay the rent owed for that suite for the remaining two months. The record shows that the trial court awarded HFC the "[r]ent due for Suite 201" for August and **\*798** September 2010, which was $4,270 ($2,135 + $2,135). Stovall does not appear to challenge this portion of HFC's award.

It also is undisputed that Stovall expanded into and occupied seven additional suites at various times beginning in December 2008. Those suites were suites 217, 307, 309, 311, 312, 305, and 300 (in order of when Stovall took possession). HFC alleged a series of oral agreements that form the basis of its request for unpaid rent on those additional suites. The trial court granted summary judgment for HFC on its unpaid rent claim for those seven suites and awarded HFC $19,494.63, the "Total rent due" for the seven suites from December 2009 through April 2010. The trial court also awarded HFC a prorated amount of $1,372.20 for rental of those suites for six days in August 2010.

[7] To prevail on its claim for unpaid rent for the additional suites, HFC must prove (1) the existence of a valid

contract; (2) its performance or tendered performance; (3) Stovall's breach of the contract; and (4) damages as a result of the breach. *Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.,* 227 S.W.3d 876, 882 (Tex.App.-Dallas 2007, no pet.); *see also Esty v. Beal Bank S.S.B.,* 298 S.W.3d 280, 299 (Tex.App.-Dallas 2009, no pet.) ("A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform.").

Stovall argues the trial court erred in granting summary judgment on HFC's claim for unpaid rent. It attacks the first element of HFC's claim—the existence of a valid contract—and argues any oral contract(s) to lease and pay rent on the additional suites as alleged by HFC are unenforceable under the statute of frauds. Stovall also maintains there are issues of fact related to the interpretation of any agreements on the rental of additional suites not listed in the signed lease agreement.

### Statute of Frauds

[8] [9] The statute of frauds concerns problems of proof and exists to prevent fraud and perjury in certain kinds of transactions by requiring agreements to be set out in writing and signed by the parties. *Haase v. Glazner,* 62 S.W.3d 795, 799 (Tex.2001); RESTATEMENT (SECOND) OF CONTRACTS § 131 cmt. c (1981). The statute of frauds is an affirmative defense in a breach of contract suit and renders a contract that falls within its purview unenforceable. *See* TEX.R. CIV. P. 94; TEX. BUS. & COM.CODE ANN. § 26.01(a) (West 2009); *see also S & I Mgmt.,* 331 S.W.3d at 854.

[10] [11] The statute of frauds encompasses leases of real estate for a term longer than one year and agreements that are not to be performed within one year from the date of making the agreement. TEX. BUS. & COM.CODE ANN. § 26.01(b)(5), (6). The statute of frauds renders these types of agreements unenforceable unless the agreement is in writing and signed by the person to be charged. *See id.* § 26.01(a). The question of whether an agreement falls within the statute of frauds is one of law. *See Bratcher v. Dozier,* 162 Tex. 319, 346 S.W.2d 795, 796 (1961); *Biko v. Siemens Corp.,* 246 S.W.3d 148, 159 (Tex.App.-Dallas 2007, pet. denied). Yet the question of whether an exception to the statute of frauds applies is generally a question of fact. *See Adams v. Petrade Int'l, Inc.,* 754 S.W.2d 696, 705 (Tex.App.-Houston [1st Dist.] 1988, writ denied).

HFC argues that the agreements to lease the additional suites do not fall within the statute of frauds because they are for lease terms of less than one year and could be

performed within one year of the dates the agreements were made. HFC also argues the series of documents, including **\*799** the e-mails between representatives of the parties, HFC submitted as summary-judgment evidence were sufficient to constitute an agreement in writing to satisfy the statute of frauds and support enforcement of the agreements to pay rent on the additional suites. HFC further maintains that even if the statute of frauds applies, Stovall's partial performance rendered the defense unavailable to Stovall.

[12] We agree with HFC that the agreements to lease and pay rent on six of the suites, specifically, suites 307, 309, 311, 312, 305, and 300, do not fall within the statute of frauds because they do not involve the lease of real estate for more than one year or could be performed within one year from the date the agreements were made. HFC alleged agreements with Stovall to pay rent on the additional suites. The agreements were effective on various dates based on the timing of when Stovall took possession of the suites. The record shows the parties stipulated to the dates that Stovall expanded into the additional suites: The stipulated facts show that Stovall began using suites 307 and 309 on November 15, 2009, suites 311 and 312 on February 1, 2010, and suites 305 and 300 on March 1, 2010. HFC's claim for unpaid rent on those suites corresponded to the dates Stovall began using the suites. For example, HFC alleged as of December 2009, Stovall was occupying suites 201, 217, 307, and 309 but that Stovall paid rent only for suites 201 and 217. The trial court awarded unpaid rent for suites 307 and 309 for five months, beginning in December 2009 and ending April 2010, plus six days in August 2010.

Barnes and Liegman testified that the agreement to lease each suite was effective on the date Stovall took possession of the suite and Stovall agreed to lease the suites under the same terms and price per square foot through September 30, 2010. Liegman also testified that "upon renewal of [Stovall's] lease at the end of September 2010," a new lease would be prepared that incorporated all the suites Stovall intended to occupy.

[13] To measure a contract's duration for statute-of-frauds purposes, the "court simply compares the date of the agreement to the date when the performance under the agreement is to be completed." *Young v. Ward,* 917 S.W.2d 506, 508 (Tex.App.-Waco 1996, no writ). And if there is a year or more between those two reference points, then a writing is required to render the agreement enforceable. *Id.* Here, there is less than a year between the beginning dates for each expansion to the end of September 2010. The longest agreement (for suites 307

and 309) was from a period of November 15, 2009 through September 30, 2010, which is plainly less than one year.

Stovall, as the party pleading the statute of frauds, bore the burden of establishing its applicability; that is, the agreements to lease the additional suites were for more than one year or could not be performed within a year of the date of making the agreements. *See Kalmus v. Oliver,* 390 S.W.3d 586, 590 (Tex.App.-Dallas 2012, no pet.). Stovall moved for traditional summary judgment on its statute-of-frauds defense. It argued that the unsigned lease agreement was unenforceable under the statute of frauds because performance was for more than one year after the commencement of the lease. It supported its motion with the unsigned lease agreement, which had been prepared by HFC, and the affidavit of Jewell in which she testified there was no signed lease agreement for any suite other than suite 201. The unsigned lease agreement also was attached to Liegman's affidavit and submitted as part of HFC's summary-judgment evidence.

**\*800** The unsigned lease agreement pertained to suites 201, 217, 307, and 309. The agreement provided that the lease term was for a period of twenty-four months and listed three "Commencement Date(s)" corresponding to when Stovall moved into suites 201, 217, 307, and 309. The lease term did not specify that the 24–month lease term began from each commencement date; rather, it was for "a period" of twenty-four months that could only logically begin when Stovall first took possession of its first suite, which was suite 201, effective October 1, 2008. Further, the trial court did not treat each expansion as beginning a new 24–month term. It treated each expansion as a month-to-month lease and awarded damages accordingly. Liegman testified that for each suite Stovall took possession of and occupied beyond suite 201, the agreement was to lease the space through the end of September 30, 2010.

Other than the documents described above, Stovall presented no additional summary-judgment evidence in response to HFC's motion and amended motion; Stovall simply argued that because HFC did not produce "any proper, admissible summary judgment evidence to prove the claimed proposition," HFC is not entitled to summary judgment as a matter of law. We conclude Stovall did not meet its burden to show the agreements to lease additional suites as alleged by HFC were unenforceable because they were for more than one year or could not be performed within one year from the date of making the agreement. Thus, the oral agreements to lease suites 307, 309, 311, 312, 305, and 300 are not barred by the statute of frauds.

The oral agreement to lease suite 217, however, requires a different analysis because the stipulated facts show that any agreement to lease suite 217 was for more than one year and therefore is within the statute of frauds. TEX. BUS. & COM.CODE ANN. § 26.01(a), (b)(5), (6). There is no dispute that Stovall occupied suite 217 and paid rent for the suite from December 2008 through July 2010. HFC's summary-judgment evidence includes check stubs showing Stovall's payment for rent on "Sts 201 & 217." And Stovall admitted in its opening brief that it "had paid rent for the additional Suite 217." But HFC also alleged that Stovall owed rent for all suites, including suite 217, in August and September 2010, and the trial court awarded recovery of unpaid rent for the suites other than suite 201 through August 6, 2010. We therefore must determine whether the statute of frauds precludes recovery of unpaid rent for suite 217 for the six days in August 2010.

[14] [15] HFC argues that Stovall's partial performance renders the statute-of-frauds defense unavailable to Stovall. Partial performance has been recognized as an equity-based exception to the statute of frauds. *Bank of Tex., N.A. v. Gaubert,* 286 S.W.3d 546, 553 (Tex.App.-Dallas 2009, pet. dism'd w.o.j.). Under this exception, "an oral agreement that does not satisfy the traditional statute of frauds but that has been partially performed may be enforced if denying enforcement would itself amount to a fraud." *Id.* at 554; *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 439 (Tex.App.-Dallas 2002, pet. denied). The actions asserted to constitute partial performance must be "unequivocally referable" to the alleged oral agreement and corroborate the existence of that agreement; they "must be such as could have been done with no other design than to fulfill the particular agreement sought to be enforced." *Breezevale,* 82 S.W.3d at 439–40.

Citing *Hooks v. Bridgewater,* 111 Tex. 122, 229 S.W. 1114, 1116 (1921), Stovall **\*801** argues that to establish partial performance, HFC must show: (1) payment of consideration by the purchaser/lessee; (2) possession of the property by the purchaser/lessee; and (3) permanent and valuable improvements by the purchaser/lessee with the consent of the landlord, or without such improvements, the presence of other facts as would make the transaction a fraud upon the purchaser/lessee if it were not enforced. We agree this test applies in the context of a purchaser or *lessee* attempting to enforce an oral agreement pertaining to the sale or lease of real property. *See id.; Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.,* 48 S.W.3d 865, 882–83 (Tex.App.-Houston [14th Dist.] 2001, pet. denied);

*Carmack v. Beltway Dev. Co.,* 701 S.W.2d 37, 40 (Tex.App.-Dallas 1985, no writ). But the case before us involves a *lessor's* attempt to enforce an oral agreement for lease of real estate. In such circumstances, the partial performance exception to the statute of frauds has been applied to prevent application of the statute when the lessor fully performs and the lessee knowingly accepts the benefits of the oral agreement to lease and partly performs. *See, e.g., Carmack,* 701 S.W.2d at 40 (seller/lessor may be entitled to enforce oral agreement if it shows "performance of the contract by delivery of possession to the purchaser and a detrimental change of position for which the [vendor/lessor] has no adequate remedy."); *see also Newsom v. Newsom,* 378 S.W.2d 842, 844–45 (Tex.1964) (lessor permitted to recover rent stipulated in oral lease for more than one year); *Tinsley v. Metzler,* 44 S.W.2d 820, 822 (Tex.Civ.App.-El Paso 1931, writ dism'd w.o.j.) ("[W]here the tenant has gone into possession and paid rent, this is such part performance as takes the transaction out of the operation of the statute [of frauds] and renders it unavailable as a defense" in an action for unpaid rent.).

[16] Here, HFC permitted Stovall to occupy its property, and Stovall paid rent for the majority of that time. Specifically, the summary-judgment evidence shows Stovall occupied suite 217 for over a year and a half and paid full rent on the suite on a monthly basis until August 2010. HFC accepted Stovall's possession of the suite (as evidenced by e-mail communications attached to Barnes's affidavit showing HFC performed maintenance services, such as temperature and pest control, related to suite 217) and accepted the rent payments. Liegman testified that a written lease agreement was prepared at one point to cover suite 217 (as well as suites 201, 307, and 309), but that "as a result of Stovall's uncertainty as to when they wished to take possession of Suites 307 and 309, execution of this lease was delayed." She also stated that when the original lease agreement expired in September 2010, a new lease would be prepared to incorporate all suites occupied by Stovall. These acts are sufficient to corroborate the existence of an agreement to lease 217 and could not have been performed with any purpose except to perform an agreement to lease and pay rent for suite 217. *See Wukasch v. Hoover,* 247 S.W.2d 593, 595 (Tex.Civ.App.-Austin 1952, no writ). We therefore conclude Stovall's partial performance with respect to an agreement to lease and pay rent for suite 217 is supported by the summary-judgment record, which removes the agreement from the statute of frauds.[2]

[2]     We note that the party successful in removing an oral agreement from the statute of frauds because of partial performance would be entitled to only reliance

damages. *See Breezevale,* 82 S.W.3d at 441. Stovall did not attack the measure of damages, and we therefore decline to address whether HFC suffered reliance damages.

**\*802 Claimed Issues of Fact**

Because the statute of frauds does not bar the oral agreements to lease suites 307, 309, 311, 312, 305, and 300 and the statute is unavailable due to partial performance related to the agreement to lease suite 217, we next consider whether fact issues remain precluding summary judgment for HFC. Stovall argues HFC failed to establish its entitlement to judgment as a matter of law on its claim for unpaid rent because "genuine issues of material fact still existed on several issues." Stovall first contends that the affidavit testimony of Barnes and Liegman that alleged oral agreements entered into by a Stovall employee raises a fact issue because Stovall disputes that any oral agreement to pay additional rent took place. Stovall further maintains there is a fact issue on "the purpose and origin of the increased payments" by Stovall to HFC in May, June, and July of 2010. It claims that although Barnes stated the increased payment was to pay rent on the additional suites, Stovall argues that its "pleadings [alleged] that these increased payments were intended to satisfy a security deposit."

The affidavits and other evidence HFC submitted as summary-judgment evidence provided relevant factual details underlying each element of its claim. Barnes and Liegman testified to the executed lease agreement and identified each suite added to Stovall's leased premises, including the dates when Stovall took possession of each additional suite, the rent due for each suite based on the price per square footage, and the duration of the agreements. Liegman testified to Stovall's agreement to lease and pay rent as it took possession of the suites, Stovall's failure to pay the rent due, and the amount of money owed in unpaid rent. Similarly, Lamkin testified to a period of unpaid rent and the amount. The e-mail communications identified Kay Wilbanks as the Stovall representative who requested the additional suites, and the letters of intent signed by Kimberly Stovall (or her representative) show the terms Stovall sought to lease certain suites. Thus, HFC established a series of oral agreements to lease the seven additional suites, Stovall took possession of the suites and occupied the suites until August 2010, Stovall breached the agreements by failing to pay rent on the additional suites, and HFC suffered damages as a result of the nonpayment.

To defeat HFC's claim for unpaid rent on a traditional motion for summary judgment, Stovall had the burden to come forward with evidence to negate an element of the HFC's claim. *See Ohio Cas. Ins. Co.,* 244 S.W.3d at 888. In its response to HFC's motion and amended motion, however, Stovall did not file any controverting evidence. Instead, it responded by filing objections to HFC's summary-judgment evidence, which were overruled. And in this Court, Stovall does not direct our attention to any summary-judgment evidence to support its contention that any oral agreements to pay additional rent did not take place or the purpose and origin of the increased payments in May, June, and July 2010. On the latter contention, it merely cites "CR xx."

In its reply brief, Stovall argues there are "fact issues as to whether Stovall agreed to lease or to pay rent for the office suites for which there were no written leases" because the affidavits of Barnes, Liegman, and Lamkin do not meet the requirements for affidavits from interested witnesses. Stovall clarifies that the point of its argument "is not that these affidavits were not admissible, but only that they failed to establish conclusively that Stovall agreed to lease or to pay rent for the additional suites."

**\*803** [17] The rules of appellate procedure provide that an appellant "may file a reply brief addressing any matter in the appellee's brief." TEX.R.APP. P. 38.3. But an issue raised for the first time in a reply brief is ordinarily waived and may not be considered by this Court. *See Collin Cnty. v. Hixon Family P'ship, Ltd.,* 365 S.W.3d 860, 877–78 (Tex.App.-Dallas 2012, pet. denied); *Dallas Cnty. v. Gonzales,* 183 S.W.3d 94, 104 (Tex.App.-Dallas 2006, pet. denied).

Stovall nevertheless contends this argument is a subsidiary issue covered under its general assertion that "genuine issues of material fact still existed on several issues." (citing TEX.R.APP. P. 38.1(f)). It asserts that this argument "raises this Court's authority and obligation to scrutinize the summary judgment evidence to determine whether [HFC] conclusively established its entitlement to judgment as a matter of law." Counsel for Stovall also stated at oral argument that this issue was embraced in the contention raised in Stovall's opening brief that the trial court erred when it relied on inadmissible affidavits.

Although related to Stovall's challenge of the trial court's grant of summary judgment, the argument Stovall raises in the reply brief is wholly different from arguments raised in its opening brief, in which Stovall only challenged the summary-judgment evidence on hearsay grounds and asserted issues of fact remained "even if" the affidavits are admissible. Stovall's opening brief does not

even mention the interested-witness ground—an objection it raised in the trial court—much less make any arguments that the affidavits raise fact issues because they are from interested witnesses. That Stovall could have but did not make such an argument in its opening brief does not allow it to do so for the first time in its reply brief. *See López v. Montemayor,* 131 S.W.3d 54, 61 (Tex.App.-San Antonio 2003, pet. denied) ("A reply brief is not intended to allow an appellant to raise new issues."). This argument is not properly before us.

After reviewing the summary-judgment record, we conclude HFC met its summary-judgment burden showing it was entitled to summary judgment as a matter of law on its claim for unpaid rent and that no genuine issues of material fact exist as to the elements of HFC's breach of contract claim. TEX.R. CIV. P. 166a(c). We overrule Stovall's first issue.

### Trial Court's Award of Attorney's Fees to HFC

[18] In its second issue, Stovall contends the trial court erred in awarding "unreasonable" attorney's fees to HFC because no enforceable contract existed upon which HFC could sue for breach. We generally review a trial court's decision to award attorney's fees for an abuse of discretion. *Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998).

[19] [20] [21] Section 38.001 of the Texas Civil Practice and Remedies Code permits the recovery of reasonable attorney's fees in a suit on an oral or written contract. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (West 2008). To recover attorney's fees in a suit based on a contract, a party must prevail on the cause of action and recover damages. *Ochoa v. Craig,* 262 S.W.3d 29, 33 (Tex.App.-Dallas 2008, pet. denied). While the trial court has the discretion to set the amount of an attorney's fees, it has no discretion to deny the fees if they are proper under section 38.001. *Smith v. Patrick W.Y. Tam Trust,* 296 S.W.3d 545, 547 (Tex.2009); *RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.,* 348 S.W.3d 444, 452 (Tex.App.-Dallas 2011, no pet.); **\*804** *Hassell Constr. Co. v. Stature Commercial Co.,* 162 S.W.3d 664, 668 (Tex.App.-Houston [14th Dist.] 2005, no pet.). It is presumed that usual and customary attorney's fees are reasonable, but this presumption may be rebutted. *Hassell Constr. Co.,* 162 S.W.3d at 668.

[22] By rendering summary judgment in favor of HFC, the trial court rejected Stovall's statute-of-frauds defense and determined that in addition to the signed lease, there were oral agreements to lease the additional suites. HFC was awarded unpaid rent in the amount of $25,136.83 for Stovall's breach of those agreements. Because HFC prevailed on its claim for unpaid rent, the trial court did not err in awarding attorney's fees for breach of contract. *See Ochoa,* 262 S.W.3d at 33.

The issue of the amount of attorney's fees was tried to the bench. HFC's attorney submitted his resume, the September 14, 2010 presentment letter to Stovall, and the billing records for the representation. He sought $38,250 in fees through trial and testified the fees sought were reasonable based on the time and labor involved, the skill required, the customary fee charged, the amount involved and the results, and his experience, reputation, and ability. Stovall did not cross-examine HFC's attorney; rather, it objected that there was no basis for attorney's fees because "there ha[d] been no contract proven." The trial court reduced HFC's request "slightly" and awarded $35,000 in attorney's fees through trial plus amounts if HFC prevailed on appeal. The trial court acknowledged that it was "awfully loath" to award attorney's fees in excess of the actual damages, but it stated, "the record in this matter overall will reflect that it was seriously contested, [and] that there was a certain amount of dilatory and obstructive behavior on the part of [Stovall]."

Without citation to any authority, Stovall argues the award of attorney's fees, which was "in excess of the actual judgment is not customary or reasonable for a breach of contract case." We disagree, and after reviewing the record, we conclude the trial court did not abuse its discretion in awarding $35,000 in attorney's fees to HFC. We overrule Stovall's second issue.

Based on our resolution of Stovall's issues, we affirm the trial court's judgment.

### All Citations

409 S.W.3d 790

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.